**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

Friedrichs Harris, Administrator of the
Estate of Evan M. Harris, deceased,

      Plaintiff,

v.

Q & A Associates, Inc.
Angela Shockley, Individually,
Keith Bishop, Individually,
Matthew Shockley, Individually,
Sandy Schmiedeknecht, Individually, and,
Tammy Robbins, Individually,

      Defendants.

> ELECTRONICALLY
> FILED
> **Jun 10 2016**
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. ___2:16-CV-46__ (Bailey)

## COMPLAINT FOR DAMAGES

      NOW COMES PLAINTIFF, Friedrichs Harris, as Administrator of the Estate of Evan

M. Harris and its beneficiaries who for their Complaint against Defendants state as follows:

**INTRODUCTION OF THE PARTIES:**

    1.    Evan M. Harris was born on May 25, 1992 in New Orleans, Louisiana.

    2.    Evan M. Harris is the son of Friedrichs Harris, M.D. and Kathleen Stull Harris.

    3.    Friedrichs Harris and Kathleen Stull Harris are the beneficiaries of the Estate

        of Evan M. Harris.

    4.    Friedrichs Harris and Kathleen Stull Harris are residents of the State of

        Louisiana.

    5.    On the 9th day of March 2016, Friedrichs Harris qualified as the

        Administrator of the Estate of Evan M. Harris. A copy of the Administration

        letter is attached hereto as Exhibit A.

6.      Q & A Associates, Inc. is a West Virginia corporation with its principal place

of business in Davis, West Virginia, which is within the Northern District of

West Virginia.

7.      Upon information and belief, Angela Shockley is a resident of Davis, West

Virginia and is an officer at Q & A Associates, Inc., which is within the

Northern District of West Virginia.

8.      Upon information and belief, Keith Bishop is a resident of Davis, West

Virginia and is an officer at Q & A Associates, Inc., which is within the

Northern District of West Virginia.

9.      Upon information and belief, Matthew Shockley is a resident of Davis, West

Virginia and is an officer at Q & A Associates, Inc., which is within the

Northern District of West Virginia.

10.     Upon information and belief, Sandy Schmiedeknecht is a resident of Davis,

West Virginia and is an officer at Q & A Associates, Inc., which is within the

Northern District of West Virginia.

11.     Upon information and belief, Tammy Robbins, is a resident of Davis, West

Virginia, which is within the Northern District of West Virginia.

**JURISDICTION AND VENUE:**

12.     Jurisdiction of this Court is invoked pursuant to: (a) 28 U.S.C. § 1332(a), (b),

(c); and (d).

13.     The amount in controversy exceeds the sum of Seventy-Five Thousand

Dollars ($75,000.00).

14.   Venue is appropriate in this Court pursuant to the provisions of 28 U.S.C. § 1391(a), (b) and (c).

BACKGROUND INFORMATION:

15.   Q & A Associates, Inc. was established as a for-profit facility in the troubled teen industry by some of the individual Defendants. In addition to troubled teens, Defendants claim to be able to assist young adults who need assistance due to intellectual or emotional immaturity.

16.   Due to Evan M. Harris's cognitive abilities, he was operating at a level of a young teen, despite his age, which was well-known by the officers and employees of Q & A Associates, Inc. prior to his admission into the program.

17.   The troubled teen and young adult industry is a multi-billion-dollar industry in the United States.

18.   The troubled teen and young adult industry is largely unregulated and highly deceptive in the types and quality of programs and services that are being offered to its participants.

19.   Angela Shockley, as President of Q & A Associates, Inc., announced on November 30, 2010 that she was opening a facility in Davis, West Virginia, which purportedly provides services to troubled teens and young adults.

20.   In the announcement, Angela Shockley stated that she has worked in the industry for many years as the Director of Alldredge Academy and as a Regional Director at Eckerd Youth Alternatives, where she was responsible for the development of the Private Programming Division.

3

21.    Alldredge Academy was also located in Tucker County, West Virginia. Defendant Shockley was aware that at least one death by suicide had been reported at that facility and was aware that the young man who killed himself had asked his counselor to take away his knife before he hurt himself again.

22.    Angela Shockley, Keith Bishop and others on the management team at Q & A Associates, Inc. had previously worked at other facilities where troubled teens had died by suicide and others were abused by staff and other residents within the facility.

23.    Defendants were all uniquely aware of the problems associated with the types of programs they were offering and that suicides at these types of facilities were not uncommon.

24.    Defendants, their employees and their colleagues travel around the country falsely representing the quality of their programs, the training of their staff, and the alleged success they have to parents, educators and others so as to convince parents to enroll their kids, teens and young adults in these programs.

25.    Q & A Associates, Inc.'s officers, employees staff and colleagues falsely represent the effectiveness of the programs offered to the parents of troubled teens and young adults for profit, claiming that they can take a troubled teen or young adult and mold them into a productive member of society through leadership, education, training and supervision.

26.    Q & A Associates, Inc. is not a healthcare facility, nor is it licensed to provide medical care of any kind.

27.    Q & A Associates, Inc. is not a mental health facility, nor is it licensed to provide mental healthcare services of any kind.

28.    Q & A Associates, Inc. is not licensed by any entity of the state or federal government.

29.    Q & A Associates, Inc. has structured itself to avoid being regulated in the State of West Virginia, much like others in the troubled teen and young adult industry.

30.    In reality, the troubled teen industry is itself troubled because of the lack of regulations of entities like Q & A Associates, Inc. The Government Accounting Office's (GAO) investigation into the troubled teen industry found thousands of cases of abuse and at least 10 deaths between 1990 and 2004.

31.    Congress proposed a bill to regulate these facilities in 2007. After that bill died in committee, they proposed it again the next year. It died again in 2011, and again in 2013 all because of the lobbyists fighting on behalf of the troubled teen industry have quashed it in order to protect their financial interests.

32.    There was a second effort to regulate these facilities by the introduction of a bill in Congress called "Stop Child Abuse in Residential Programs for Teens Act of 2015".

33.    Those same industry lobbyists have stymied the passage of this bill as well.

34.   The interests of teens and young adults placed in these facilities have gone
      unnoticed and are clearly unimportant to the providers in the troubled teen
      and young adult industry.

35.   Studies of the effectiveness of these programs document that the troubled
      teen industry has created lots of problems for its participants, while keeping
      that information from the public and parents of troubled teens and young
      adults.

36.   In November of 2015, Q & A Associates, Inc. offered three programs,
      Applewood Transitions, The Journey WV and Cabin Mountain Living to
      persons like Evan M. Harris.

37.   Prior to his participation in the program, Q & A Associates, Inc.'s personnel
      required Evan M. Harris to undergo a complete psychological evaluation,
      which revealed a myriad of emotional and psychological needs that Evan M.
      Harris required be met for his success in any program.

38.   The psychological evaluation provided a listing of medications and why Evan
      M. Harris was prescribed them.

39.   The author of the psychological evaluation made it very clear that Evan M.
      Harris required consistent efforts to take his medications.

40.   The author of the psychological evaluation made it clear that Evan M. Harris
      needed to take his medications as prescribed.

41.   The psychological evaluation revealed a number of medical conditions and
      psychiatric disorders that Evan M. Harris was dealing with and had been for
      years.

42.   The psychological evaluation revealed that Evan M. Harris was intellectually limited, impulsive and he had a troubled past which required him to be closely monitored, supervised, and encouraged in order to progress.

43.   The psychological evaluation detailed previous self-injurious behaviors and suicidal statements when Evan M. Harris was not coping well.

44.   The psychological evaluation stated that Evan M. Harris had been dealing with substance and addiction issues that needed to be addressed during his participation in the program.

45.   The psychological evaluation detailed the requirement that Evan M. Harris be closely followed by a psychiatrist.

46.   The psychological evaluation was provided to personnel of Q & A Associates, Inc. whose staff promptly reported that Evan M. Harris was accepted into the program.

47.   Evan M. Harris was enrolled as a participant in Q & A Associates, Inc.'s program called The Journey WV. According to the information provided by its website and its advertisements, The Journey WV program provides:

> Our clients often struggle with recurring issues from adolescence, causing difficulties in transitioning effectively to independence. Many of our clients have participated in numerous forms of therapy, but have struggled translating what they have learned to real life. Supported and guided by Certified Life Coaches and mentors, clients are presented with real life situations on a daily basis. This provides opportunities for them to have genuine experiences rather than contrived outcomes...All of our clients are engaged in some level of academic, vocational or training program. Some of our clients have not been able to complete high school due to extenuating circumstances, so we offer the opportunity to complete a high school diploma through National High School, which requires a combination of online and book/paper work. We provide

7

individual tutoring as needed. We also work with Eastern WV Technical and Community College where our clients can take college level courses in a variety of vocational areas or take entry-level core courses as they prepare to attend a four-year college or university. Some of our clients complete online courses in an Ed-To-Go program, which provides a certificate of completion. Our clients are permitted to take a Certified Nurse Assistant (CNA) course through our local assisted living program. We also work with local professionals to provide apprenticeship opportunities as appropriate. These areas can include electrician, farrier, construction, cable TV, phone, Internet line work, and mechanic.

48. Educational consultants recommending facilities such as those operated by Q & A Associates, Inc. are often paid recruiting or placement fees for sending these teens and young adults to their facilities, without the knowledge of the parents.

49. Evan M. Harris's parents learned about Q & A Associates, Inc. from an educational consultant in Atlanta, Georgia.

50. These Defendants, including Tammy Robbins, falsely represented that they could offer all of the services that Evan M. Harris needed.

51. When the officers of the corporation and members of the staff were questioned by Evan M. Harris's parents about meeting the special and specific needs of their son, as detailed in the psychological evaluation, each promised that the staff were fully trained and capable of meeting those needs and that they would take excellent care of their son.

52. Most importantly, the officers and staff members of Q & A Associates, Inc. assured Friedrichs Harris and Kathleen Harris that their son would be safe.

53. On November 19, 2015, Evan M. Harris came to Davis, West Virginia to participate in The Journey WV program.

8

54.    According to the program materials, he was to be engaged in some level of academic, vocational or training program.

55.    While at Q & A Associates, Inc., Evan M. Harris was never engaged in any academic, vocational or training program of any kind.

56.    Instead of academic, vocational or training program participation, as advertised, Evan M. Harris was made to wash dishes at The Deerfield Inn Restaurant, which is owned by Matthew Shockley and Angela Shockley, as well as dishwashing at a coffee shop called The Nook, as other participants in the program were required to do.

57.    When Evan M. Harris's parents questioned their son's working at The Deerfield Inn, they were told that he needed to have a job and that was what was available to him.

58.    Instead of meeting the psychological needs of Evan M. Harris, as outlined in the psychological evaluation, officers and staff members watched Evan M. Harris deteriorate physically and emotionally, while assuring his parents that Evan M. Harris was "doing great".

59.    As is documented by the records maintained by Q & A Associates, Inc., early on in the program, Evan M. Harris was expressing a desire to leave the facility and return home or to a previous program he had attended.

60.    On December 3, 2015, Evan M. Harris packed up his belongings and left the facility, only to be found and quickly returned to the facility, and which was not immediately reported to Evan's parents.

61.   As early as December 24, 2015, Keith Bishop was receiving reports that Evan
      M. Harris was cutting his arm and was expressing suicidal ideations over a
      breakup with a female participant in the program, which went unreported to
      Evan's parents.

62.   On January 2, 2016, according to Q & A Associates, Inc.'s own records, its staff
      members were told that Evan M. Harris was regularly purging, which was not
      reported to Evan's parents.

63.   Purging would limit the absorption of his medications and was indicative of
      underlying disorders that Q & A Associates, Inc. staff members were ignoring.

64.   On December 26, 2015, according to Q & A Associates, Inc.'s own records,
      Evan M. Harris was distraught about a breakup with another participant at
      the program with whom he had a romantic relationship. Evan M. Harris
      informed Q & A Associates, Inc.'s staff that after a previous breakup he "was
      very distraught, and mentioned a series of suicidal ideations and attempts."

65.   On January 12, 2016, Evan M. Harris borrowed money from Sandy
      Schmiedeknecht to buy cigarettes. He left the store and walked to the bank
      where he withdrew money and used it to purchase a bottle of Jack Daniels
      whisky. Instead of alerting Evan's parents of this behavior, it went
      unreported until the regularly scheduled parent conference on January 14,
      2016.

66.   On January 14, 2016, Angela Shockley was supposedly going to the farm to
      speak with Evan M. Harris, but they were unable to locate him and had to
      conduct a search to find him. When she found him, Angela Shockley

wrongfully told Evan M. Harris that he would not be able to return to Waterfall Canyon, an independent living program where he had previously experienced some success and where he wanted to return.  Angela Shockley had no basis to make this statement to Evan M. Harris, and the statement was untrue. By making this statement, Angela Shockley took away any hope that Evan M. Harris had for a better life and a return to  Waterfall Canyon. According to Angela Shockley's own notes, Evan M. Harris told her that his only option was to be homeless on the camps road.  These events were not reported to Evan M. Harris's parents.

67.    On January 15, 2016, Evan M. Harris again left the facility. He was found walking along Cortland Road in Tucker County by Angela Shockley after he had again gone missing, which was not reported to Evan M. Harris's parents.

68.    On January 23, 2016, Evan M. Harris expressed a strong desire to drink alcohol and was provided counseling by Mark Shockley about addiction and he offered to take him to AA meetings.

69.    As early as December 14, 2015, and continuing until his death, as documented in Q & A Associates, Inc.'s own records, Evan M. Harris was not taking his medications as prescribed, which was not reported to Evan M. Harris's parents or his treating psychiatrist.

70.    The psychological report required by Q & A Associates, Inc. made it clear that taking his medications was critical for Evan M. Harris and his mental stability.

71.   Instead of regularly reporting the continuing deterioration of Evan M.
      Harris's condition to his parents, Q & A Associates, Inc.'s officers and
      employees began a systematic effort to limit his communications with them.

72.   As is documented in the corporate records of Q & A Associates, Inc., members
      of the management team and the staff encouraged Friedrichs Harris and
      Kathleen Harris to limit or end communications with their son early on in the
      program.

73.   When Evan M. Harris's communications with his parents did not end, as is
      documented in the corporate records of Q & A Associates, Inc., the "seed" was
      planted in the mind of his parents to discontinue the cellphone service that
      Evan M. Harris had so that communications with his parents would be
      limited to the one call per week, which members of the staff at Q & A
      Associates, Inc. closely monitored and participated.

74.   Initially, Evan M. Harris's mother Kathleen Harris resisted the efforts of Q & A
      Associate, Inc.'s staff to turn off her son's cellphone, but she was told that the
      cellphone was interfering with his progress and that she was merely enabling
      her son's refusal to become an adult and to be self-sufficient.

75.   In an effort to resist cutting off communication with her son, Kathleen Harris
      told members of the staff that it was a difficult process to discontinue the
      cellphone service, which is clearly documented in the corporate records
      relating to Evan M. Harris's participation in the program.

76.   After more coaxing and finally a demand from Q & A Associates, Inc.'s staff,
      Kathleen Harris discontinued her son's cellphone service.

77.   As is documented in the corporate records relating to Evan M. Harris's participation in the program, Evan M. Harris's condition was deteriorating.

78.   The records demonstrate that Evan M. Harris was not taking his medications that he needed to treat his bipolar disorder and other medical conditions, which went unreported to Evan M. Harris's parents. He was engaging in destructive behavior, including purging, cutting and substance abuse.

79.   On the days leading up to Evan M. Harris's suicide, Q & A Associates, Inc.'s officers and staff were aware of his deteriorating condition, addiction issues, his impulsivity, and Q & A Associates, Inc.'s own notes reflect that Evan M. Harris refused to do his chores and refused to eat meals with his housemates.

80.   On December 21, 2015, John Doe, another participant in the program and a housemate of Evan M. Harris, died from hanging himself in the barn on Q & A Associates, Inc.'s premises. (His name is not being used in order to protect his identity and to protect his family's desire for privacy and from unwanted publicity associated with the public nature of legal proceedings and their ready access by others on the internet.)

81.   Despite the fact that Evan M. Harris and the other participants in Q & A Associates, Inc.'s programs knew that John Doe had committed suicide by hanging in the barn, Q & A Associates, Inc. made no effort to restrict other troubled residents' access to the suicide scene after that death, which was never reported to Evan M. Harris's parents.

82.   On the day of Evan M. Harris' suicide, according to Q & A Associates, Inc.'s own records, its staff knew that Evan M. Harris went to that same barn

13

multiple times, even though there was no valid reason why he would be in that barn. In addition, Q & A Associates, Inc.'s staff knew that Evan M. Harris was engaging in risky behavior in that same barn insofar as they knew he was smoking in that barn, and Q & A Associates, Inc. did nothing to restrict Evan M. Harris from engaging in that behavior at the suicide scene or returning to the suicide scene alone on that day.

83.    John Doe had been missing from the community house in which he stayed before anyone had noticed he was missing. When another program participant went looking for him, he was found hanging in the barn.

84.    Evan M. Harris and other program participants knew that John Doe had committed suicide by hanging in the barn, but Q & A Associates, Inc., and Tammy Robbins told Kathleen Harris that John Doe's death was a tragic accident, and that additional details could not be revealed out of concern for the privacy rights of the parents of the deceased.

85.    While the privacy rights of the parents were a legitimate concern, the nature of John Doe's death was a matter of public record, which Defendants chose to keep from parents of other participants in the program, even though the program participants like Evan M. Harris knew that John Doe had committed suicide.

86.    Based on Q & A Associates, Inc. and Tammy Robbins' false representations to Kathleen Harris that John Doe's death was an accident, Q & A Associates, Inc.'s officers and employees misrepresented to Friedrichs and Kathleen Harris the danger to their son.

14

87. In a Charleston Gazette article about the death, Angela Shockley is quoted as saying: "In the wake of the first death, Shockley said, Q & A Associates, Inc. did not plan to increase monitoring of clients, and she said she was not worried about another death occurring."

88. Angela Shockley's statement to the media about the first death was false. Defendants knew from their prior experiences with suicides and deaths at these types of facilities that deaths of participants posed a particularly delicate and potentially deadly effect on the remaining program participants, but fraudulently withheld such information from them and the public.

89. Because there were no efforts made by Defendants to assist the other program participants in coping with the death of John Doe, a second death occurred on January 24, 2016 when Evan M. Harris was found hanging in the same barn.

90. Evan M. Harris had been exhibiting self-injurious behaviors, impulsive behaviors, and other serious emotional issues that went unreported to Friedrichs and Kathleen Harris.

91. Evan M. Harris had also been missing from the program before he was found hanging in the barn.

92. Evan M. Harris's death was ruled a suicide by the coroner responsible for the investigation.

93. Evan M. Harris's death was entirely foreseeable to Defendants who willfully, wantonly and recklessly disregarded the warning signs that his death by suicide was about to occur.

94.   Evan M. Harris's pleas for help in the weeks and days leading up to his death, including his refusal to take his medicines on the day in question, went ignored by Defendants and its employees and unreported to Evan M. Harris's parents and his psychiatrist.

**COUNT ONE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

95.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

96.   Q & A Associates, Inc. offers residential programs through advertisements, at trade shows, and by direct marketing to parents of troubled teens and young adults.

97.   Despite the actual knowledge that these programs are generally harmful to their participants, Q & A Associates, Inc.'s officers and employees actually recruited Evan M. Harris to participate in their program once they learned that Evan Harris's parents had expressed some interest.

98.   Once in the program, Defendants systematically limited contact between Evan M. Harris and his parents on a growing basis.

99.   Shortly into the program, Defendants told Friedrichs Harris and Kathleen Harris that they needed to quit taking phone calls from their son, Evan M. Harris, claiming that the calls were disrupting the services they were providing to their son.

100.   Defendants convinced Evan M. Harris's parents that he was not going to succeed in the program if they continued to have contact with him.

101.   Not long after they were told to quit taking phone calls from their son, Evan M. Harris, the parents were informed that they needed to turn off the cell phone that Evan M. Harris had with him in Davis, West Virginia, under the guise that it was disrupting the services they were providing to their son.

102.   Not wanting to turn off his phone and thus eliminate her ability to communicate with him, Kathleen Harris initially resisted the Defendants' insistence that she turn off his cellphone, but later gave into the pressure because of the Defendants' and their statements that the phone service was disrupting the services they were providing and impeding their son's progress.

103.   After discontinuing Evan M. Harris's cellphone service, the only method Evan had to communicate with his parents was by telephone calls limited to once a week, which were carefully monitored by Defendants and their staff.

104.   Since the death of Evan M. Harris, Friedrichs Harris and Kathleen Harris have learned some very valuable information;

   a.   That Defendants were making certain that Evan M. Harris was isolated and his ability to communicate that to his parents was restricted so that they would not learn that their son was in danger of harming himself;

   b.   That Defendants were making certain that Evan M. Harris did not tell his parents that he had harmed himself;

   c.   That Defendants refused to advise Evan M. Harris's parents of his overwhelming desire to leave the program;

    d. That Defendants were making certain that Evan M. Harris could not communicate his concerns with his parents about the program;

    e. That Defendants were making certain that Evan M. Harris could not communicate his concerns that they were not addressing his medical and emotional needs; and,

    f. That Defendants were preventing Evan M. Harris from telling his parents that his condition was deteriorating during his stay in The WV Journey program.

105. Since the death of Evan M. Harris, Friedrichs Harris and Kathleen Harris have learned that Defendants were hiding Evan M. Harris's condition from them so they did not come to West Virginia and take him home, including his expressed desire to harm himself, his actual harm to himself, his refusals to take his medications, and his new destructive purging behavior.

106. When Kathleen Harris became concerned about her son and traveled to West Virginia, her visit was cut short because Defendants encouraged her to leave and to "stop enabling" her son Evan M. Harris's bad behavior.

107. While in West Virginia, Tammy Robbins falsely reported Evan M. Harris's condition to his mother Kathleen Harris.

108. The visit with Evan M. Harris was cut short by Defendants so that Kathleen Harris would not take her son home.

109. Within days, Evan M. Harris hanged himself despite the fact that he was supposed to be under the supervision of Defendants and their staff members at all times.

110.    On January 24, 2016, Defendants failed to properly supervise Evan M. Harris and he was found hanging from a rope in the barn.

111.    Since his death, it has been learned that Evan M. Harris had left the facility on a number of occasions, which was not reported to his parents.

112.    Since his death, it has been reported that Evan M. Harris had reported that he was experiencing suicidal ideations, which were not reported to his parents.

113.    The conduct of Q & A Associates, Inc. by its officers and employees, as hereinabove described, was extreme, outrageous, and exceeded all bounds of decency in a civilized society.

114.    Q & A Associates, Inc. by its officers and employees acted intentionally and/or recklessly in contributing to the death of Evan M. Harris, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death, along with other deaths that its officers and employees had knowledge of prior to Evan M. Harris's death.

115.    As a direct result of Q & A Associates, Inc. by its officers and employees' outrageous conduct, the beneficiaries of the Estate of Evan M. Harris suffered emotional distress, which distress was so severe that no reasonable person could have been expected to endure it in a civilized society.

**COUNT TWO: NEGLIGENCE IN PERFORMING ASSESSMENTS ON EVAN M. HARRIS:**

116.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

117.   This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

118.   Defendants did not perform any formal assessments on Evan M. Harris to determine if he was a proper candidate for their programs prior to his arrival.

119.   Following his arrival, Defendants did not perform any formal assessments of Evan M. Harris to determine if he was a proper candidate for their programs.

120.   As a result of their failures to properly assess Evan M. Harris, Defendants' staff was largely unaware of any psychological history associated with Evan M. Harris or his propensities for self-harm or injury, despite the psychological report that was provided to Q & A Associates, Inc. and its officers and employees prior to his arrival.

121.   As a direct and proximate result of the negligence of Defendants, Evan M. Harris is deceased, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death and his deteriorating condition, as documented in the records of Q & A Associates, Inc.

**COUNT THREE: NEGLIGENT SUPERVISION OF PROGRAM PARTICIPANTS:**

122.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

123.   This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

124.   Defendants did not properly supervise Evan M. Harris as was represented to his parents they would.

125.   Defendants did not follow the recommendations from the psychological evaluation that they insisted be performed prior to his admission with regards to his need for supervision or the level of that supervision.

126.   As a result of their failures to properly supervise Evan M. Harris, he is deceased, which was entirely foreseeable in light of the earlier death of John Doe the month before Evan M. Harris's death; Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants' actual knowledge about similar deaths in the industry; and because of Evan M. Harris's deteriorating condition during his participation in the program.

**COUNT FOUR: NEGLIGENT HIRING OF STAFF:**

127.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

128.  This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

129.  Defendants failed to properly screen their staff members prior to their hiring.

130.  Because the industry is unregulated in the State of West Virginia, there was no requirement that the staff have background checks done prior to their employment.

131.  Advocates in the industry stress the need for staff screening prior to employment.

132.  Defendants failed to conduct background checks or other basic informational checks to determine the fitness of their applicants for employment.

133.  Defendants failed to hire staff members who were capable of assisting program participants like Evan M. Harris, even though they specifically advertise that they are completely able to assist him and others like him.

134.  Defendants failed to hire staff members who were capable of determining that Evan M. Harris was deteriorating.

135.  Because of the negligent hiring of staff members Evan M. Harris hanged himself on January 24, 2016.

136.  As a result of Defendants' negligent hiring of staff members, Evan M. Harris is deceased, which was entirely foreseeable in light of John Doe's death the month before Evan M. Harris's death: Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants'

actual knowledge about deaths within the industry; and Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

**COUNT FIVE: NEGLIGENT TRAINING OF STAFF:**

137.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

138.   This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

139.   Defendants did not properly train their staff because of the costs associated with such training.

140.   Advocates in the industry recommend training staff members to protect program participants.

141.   Defendants did not properly train their staff to recognize that program participants, like Evan M. Harris, may be suicidal or have other needs that were not being addressed by the programs in which they were participants.

142.   Because of the lack of training that their staff members received, John Doe was permitted to hang himself in the barn in December of 2015.

143.   After the first incident occurred resulting in the death of John Doe, the staff were not trained to deal with the emotional disturbance caused by his death upon the other program participants like Evan M. Harris.

144.   Defendants failed to make certain that staff members were capable of providing services to the program participants to address the needs created by the death of John Doe.

145.   Evan M. Harris also hanged himself in the same barn as John Doe because the staff did not recognize his needs or his deteriorating condition because they were not adequately trained.

146.   As a result of Defendants' negligent hiring of staff members, Evan M. Harris is deceased, which was entirely foreseeable in light of John Doe's death the month before Evan M. Harris's death; Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants' actual knowledge about deaths within the industry; and Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

**COUNT SIX: NEGLIGENT STAFFING LEVELS:**

147.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

148.   This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

149.   Advocates in the industry advise entities like Q & A Associates, Inc. to have sufficient staff for the protection of program participants.

150.   Defendants recognize the costs associated with staffing of their facilities and made a conscious decision to keep those costs to a minimum.

151.   Because of the costs involved, Defendants did not properly staff their
       programs to assist their participants like Evan M. Harris.

152.   As a result of Defendants' failures to properly staff their programs, Evan M.
       Harris is deceased, which was entirely foreseeable in light of an earlier death
       the month before Evan M. Harris's death; Defendants' actual knowledge of
       other deaths at other facilities where they had worked previously;
       Defendants' actual knowledge about deaths within the industry; and
       Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

**COUNT SEVEN: NEGLIGENT PROGRAM DESIGN:**

153.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does
       hereby restate all allegations contained in this Complaint in this paragraph as
       if the same were reprinted herein.

154.   This is an action whereby Friedrichs Harris and the beneficiaries of the
       Estate of Evan M. Harris seek to recover damages from the Defendants for
       their negligence in causing the death of Evan M. Harris and Defendants actual
       knowledge of other deaths at other facilities where they had worked
       previously and about deaths within the industry.

155.   Defendants required Evan M. Harris to have a psychological evaluation prior
       to his admission in the program, which advocates in the industry support.

156.   The purpose for having these evaluations completed prior to a participant's
       arrival is so that prudent program designers would tailor their programs to
       meet the needs of the participants.

157.  Defendants negligently designed their programs to assist participants like Evan M. Harris.

158.  As a result of Defendants' failures to design and implement a proper program for Evan M. Harris, he is deceased, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death; Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants actual knowledge about deaths within the industry; and, Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

**COUNT EIGHT: NEGLIGENT PROGRAM ASSESSMENTS:**

159.  Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

160.  This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

161.  Reasonably prudent program designers for participants like Evan M. Harris would perform proper assessments of those programs to ensure that the programs were tailored to assist those participants, especially in light of the psychological evaluation that Defendants required for him.

162.  Advocates in the industry have long pressed entities like Q & A Associates, Inc. to conduct proper assessments of their programs.

163.    In fact, Q and A Associates, Inc. had begun efforts to assess the effectiveness of their programs in an effort to become certified by industry trade groups.

164.    There are costs associated with performing program assessments, which Defendants recognized and chose not to perform earlier and thereby prevent the death of Evan M. Harris.

165.    Defendants did not conduct program assessments to determine if they were effective for persons like Evan M. Harris, prior to their decision to offer these programs to his parents in light of the psychological evaluation performed on their son.

166.    As a result of Defendants' failures to properly conduct program assessments, Evan M. Harris is deceased, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death; Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants' actual knowledge about deaths within the industry; and Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

## COUNT NINE: NEGLIGENT MISREPRESENTATIONS OF FACT:

167.    Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

168.    This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from the Defendants for their negligence in causing the death of Evan M. Harris.

169. Defendants negligently misrepresented the following to Evan M. Harris's parents:

   a. That they would perform assessments on their son to determine his progress and they would be shared with them on a regular basis;

   b. That their son was being properly supervised twenty-four hours a day and seven days a week;

   c. That they properly screened their staff members prior to hiring;

   d. That they had properly trained staff to assist their son;

   e. That they had sufficient staff to ensure their son's progress;

   f. That they had sufficient staff to ensure their son's safety;

   g. That they had properly designed programs to meet their son's needs; and,

   h. That they regularly performed assessments of the programs to determine their effectiveness.

170. Defendants were aware of other deaths at other facilities where they had worked prior to the creation of Q & A Associates, Inc. due to the ineffective nature of the programs, which they negligently failed to share with Evan M. Harris's parents prior to his participation in their programs.

171. Evan M. Harris's parents had a right to know the information that was being represented to them was not true prior to their son's participation in the program.

172. As a result of Defendants' negligent misrepresentations, Evan M. Harris is deceased, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death; Defendants' actual knowledge of other

deaths at other facilities where they had worked previously; Defendants'
actual knowledge about deaths within the industry; and, Defendants' actual
knowledge of Evan M. Harris's deteriorating condition.

## COUNT TEN: INTENTIONAL MISREPRESENTATIONS OF FACT:

173.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does
hereby restate all allegations contained in this Complaint in this paragraph as
if the same were reprinted herein.

174.   This is an action whereby Friedrichs Harris and the beneficiaries of the
Estate of Evan M. Harris seek to recover damages from the Defendants for
their intentional misrepresentations in causing the death of Evan M. Harris.

175.   Defendants intentionally misrepresented the following to Evan M. Harris's
parents:

   a.   That they would perform assessments on their son to determine his
        progress and they would be shared with them on a regular basis;

   b.   That their son was being properly supervised twenty-four hours a day
        and seven days a week;

   c.   That they properly screened their staff members prior to hiring;

   d.   That they had properly trained staff to assist their son;

   e.   That they had sufficient staff to ensure their son's progress;

   f.   That they had sufficient staff to ensure their son's safety;

   g.   That they had properly designed programs to meet their son's needs; and,

   h.   That they regularly performed assessments of the programs to determine
        their effectiveness.

176.   Defendants were aware of the statistics which demonstrate these programs are ineffective and harmful to teens and young adults but intentionally misrepresented the effectiveness of their program to Evan M. Harris's parents.

177.   When one of the participants died in December of 2015, Defendants' intentionally misrepresented to the parents of Evan M. Harris the nature of the death so that his parents would not come to West Virginia and take him home.

178.   After John Doe's death, Evan M. Harris's parents questioned their son's response to it. Defendants' intentionally misrepresented his condition to his parents so that his parents would not come to West Virginia and take him home.

179.   When Evan M. Harris's mother visited the facility in January of 2016 shortly before Evan M. Harris's death, she was told by Q & A Associates, Inc.'s staff that she needed to leave, that she was merely enabling her son's behaviors and that her son needed to grow up and take responsibility for his own actions.

180.   The officers and employees of Q & A Associates, Inc. made Evan M. Harris's parents discontinue his cell phone coverage so that he could not communicate with them because Defendants claimed it was destroying the work they had done with him by being able to "run to his parents" for help over the phone.

181.   As a result of Defendants' intentional misrepresentations, Evan M. Harris is deceased, which was entirely foreseeable in light of an earlier death the month before Evan M. Harris's death.

182.   Defendants were aware of other deaths at other facilities where they had worked prior to the creation of Q & A Associates, Inc. due to the ineffective nature of the programs, which they intentionally failed to share with Evan M. Harris's parents prior to his admission and prior to his death.

183.   As a result of Defendants' intentional misrepresentations, Evan M. Harris is deceased, which was entirely foreseeable in light of John Doe's death a month earlier; Defendants' actual knowledge of other deaths at other facilities where they had worked previously; Defendants' actual knowledge of deaths within the industry; and Defendants' actual knowledge of Evan M. Harris's deteriorating condition.

**COUNT ELEVEN: VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT:**

184.   Friedrichs Harris as Administrator of the Estate of Evan M. Harris does hereby restate all allegations contained in this Complaint in this paragraph as if the same were reprinted herein.

185.   This is an action whereby Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris seek to recover damages from Defendants for violations of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-101 et seq. (hereinafter "the Act"), in order to require Q & A Associates, Inc. by its officers and employees to pay Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris just restitution as well as civil

penalties, and to award Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris all other appropriate relief.

186.   Upon information and belief, the above-named Defendants have acted in concert with each other in the actions alleged herein below at all times pertinent hereto.

187.   Defendants, acting in concert with each other, are guilty of engaging in the following unfair or deceptive acts or practices in violation of the Act:

    a.   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

    b.   Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

    c.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

    d.   Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;

    e.   Advertising goods or services with intent not to sell them as advertised;

    f.   Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; and,

    g.   The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby.

188.   The Act as set forth in <u>W. Va. Code</u> § 46A-6-104 makes the use of deceptive practices unlawful.

189.   The Act as set forth in <u>W. Va. Code</u> § 46A-6-106 creates a private cause of action against those employing deceptive practices in the State of West Virginia.

190.   Q & A Associates, Inc. by its officers and employees have an established a pattern of violations of West Virginia's consumer protection laws.

191.   Q & A Associates, Inc. by its officers and employees falsely represented The WV Journey Program was an approved and certified program in the troubled teen and young adult industry

192.   Q & A Associates, Inc. by its officers and employees falsely represented The WV Journey Program as providing 24/7 supervision of troubled teens and young adults.

193.   Q & A Associates, Inc. by its officers and employees falsely represented The WV Journey Program had sufficient staff to provide services to troubled teens and young adults.

194.   Q & A Associates, Inc. by its officers and employees falsely represented The WV Journey Program had staff that was specifically trained to deal with troubled teens and young adults.

195.   Q & A Associates, Inc. by its officers and employees falsely represented that The WV Journey Program had staff that was specifically trained to deal with troubled teens and young adults suffering from learning disabilities.

196.   Q & A Associates, Inc. by its officers and employees falsely represented that The WV Journey Program had staff that was specifically trained to deal with

troubled teens and young adults who are suffering from depression or other
mental or emotional conditions.

197.    Q & A Associates, Inc. by its officers and employees falsely represented that
The WV Journey Program had staff that was specifically trained to deal with
troubled teens and young adults who are suffering from depression or other
mental or emotional conditions.

198.    Q & A Associates, Inc. by its officers and employees falsely represented the
qualifications of its officers and employees to participants in The WV Journey
Program and to the parents of troubled teens and young adults.

199.    Q & A Associates, Inc. by its officers and employees falsely represented the
qualifications of members of its staff in The WV Journey Program.

200.    As a direct and proximate result of the false representations of the
Defendants, Friedrichs Harris and the other beneficiaries of the Estate of
Evan M. Harris have been damaged by the death of Evan M. Harris, which was
entirely foreseeable in light of an earlier death the month before Evan M.
Harris's death.

201.    Friedrichs Harris and the other beneficiaries of the Estate of Evan M. Harris
have suffered an ascertainable loss of money as a result of the Defendants'
unlawful practices as alleged herein, which was entirely foreseeable in light
of the death of John Doe; Defendants' actual knowledge of deaths at places
where they previously worked; Defendants' actual knowledge of deaths in
the industry; and, Defendants' actual knowledge of Evan M. Harris's
deteriorating condition.

**PLAINTIFF'S PRAYER FOR RELIEF:**

Friedrichs Harris and the beneficiaries of the Estate of Evan M. Harris respectfully

pray that they be granted relief against the Defendants as follows:

1. For the Defendants' intentional conduct, they seek the following relief:

   a. That the Court enter an order finding that Q & A Associates, Inc. by its officers and employees have engaged in intentional conduct as set forth hereinabove;

   b. That this Court enter an order finding that the intentional conduct of Q & A Associates, Inc.'s officers and employees was a proximate cause of the wrongful death of Evan M. Harris as the evidence shall show;

   c. That the Court enter an order finding that the beneficiaries of the Estate of Evan M. Harris are entitled to damages for the wrongful death of Evan M. Harris;

   d. That the Court award the beneficiaries of the Estate of Evan M. Harris general damages for all damages recoverable under the wrongful death statute;

   e. That the Court award the beneficiaries of the Estate of Evan M. Harris punitive damages to deter them and others from acting in a similar way in the future; and,

   f. That the Court enter an order awarding the beneficiaries of the Estate of Evan M. Harris such other relief as is proper and just arising from this matter.

2. For the Defendants' negligent conduct, they seek the following relief:

   a. That the Court enter an order finding that Q & A Associates, Inc. by its officers and employees has engaged in negligent conduct as set forth hereinabove;

   b. That this Court enter an order finding that the negligent conduct of Q & A Associates, Inc.'s officers and employees was a proximate cause of the wrongful death of Evan M. Harris as the evidence shall show;

35

    c.   That the Court enter an order finding that the beneficiaries of the Estate of Evan M. Harris are entitled to damages for the wrongful death of Evan M. Harris;

    d.   That the Court award the beneficiaries of the Estate of Evan M. Harris general damages for all damages recoverable under the wrongful death statute;

    e.   That the Court award the beneficiaries of the Estate of Evan M. Harris damages for his pain, suffering and mental anguish prior to his death; and,

    f.   That the Court enter an order awarding the beneficiaries of the Estate of Evan M. Harris such other relief as is proper and just arising from this matter.

3.  For violations of the West Virginia Consumer Credit and Protection Act, they seek the following relief:

    a.   That the Court enter an order finding that Q & A Associates, Inc. by its officers and employees has engaged in a course of repeated and willful violations of the Act as alleged in the causes of action set forth hereinabove;

    b.   That this Court enter an order finding that Q & A Associates, Inc. by its officers and employees violated the Act as alleged in the causes of action set forth hereinabove on as many occasions as the evidence shall show;

    c.   That the Court enter an order finding that the beneficiaries of the Estate of Evan M. Harris are entitled to damages for the violations of the Act;

    d.   That the Court award the beneficiaries of the Estate of Evan M. Harris general damages for the annoyance, aggravation and inconvenience caused by Q & A Associates, Inc.;

    e.   That the Court award the beneficiaries of the Estate of Evan M. Harris punitive damages inasmuch as the Defendants actions were willful and wanton and done with reckless disregards for the rights of the Harris family and the citizens of West Virginia;

    f.   That the Court award the beneficiaries of the Estate of Evan M. Harris all actual damages they have sustained as a result of the acts of the Defendants described above;

g. That the Court award the beneficiaries of the Estate of Evan M. Harris their costs and attorney fees incurred in bringing this action in accordance with W.Va. Code §46A-5-104; and,

h. That the Court enter an order awarding the beneficiaries of the Estate of Evan M. Harris such other relief as is proper and just arising from this matter.

**A TRIAL BY JURY IS DEMANDED ON ALL ISSUES.**

Friedrichs Harris, Administrator

*s/David A. Sims*

By:    _____

David A. Sims (#5196)
LAW OFFICES OF DAVID A. SIMS, PLLC
P.O. Box 5349
Vienna, West Virginia 26105
304-428-5291
304-428-5293 (fax)
david.sims@mywvlawyer.com

37