```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF WEST VIRGINIA

 3                        - - -

 4    FRIEDRICHS HARRIS, Administrator of the Estate

 5    of Evan M. Harris, deceased,

 6              Plaintiff,

 7              VS.          CIVIL ACTION NO.  2:16-cv-46

 8    Q&A ASSOCIATES, INC., et al.,

 9              Defendants.

10                        - - -

11         Proceedings had in the evidentiary hearing of the

12    above-styled action on January 4, 2017, before Honorable John

13    Preston Bailey, Judge, at Wheeling, West Virginia.

14                        - - -

15         APPEARANCES:

16         On behalf of the Plaintiff:

17                   David A. Sims, Esq.
                     Law Office of David A. Sims
18                   P.O. Box 5349
                     Vienna, West Virginia  26105
19                   (304) 428-5291

20

21

22

23

24

25    (Appearances continued on next page)
```

Linda Mullen, RDR, CRR
(304) 234-3987        PO Box 452, Wheeling, WV  26003

1              APPEARANCES: (Continued)

2          On behalf of the Defendants:

3                   Christopher M. Jones, Esq.
                    Dinsmore & Shohl LLP
4                   215 Don Knotts Boulevard, Suite 310
                    Morgantown, West Virginia  26501
5                   (304) 296-1100
                         and
6                   Lindsey M. Saad, Esq.
                    Flaherty Sensabaugh & Bonasso PLLC
7                   48 Donley Street, Suite 501
                    Morgantown, West Virginia  26501
8                   (304) 598-0788

9

10

11

   Proceedings recorded utilizing realtime translation.
12 Transcript produced by computer-aided transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS:                                          PAGE

3    FRIEDRICHS HARRIS
     Direct Examination By Mr. Sims                       5
4    Cross-Examination By Ms. Saad                       41

5    SANDRA SCHMEIDEKNECHT
     Direct Examination By Mr. Sims                      58
6    Cross-Examination By Ms. Saad                       79
     Redirect Examination By Mr. Sims                    87
7
     PAUL GERARD PELTS
8    Direct Examination By Mr. Sims                      90
     Cross-Examination By Mr. Jones                     114
9
     AUDREY PEAVEY
10   Direct Examination By Ms. Saad                     135
     Cross-Examination By Mr. Sims                      143
11   Redirect Examination By Ms. Saad                   151
     Recross-Examination By Mr. Sims                    152
12   Further Redirect Examination By Ms. Saad           153

13

14   EXHIBITS                    REFERENCED    ADMITTED

15    Defendants' Exhibit A          47           51
      Defendants' Exhibit B          51           89
16    Defendants' Exhibit C         131          134
      Defendants' Exhibit D         133          134
17    Defendants' Exhibit E         137          143

18    Plaintiff's Exhibit 1         67           89
      Plaintiff's Exhibit 2         69           89
19    Plaintiff's Exhibit 3         69           89
      Plaintiff's Exhibit 4         74           89
20    Plaintiff's Exhibit 5         77           89
      Plaintiff's Exhibit 6        102          134

21

22                         -  -  -

23

24

25

                    Linda Mullen, RDR, CRR
          (304) 234-3987     PO Box 452, Wheeling, WV  26003

1      (Proceedings in open court, January 4th, 2017, 10:02 a.m.)

2              THE COURT:  I would ask the clerk to call the next

3   case.

4              THE CLERK:  This is the case of Harris v. Q&A

5   Associates, Inc., et al.  Civil Action 2:16-cv-46.

6              Will the parties please note their appearance for the

7   record.

8              MR. SIMS:  Good morning, Your Honor.  David Sims on

9   behalf of Cathy and Rick Harris, plaintiffs in this case.

10             MS. SAAD:  Good morning, Your Honor.  Lindsey Saad

11  for all the defendants.  And here with me is Christopher Jones.

12             THE COURT:  Who wants to go first?

13             MS. SAAD:  Your Honor, I believe the party with the

14  burden should go first.

15             MR. SIMS:  That's them.

16             THE COURT:  Well, I gave that some thought.  The

17  defendant has the burden of proving a valid arbitration clause.

18             MR. SIMS:  Yes, sir.

19             THE COURT:  However, this is a -- I believe it's a

20  diversity case, West Virginia has a presumption of mental

21  capacity.  So I'll ask the defendants, do you intend to present

22  any evidence on your own today?

23             MS. SAAD:  Yes, Your Honor, we do.  However, Your

24  Honor, we do believe that it is the plaintiff's burden to prove

25  that the decedent lacked the mental capacity to enter into an

Linda Mullen, RDR, CRR
(304) 234-3987        PO Box 452, Wheeling, WV  26003

1  arbitration agreement.

2          THE COURT:  Well, that's a decision I'll make.

3  Plaintiff, why don't you call your witnesses first.

4          MR. SIMS:  Your Honor, I just had surgery on my foot.

5          THE COURT:  You may remain seated.

6          MR. SIMS:  Okay, thank you.  Because I get wobbly

7  after a while.

8          Your Honor, my first witness would be Dr. Rick

9  Harris.

10          THE CLERK:  Come up here, first.  Please state and

11  spell your name for the record.

12          THE WITNESS:  Rick Harris.  R-i-c-k, H-a-r-r-i-s.

13                **FRIEDRICHS HARRIS, PLAINTIFF, SWORN**

14                      DIRECT EXAMINATION

15  BY MR. SIMS:

16  Q.    Good morning, Dr. Harris.  Would you tell the Court your

17  full legal name and your current address?

18  A.    Friedrichs H. Harris, Junior.  First name is spelled

19  F-r-i-e-d-r-i-c-h-s.  3720 Edenborn, E-d-e-n-b-o-r-n, Avenue,

20  Metairie, Louisiana, M-e-t-a-i-r-i-e.

21  Q.    And, Dr. Harris, you are the plaintiff in this case?

22  A.    Yes.

23  Q.    And you were duly appointed as the administrator of your

24  son's estate?

25  A.    Yes.

FRIEDRICHS HARRIS - DIRECT

1   Q.   And would you please tell the Court your occupation.

2   A.   I'm a nephrologist.  I take care of dialysis patients and

3   patients with chronic kidney disease.

4   Q.   And where did you receive your medical training?

5   A.   I did my medical training at Tulane.  I did my internship

6   and residency there.  I did my fellowship in nephrology at

7   UCLA.

8   Q.   And we're here today because of the death of your son,

9   Evan Harris?

10  A.   Correct.

11  Q.   And if you would, tell the Court your son's legal name and

12  how it became that -- you became his parent or one of his

13  parents.

14  A.   Evan Matthew Harris with one T -- two Ts, and we adopted

15  him at three days of age.  We employed a legal firm that my

16  wife was friends with one of the lawyers there, and went

17  through some various testing.  We were older than normal, I

18  think, for adoptive parents, wanted to prove we were committed

19  to the role.  And we assumed care after three days.

20  Q.   What information, if any, were you provided about Evan's

21  birth parents, biological parents?

22  A.   Yes.  Well, we -- they mentioned that she had used drugs

23  in the first trimester.  The father had some legal problems as

24  well.  She had another child and didn't feel like she could

25  take care of Evan any longer.  She was going to nursing school

1   is our understanding.

2        That's what we knew initially.  We found out other things

3   later.

4   Q.   What other things did you find out later?

5   A.   That she died of suicide.  At about three years later, we

6   found out about that.

7   Q.   And what did you learn about his biological father?

8   A.   He was in jail for assault or maybe with a deadly weapon,

9   or a screwdriver that became a deadly weapon.

10  Q.   Please tell the Court what your son's condition was like

11  as a small child.

12  A.   He seemed healthy.  He did have a lot of problems with

13  colic.  My wife was the main caregiver at that point.  My

14  partner had just died and I was by myself, so it was -- it was

15  a tough few years when he first came home.  Eventually I got

16  partners and was more involved in his care.  But I do remember

17  late nights with him up rocking him because of colic, at least

18  for the first nine months.

19  Q.   Please tell the Court, if you would, what medical issues,

20  if any, that Evan suffered from as a small child.

21  A.   He had many.  He had to wear head gear for orthodontic

22  problems.  He had visual problems, he had nystagmus and had to

23  wear a patch over his eye.  He had some asthma problems.  Those

24  were the main things.  Later on there were some other problems

25  that developed.  But as a child, those were the things that I

FRIEDRICHS HARRIS - DIRECT

1  remember.

2  Q.   When your son went to preschool, how did he do there?

3  A.   Well, he was very enthusiastic, he seemed to do well.

4  There was some testing done even prekindergarten.  And he

5  actually did prekindergarten two years because they didn't feel

6  like he was mature enough to go on to kindergarten.

7       And so he was tested again before he went to kindergarten.

8  He passed those tests and he seemed to be assimilated into the

9  group and happy to go to school.

10 Q.   And tell the Court, if you would, what his elementary

11 school days were like.

12 A.   Well, they were tough.  He went to a special school called

13 St. George's initially, and he was falling behind the other

14 students, he was frustrated.  He had a hard time making

15 friends, connecting with the other students.  We -- well, we

16 formally had him tested actually in pre-K -- going back,

17 sorry -- one of the pre-K teachers noticed that he was very

18 fidgety and suggested we go to a psychiatrist about his

19 problems.  And it was a Dr. Sands who saw him when he was about

20 three and a half, four, and started him on medications for ADHD

21 at that time.  So he was four.  And he regularly saw Dr. Sands.

22      So that therapy continued.  When he started falling behind

23 more in second grade, he was very frustrated and he had a

24 formal evaluation at Children's Hospital.  And it was one of

25 the longest evaluations he had.  And it showed that his

FRIEDRICHS HARRIS - DIRECT

1   intellectual function was poor, that he had emotional problems,

2   that his working memory was poor.  He had a hard time planning

3   things in particular.  He couldn't hold two things in his brain

4   at once, especially math and multiplying things in general.

5       So it turned out that we felt that St. George's wasn't a

6   good fit for him, that the children were much higher

7   functioning than he was, so we transferred him to another

8   school called Holy Rosary in third grade.  And that also was a

9   special learning school.  And he seemed to fit in with the

10  children there.

11      He still had socialization problems and the memory

12  problems and low intellect problems that continued with him.

13  But he did -- he was able to stay in school.  He was respectful

14  of his teachers.  He was more respectful to the teachers than I

15  think he was to us.  That's just a common trait, I guess.

16      Anyway, he continued to go to Dr. Sands and received his

17  medications all the time.  He continued the head gear therapy

18  and the eye therapy.

19      We noticed that his stature was small at that time, he was

20  about nine or ten years old.  And he turned out to be growth

21  hormone deficient.  He was started on growth hormone shots,

22  60,000 a year for that.  He also had blood in his urine and had

23  a disease called IgA nephropathy.  We took him to a pediatric

24  nephrologist for that.  We could just watch that.  I knew

25  exactly what that was, I was an adult nephrologist.

FRIEDRICHS HARRIS - DIRECT

1    Fortunately, he didn't develop any kidney failure or protein in

2    the urine or anything like that.  So again, a lot of medical

3    problems to keep up with.

4        But his days at Holy Rosary were pretty good, I guess,

5    until after he started the growth hormone, he started to grow.

6    And that was the most effective drug that he ever received.  He

7    was about three feet and a half, three feet nine inches when he

8    started the drug.  And by the time he finished it when he was

9    17, he was five foot 10 or 11.  But it was during this period

10   of puberty and there was all sorts of hormones going on.  And

11   he became very agitated at home and aggressive at home.  It was

12   a very difficult time.

13   Q.   Besides Dr. Sands, did your son receive other mental

14   health treatment during his formative years?

15   A.   Many different physicians.  And he went to another

16   learning physician by the name of Dr. Perdigao, he was a

17   psychiatrist also.  Tried behavioral therapy.  And he was -- he

18   was the first one who brought up bipolar.  He said that at that

19   young in age, I guess he was six, something like that, and he

20   had -- usually they don't like to give that diagnosis, but he

21   obviously was different.  He would purposely ignore the

22   commands of a person who was over six feet and he was about

23   three feet.  And he would purposely aggravate them.  I mean,

24   that's -- and he just hadn't seen that before, the way -- a

25   stranger in the room with him, he would not listen to them.

1          He also went through a program called Fast Forward with a

2    psychologist.  It's a computer program that helped him

3    understand things, but hopefully to train his brain a little

4    bit more.  After we got those results from Children's Hospital,

5    we were looking for anything we could do to improve his brain

6    function.

7              There were other -- there were other psychologists he

8    went to.  One was a behavior therapist.  I read this book after

9    he got so aggressive at home.  It was mainly anger, anger or

10   hard to understand reasons why, why he would get angry.  He

11   would get mad at people.  If he would fall, say, at the

12   playground, he would get mad at somebody who was on the

13   playground saying why did you make me fall, things like that.

14             So he went to a -- the book I read was by a guy named

15   Green and it was about handling anger in these patients, and a

16   lot of different ways you can get to anger in children.  Manic

17   depression is one of them, being bipolar is one of them.

18             So he put everything into one basket as far as what

19   you would get into an argument with him about.  I mean, we

20   had -- we had several fistfights and several police events,

21   them coming to the house and so on.  But after reading this

22   book and focusing things, I understood that Evan could not come

23   up with a plan.  He could not deal with his own anger.  It was

24   up to us as his parents to come up with a plan to help diffuse

25   any anger that developed.

FRIEDRICHS HARRIS - DIRECT

1              He had the most insatiable need for things that you

2     could imagine.  It wasn't just a want, it was an intractable

3     insatiable need.  He needed to have everything he saw.  And he

4     would go through this cycle where you would -- where you would

5     tell him no and explain everything about why he couldn't have

6     it.  And after a half an hour of this, he would get back to the

7     same question, can I have this?  It would just come right back

8     to the same question.  And it was very hard to divert him once

9     he wanted something.  It would be two hours of arguments about

10    calming things down.

11             Anyway, so also -- so this psychologist we went to

12    was a proponent of Dr. Green's methods, and we went several

13    times to see her.  She did what she could.

14             There was also another psychologist who used electric

15    wave therapy, slow electrical impulses, she would measure the

16    EEG.  And I read a little bit about it, seemed to be effective

17    in some cases.  And so we went to her a few times and she was

18    really concerned about the EEG that she saw.  He didn't -- he

19    didn't have any lesions.  You know, we worked him up for things

20    that might cause his rage symptoms, like temporal lobe

21    epilepsy.  He didn't have that.  He didn't have a brain mass or

22    anything like that.  It was just these rage spells would occur

23    sporadically.  That therapy didn't seem to help much so we

24    stopped it after several sessions.

25             He had speech therapy.  His mouth, his tongue was a

FRIEDRICHS HARRIS - DIRECT

1   little bit big.  He had to go to a speech therapist for a

2   while.  So it was a full-time job growing up with him.

3   Q.   Tell the Court, if you would, after his visits with

4   Dr. Perdigao, were there any hospitalizations for his mental

5   health issues?

6   A.   The first hospitalization I thought was with River Oaks,

7   is that what -- no, I'm going to have to defer to my wife to --

8   Q.   Okay.

9   A.   -- remember those specifics.  I remember we -- after a

10  while, we had a daughter who also had pervasive developmental

11  delays, about a year younger.  And after a while, we became two

12  separate families where I was taking care of Evan and she was

13  taking care of the other child.  That's in the future.  I mean,

14  I can -- I'll let you ask the questions, I guess, get to that

15  point.

16  Q.   What was your son hospitalized for?  What --

17  A.   Well, we had -- we had gotten in a fight.  He had not

18  taken no.  He couldn't take consequences.  He was up on the

19  second floor.  He started kicking out the spindles on the

20  second floor and then used one of the spindles to hit me.  I --

21  we called the police.  They came.  He was put in River Oaks

22  psychiatric hospital for that particular spell.

23       There was another spell where, after he had been at River

24  Oaks, he learned how to cut himself.  One of the other patients

25  there used -- I guess taught him or whatever.  So a year

FRIEDRICHS HARRIS - DIRECT

1   later -- I guess the first River Oaks admission was in 2005,

2   when he was 13.  Later, he started to cut himself one time

3   and -- well, even before that, he had -- he had -- you know, we

4   used time out as one of the therapies and he would destroy his

5   room.  Make holes in the wall and try to escape by opening the

6   windows and holding onto the electrical lines is what he

7   thought was an escape.

8        Then he also climbed up on top of his desk and went

9   through the transom with his arm, got a cut on his arm that had

10  to be sutured.  So we had to Evanize the house essentially.  We

11  changed his room.  We had to take out all of the glass and we

12  put a piece of -- we had a contractor put a piece of tin on his

13  door so he couldn't kick it down.  It was locked from the

14  outside.  So that was a safe spot to put him during those

15  periods of time when he was in a rage.  So it was -- that was a

16  difficult time.

17  Q.   Tell the Court, if you would, if you were able to teach

18  Evan things as a parent would to a child.

19  A.   It was a real challenge.  Like I said, he didn't have a

20  working memory.  He couldn't plan things.  So we had a ritual

21  of I would be cooking breakfast and I would try to teach him to

22  cook an egg, fry an egg.  And he didn't seem to be able to

23  understand that concept.

24       And just the airport, you know, going to the airport.

25  Say, you know, show me where the gate is.  Can you look at the

FRIEDRICHS HARRIS - DIRECT

1  directory and say where the gate is and then go to the gate.

2  That was out.  There was nothing he could do with that.

3      And I took him fishing often, and that's one of the things

4  we enjoyed together.  We went in the Caribbean, off the

5  Louisiana coast, freshwater bass fishing, Alaska, Hawaii, all

6  that.  And he would -- he couldn't bait a hook and his line

7  would get tangled often.  So you know, just the routine things,

8  he just couldn't pick up.

9      And you would think -- other people looking at this would

10  think, he's just doing that so that you will do it for him.

11  You know, that's what other people would think.  But it's not

12  true.  I mean, this is stuff he wanted to do and he couldn't do

13  it.  He couldn't plan it.  You would have to set everything out

14  for him so that he would progress.

15      I mean, he also liked to do pressure washing in the back

16  yard, to my wife's apprehension.  I taught him how to use a --

17  it was a perfect setup.  It was a perfect place where he could

18  do that.  I had set everything up, get the machine going.  All

19  he had to do when he finished the pressure washing, is he had

20  to turn it off.  It would go off because it would run out of

21  gas, but he had to turn off the water.  That's all he had to

22  do.  And we would go in the back yard and we had a sport court

23  that he could pressure wash all day, whether it needed pressure

24  washing or not.  He would do that.  That was one of the major

25  ways I would reward him is for doing work in the back yard.

FRIEDRICHS HARRIS - DIRECT

1        That was so difficult, finding a place in between being

2   insulted all day and called names and finding a behavior you

3   could reward.  So working in the back yard was one of his jobs

4   that I could reward him for.

5   Q.   Did you have other work or make other work for your son?

6   A.   Yeah.  I mean, he couldn't find work on his own.  I had

7   to -- after Katrina, there was a restoration project in

8   Lakeview, in the inner city.  It was a place called Beacon of

9   Hope that was remediating all of the damage.  He loved that.

10  He could go in and destroy everything that was in the house and

11  do -- that was a good thing, that he was destroying things.

12  And he got to meet -- it was incredible, the people that came

13  to New Orleans after Katrina to rebuild the city.  Great kids

14  that he met from throughout the states, throughout the world

15  actually.  He really couldn't interact with them very well.  He

16  sort of stayed doing his gardening bit and weed whackers and

17  machetes and some painting inside.  So that was a good job.

18  Actually, his, quote/unquote, volunteer work was actually paid

19  work by me.  I would give him ten bucks an hour for doing that.

20  Q.   What kind of volunteer work would he do?

21  A.   Well, mainly the remediation stuff at Beacon of Hope, but

22  he also worked at a little grammar school by the name of

23  St. Dominic's, that I knew -- I went to school with the head

24  janitor there, that he was -- in fact, we had the same

25  birthday, so we celebrated our birthdays together.

FRIEDRICHS HARRIS - DIRECT

1    He would -- I would say -- well, during the summer they

2  needed to fix up the schools so he would go there.  And I paid

3  him to volunteer there.  And I mean this was all in teenage

4  years and so on.  He liked doing that.  And I also got him a

5  volunteer job at the hospital I work at.  I couldn't get him a

6  regular job.  He worked as a volunteer in the cafeteria and he

7  would get paid for that too.  You know, this was one of the

8  last jobs he had in his 20s, 19, 20.

9  Q.   What was Evan's ability to read like?

10 A.   Well, I spent a lot of time with him on games, reading

11 things to him.  We read all of Harry Potter.  But his -- he did

12 know the words, but he would read through the punctuation.  He

13 would just da, ta-da, ta-da, ta-da, very monotone, no emotion.

14 I don't think he understood what he was reading anyway.  We

15 would take turns reading that.  And he liked Harry Potter

16 because he had a movie, he had a guide.

17    When he played games at home, he had to have a guide.  And

18 he would look at the pictures mainly to get him through the

19 game.  He didn't really read the instructions so much.  He was

20 off with the characters as soon as he got ahold of the

21 controller.  Of course there were anger issues there.  When

22 Evan couldn't get things to work, his solution was to push

23 things harder.  So he ended up breaking a lot of electronics.

24 And we had to use insurance on any electronic product that we

25 got for him, I'm sure the companies lost money.  But we would

FRIEDRICHS HARRIS - DIRECT

1   make him pay for these things too.  It wasn't just like we

2   would replace them.  He had to do certain things, working in

3   the yard, reading, whatever we could do to set up a plan for

4   him.  Because he couldn't come up with a plan.  He couldn't get

5   a job.  He couldn't get -- I mean, he even broke his TV.  He

6   threw something at it and broke it so we had to work out a

7   plan, how are you going to get this.

8       I mean, behavior therapy didn't work with him.  He didn't

9   understand consequences.  He wouldn't take consequences.  It

10  was a struggle to get him to understand that his behavior was

11  aggravating me or Kathy or Emily or anybody.  He didn't see it

12  as aggravating.  He would ask me, are you aggravated at me?  He

13  couldn't read my face or something, I don't know.  If he did

14  find out if we were aggravated, he would say well, that's your

15  problem.  So he didn't understand that his behavior was leading

16  to consequences.

17      And it really hit home when we sent him to this place

18  called Three Springs for eighth grade.  He had been through

19  Holy Rosary, you know, until seventh grade.  And there's a

20  whole story about him getting out of control and we couldn't

21  send him back there.  So we had to send him to this place

22  called Three Springs, which was an outdoor wilderness center

23  where you had to earn your way into a warm environment.  You

24  lived outside.  You had a latrine.  You had -- God, you know,

25  you had to make your own food.  You had to clean your own

FRIEDRICHS HARRIS - DIRECT

1    dishes.  This was almost -- this was worse than boot camp.

2         And after being there several months, the counselor, I

3    talked to him and he said Evan just doesn't get it.  He doesn't

4    take consequences.  He doesn't understand why he's getting

5    consequences.  He thinks we're just being mean to him.  He

6    doesn't see that his behavior results in somebody else's

7    behavior.  It was beyond him.

8    Q.   How did that end?

9    A.   With Three Springs?  Well, we -- again, it had its good

10   and bad points.  Evan picked up the worst behavior.  I mean, a

11   lot of these children that were there, young adults were there

12   were into drugs.  They were very smart.  Evan was not.  So they

13   took advantage of him.  They peed in his foot locker.  He was

14   still kind of short, so they weren't nice to him all the time.

15   He was trying to make friends.  He would try to throw the

16   football around with them.  This was up in Tennessee.  We

17   visited him every few weeks.  Drove there and back to see him.

18   We would take turns going up.

19        So it ended in 2007.  Yeah, May 2007.  It started in

20   September 2006.  So he was there for about nine months.  And he

21   did, you know, make some progress there away from his

22   electronics, away from other distractions.  I mean, he went to

23   school while he was there too.  And there was one teacher he

24   really connected with and they seemed to help him read a little

25   bit better.  And he seemed to be making some progress

Linda Mullen, RDR, CRR
(304) 234-3987          PO Box 452, Wheeling, WV  26003

FRIEDRICHS HARRIS - DIRECT

1  academically there.

2  Q.   Where did he go after Three Springs?

3  A.   He went to a place called Bachman Academy.

4  Q.   And tell the Court, if you would, what Bachman Academy is

5  like.

6  A.   Well, first off, we choose Bachman by using an education

7  consultant who gave us a list of places.  And we interviewed

8  some of them and went there with Evan one time.  It was a

9  vocational school that -- it was a boarding and day school for

10 sixth to 12th grade children.  Evan would be in the freshman

11 year, the ninth grade.  And they had two different tracks.

12 They only had about 50 children there.  They had two tracks,

13 one was collegiate, one was vocational.  Evan was in the

14 vocational track.  And there was no foreign language or

15 anything like that.  They took work math.  They took courses

16 like woodworking, mechanics, equestrian, horticulture.  It was

17 not high powered.  They also had a class called school to work.

18 You know, music appreciation.  Time with the teacher.  It was

19 more almost social skills and trying to find out if he had any

20 skills to live independently.  And he made some progress.  He

21 was happy there, I think.

22      The biggest change, he was getting into trouble the first

23 two years, some suspensions.  But the biggest change occurred

24 during the summer of 2009, when he started lithium.  He started

25 to cut himself during the summer and ended up in River Oaks.

FRIEDRICHS HARRIS - DIRECT

1    And then he learned this cutting behavior, ended up in River

2    Oaks.  And then he went to a place called Meridell.  This was

3    after he had been -- these are residential treatment programs.

4        He had been to two residential treatment programs in Texas

5    before, 2005 -- summer of 2005, summer 2006.  And this was the

6    summer of 2009 he went to Meridell and he started on lithium.

7    And that, for the first time, helped control his rage where it

8    wouldn't last for two hours.  He would still get angry very

9    easily.  And he still was frustrated by his lack of ability to

10   perform like other children intellectually, but it wouldn't go

11   on for hours.  And I could divert him a little bit.  And the

12   holes in the walls and the calls to the police and the broken

13   doors and the broken electronics calmed down.

14   Q.   What was the drug lithium prescribed for?

15   A.   Manic depression, bipolar syndrome.

16   Q.   And did your son have any other mental health diagnoses at

17   this time, other than bipolar?

18   A.   He had a long list.  ADHD.  Attachment disorder.

19   Positional defiant.  I mean, the list -- it was hard to fit him

20   into one particular category.  He had nine different.  His

21   original psychiatrist, Mark Sands, by way of introduction to

22   the first residential treatment program he went in, listed nine

23   different things.

24       I don't know all the details about all the different

25   diagnoses, I just know what it was like to live with him.

FRIEDRICHS HARRIS - DIRECT                    22

1  Q.   Tell the Judge, if you would, what kinds of things your

2  son learned at Bachman Academy?

3  A.   Well, he did have some friends there, you know, and that

4  was very important socialization.  He had two friends that he

5  seemed to -- seemed to click with.  But again, he would learn

6  woodwork, simple math.  He couldn't do subtraction, he could do

7  a little bit of addition.  Music appreciation, art.  Things

8  like that.  It wasn't rigorous at all.

9  Q.   Did your son graduate?

10  A.   Yeah, he did.  We were proud of him for doing that.  He

11  got an award for most improved reader and for dorm management.

12  He kept a clean room.  He took a lot of showers.  Kept himself

13  clean.

14  Q.   Tell the Court, if you would, what kind of things your son

15  learned.  For instance, mechanics, what did they teach him?

16  A.   Well, he never used any of those things at home.  I can't

17  say -- I mean, he would help me in the garden some.  I guess

18  that's one way I saw, he would help plant things and garden.  I

19  viewed that as a potential job for him in the future.  It was

20  something that I was hopeful that he would get plugged into.  I

21  was looking for him to get plugged into something besides games

22  and horror movies and being a gangsta in his mind.  In his

23  mind, he was a gangster.  It was ridiculous.

24  Q.   Would he understand, for instance, why you would need to

25  weed the garden or things like that?

FRIEDRICHS HARRIS - DIRECT

1  A.    No.   He pretty much -- I would have to take him through

2  the steps one by one by one.   It was a fern garden that I asked

3  him to weed next to the -- next to the wooden fence there.   And

4  he just rolled it -- when I came back to see -- I just wanted

5  him to pick out the weeds.   And when he came back, he had

6  rolled up the whole fern thing like a layer of sod and so there

7  was nothing there but soil left.   So I had to put that back up.

8      And then he would -- he would swab the deck sometimes for

9  me, but you would have to sit out everything.   You would have

10  to have the bucket with the mop.   And again, somebody looking

11  at this would say he's just using you, he knows what he has to

12  do, he couldn't.   There was -- if everything wasn't set up, he

13  wouldn't be able to do it.

14  Q.    Was he able to pack when you would go on trips?

15  A.    No.   He would -- not on his own, definitely not.   We would

16  give him a list of the clothes eventually.   But if you asked

17  him to pack, he would just bring his Game Boy, his Xbox and his

18  headphones.   That would be the end of packing.   Clothes were

19  secondary.

20      I mean, he wore the same clothes all the time almost.

21  Whether it was cold or hot, he didn't -- he was disoriented to

22  weather, to the geography, to the time.   So it was tough to get

23  him packed.   Getting him to the plane was an ordeal.   If he was

24  plugged into a game, you were in trouble.   You were going to

25  have a hard time.   No matter what you offered him as a reward

FRIEDRICHS HARRIS - DIRECT

1    and said, you know, we're going fishing, the people are coming

2    to pick us up.  Just stop your game and we can go fishing.  He

3    wouldn't do that.  I mean, he was stuck.  He was rigid.  He had

4    the problem of focusing and then he also had the problem of

5    hyperfocusing at the same time.  He was rigid and hard for him

6    to change to something else.

7    Q.    After Bachman Academy, what did your son do?

8    A.    Well, even before he left Bachman, we had looked at some

9    job training programs in the state.  There was the Louisiana

10   Workforce Commission that provided jobs for disabled people.

11        And so in April, we had interviewed with a program called

12   ARC, Association for Retarded Citizens, I think that's what it

13   stands for.  And there's a guy named Jeff Schiro.  And he

14   wasn't very optimistic about finding him a job.  But

15   fortunately, he was a friend of a neighbor who I used leverage,

16   I guess, to help him get in the program.  And so that was set

17   up when he came -- there was no formal job, there was work

18   around the house like we usually did.

19        There was part-time jobs, volunteer jobs.  He would work

20   for my aunt -- or my sister sometimes also.  Our neighbors

21   sometimes.  He tried this pressure washing thing for other

22   neighbors, and they would let him do it once.  But that was --

23   that was about it.

24        After that, as far as paying jobs, there were no paying

25   jobs, just volunteer jobs I set up.

FRIEDRICHS HARRIS - DIRECT

1        Finally he got a job in January 2012 with Rouses, a local

2   grocery store.  And again, he initially did well.  He was into

3   it.  He would show up on time.  He would listen to the

4   instructions he was given, but basically had to be mentored in

5   how to, you know, fill the bags with food.  And he loved

6   helping people bringing it out to their car because they would

7   give him a tip.

8        And it seemed, I thought -- but again, all these jobs and

9   everything, the most he could work would be 20 hours a week.

10  We're not talking full time.  We're talking four hours a day at

11  most at all these volunteer jobs, four hours a day at most.

12       The Rouses job was mainly a weekend job, six hours each

13  day.  And it was a real job.  He got a real check.  But then he

14  started testing the edges like he always does.  He makes a

15  good -- he's withdrawn initially trying to figure out what he

16  can do and can't do and whether they get on his case if he does

17  this or he does that.  And he finds out that people aren't

18  watching him all the time, so he stops doing things the way he

19  does.

20       And he wasn't supposed to wear earphones to work and he

21  said I only listen at break.  He was doing more than that.  He

22  was doing it at work and eventually got fired from that after

23  eight months or so.  I think the big thing that happened is his

24  boss changed and his new boss wasn't as forgiving for

25  work-related missed things that he wasn't doing.

FRIEDRICHS HARRIS - DIRECT

1    Q.    After his job at Rouses, what did he do?

2    A.    Well, then he -- we went to another group called AcME,

3    which also found jobs.  He was declared disabled by the state

4    and we went to -- we were advised to get some Medicaid for him,

5    just in case we died, something happened to us that we had

6    these state systems set up.  So we got Medicaid for him.  We

7    got him disabled.  He had to take an exam by their psychologist

8    to get -- to have to prove that he was disabled.  And they

9    agreed with that.  So he got some Medicaid.

10        And he was going to Louisiana Workforce Commission.  And

11   unfortunately I learned the ins and outs, a little about it.  I

12   mean, they pay $6,000 through these companies to find a job for

13   them.  And they get a lot of the money up front.  And so if you

14   use the money once, to get a job at Rouses, it's hard to have

15   any money left to find him a job elsewhere.

16        So AcME did what they could, they found him a job at

17   Popeyes, he lasted one day.  They expected him to take a bus to

18   get there, which is impossible.  You know, so we took him

19   there.  And all he had to do was cut up the chicken somehow and

20   put it out to be fried.  And he just didn't understand what

21   they were talking about.  They could show him, but he needed a

22   mentor to sit there to tell him, do this and then do this.  He

23   couldn't do it on his own.  So he lasted one day.

24   Q.    When you say they expected him to take a bus to work --

25   A.    Yeah.

FRIEDRICHS HARRIS - DIRECT

1  Q.    -- was he able to use public transportation?

2  A.    Well, when he was working at the hospital, we -- in

3  general, no, he couldn't do public transportation on his own.

4  But in certain select circumstances, where there was only one

5  bus coming to the hospital where he worked, I finally convinced

6  him to take the bus home, which was like a four-block ride,

7  five-, six-block ride.  And the first time he did that, he went

8  to the end of the line.  He called me on the phone, he didn't

9  know where he was.  I said just stay on the bus until it

10  circles around.  So he came back around and he got let off in

11  front of the hospital, I think I picked him up.

12      Eventually he was able to do that.  That was a major

13  accomplishment, that was like a perfect day for Evan, where I

14  would drop him off at the hospital, he would work there,

15  volunteer there.  And then he could go to work out two blocks

16  away at the wellness center, he had gotten into working out and

17  losing weight and being concerned about his body and girls.

18  And then he would go back to the hospital, take the bus home.

19  That is -- that was after months of doing that, that he could

20  finally do that.  It wasn't every day, it was just some days.

21      And he would eventually, again, even at jobs as a

22  volunteer at the hospital, he would test the edges and see what

23  the least amount he could do.  He would take a lot of cigarette

24  breaks.  And actually, he went to a local drugstore and bought

25  some whiskey during the -- while he was working.  And he just

1  wasn't growing up.  He wasn't growing up after four years of

2  trying to get him to grow up after he graduated, four years of

3  trying to get him to grow up, he just wasn't -- and he still

4  would get angry and he still would yell.  And you would have to

5  deal with the yelling.  I mean, you could stay calm, but inside

6  your sympathetic nervous system was just firing trying to find

7  an answer with what is wrong with you, why are you angry now,

8  what do we have to do, why can't you figure it out.

9      I think that's one of the reasons he became so angry is

10  that he couldn't figure things out, what to do next, he didn't

11  understand what the next step was.  So he would just give me

12  his desires and what he wanted.  And I would say, okay, let's

13  think about this and what we had to do.  I had to come up with

14  the plan.

15      So we were getting cardiac issues.  I mean, I was getting

16  atrial fibrillation at night.  Kathy was having her own chest

17  pains and so on.  This was after many -- it was four years.  We

18  were, I think, suffering from something called captive heart

19  syndrome or you're under stress all the time.  Your sympathetic

20  nervous system is going off.

21      And it was -- our daughter was getting like posttraumatic

22  stress syndrome also trying to deal with this herself.  Because

23  you never knew when this anger -- again, it was better after

24  lithium.  It was better, but it still occurred.  There was no

25  reasoning for a while until things settled down.

FRIEDRICHS HARRIS - DIRECT

1    So we had to look for other places, we had to look outside

2  the home.  We -- I talked to Dr. Pelts, a psychiatrist, about

3  it a little bit, and he recommended a consultant by the name of

4  Christie Woodfin.  If you go online for these things and tell

5  people you have a troubled teenager, all of a sudden you have a

6  thousand friends and they are emailing you every day about oh,

7  we have the solution, we have this, we have that.  We have a --

8  you know, anyway, it was helpful to have her give us

9  suggestions about where he might go.  And they gave us five

10 choices.

11 Q.   Where did your son go?

12 A.   He eventually went to Waterfall Canyons in Utah.

13 Q.   And what was the purpose for going there?

14 A.   That was to be independent, to learn skill, independent

15 life skills.  He got his own apartment in this building with

16 six other kids and they would help him get a job.  They had a

17 job counselor.  It was perfect.  It was the perfect place for

18 him.

19    Also there they taught him to use the bus again.  It was

20 one bus, one way to one place.  And he would get off at the bus

21 stop.  And I thought there was one month -- he got a

22 horticultural job there.  It was to help him get life skills

23 and get a job.  I mean, he needed a job.  I didn't realize how

24 important that was for him to get a job.  Because he needed

25 something to get him out, to get -- to do, a passion, other

FRIEDRICHS HARRIS - DIRECT

1   than just these impulses he had.  He had to get outside

2   himself, otherwise he was living from impulse to impulse to

3   impulse.  So that was the reason for us sending him there.

4   Q.   How did he do at Waterfall?

5   A.   Again, he had his usual MO.  Did great initially, listened

6   to everybody, was very respectful.  Did everything they asked.

7   Was -- actually found a job, horticultural job at the

8   university there, Weber -- is it Weber State, I think, in

9   Ogden, Utah.  It was perfect.  They said he could listen to his

10  music.  He was working eight-hour days.  He was getting up

11  early.  He was taking the bus there.

12       And then he started to find what he could get away with

13  and what he didn't need to do.  Again, somebody looking at this

14  from outside would say well, he's just lazy.  He's just taking

15  advantage of the situation.  And he's just, you know, not going

16  to ever be any good.

17       And we still were hopeful for him.  We still -- I mean,

18  the brain can still mature up until late 20s.  This was at 22.

19  So he had these glimpses that gave us hope that he would

20  continue to mature to at least independent living.

21       So they eventually fired him because he did take advantage

22  of disappearing for breaks and not doing -- and then the other

23  thing that happens once Evan gets money is he can't save it.

24  He's got to spend it on something.  If he knows he has money,

25  he's going to spend it somewhere.  So he would spend it on

FRIEDRICHS HARRIS - DIRECT

1  alcohol sometimes.  I don't think his alcohol, drug abuse was a

2  constant problem.  It was a goal of his, but we pretty much

3  kept him off the alcohol and off the drugs while he was living

4  with us.  And I think they did too.  He would feel -- well, I

5  don't know about guilty, but he would know we would be angry if

6  we found out he was doing it.

7      We had several contracts, behavior things that we wanted

8  him to do that he -- he would drink only at certain events, one

9  beer.  We worked it out with Dr. Pelts.  He would have a beer

10 with family get togethers.  We had a huge family, a lot of

11 first cousins and we we would have Thanksgiving and Christmas

12 and July 4th and crayfish boils on Mother's Day.  And he would

13 drink during those periods of time, just two beers supposed to

14 be max.

15     And once he got the money, he would binge, I think,

16 sometimes.  But he would turn himself in.  He would say well, I

17 did this and did that because I really couldn't plan anything

18 without us.  I mean --

19 Q.  How did his stay at Waterfall end?

20 A.  So his MO again, he became more disrespectful.  It wasn't

21 from excess drugs and excess marijuana or cocaine or anything.

22 He was just disrespectful.  And we got to know the head of the

23 Waterfall Canyons supervisor there pretty well.  And he said I

24 can't control him anymore.  He doesn't listen to me.  He

25 doesn't -- he's starting to put holes in the wall.  Not only

1    that, but he's irritating the other residents.  This is a group

2    home that everybody has to get along, so they asked him to

3    leave.  That was it.  So he went there in February 2015 and he

4    lasted until August 2015.

5    Q.    Where did he go after Waterfall?

6    A.    Well, he came home unexpectedly.  We told him he couldn't

7    come home and we had made arrangements for him to go to this

8    place called Aspiro afterwards.  But they had put him into a

9    motel.  He had all his belongings and he had the Internet to

10   make connections with something called Meet Me, which was a

11   dating site.  And they were more than happy to help him with

12   all the money he had and all the devices he could sell at

13   GameStop.  And they helped him get around.  And they helped him

14   sell stuff and they took most of his money.

15        But they did give him enough money to get on a bus.

16   That's the one thing they did for him.  They took the rest of

17   the money.  So they told him when to get up, when to do this

18   and that.  So he did leave the motel.  He was supposed to stay

19   at the motel until he went to Aspiro.  He was getting his

20   medicine by the Waterfall Canyons people.  So he was 22 at this

21   point.  Yeah, 23.

22        So he did take the bus.  He left his phone in the motel

23   room.  That's -- that was something very important to him.  I

24   mean he has no idea how to plan things, his impulses obstruct

25   his ability to think.  His emotions trump everything.  He just

FRIEDRICHS HARRIS - DIRECT

1    knew he was supposed to get on the bus.  He leaves the most

2    precious thing to him in the motel room and gets on the bus.

3    And he has no food, no money, no medicines.  Nothing.  And this

4    is in Ogden, Utah.  And he did have a ticket to New Orleans but

5    he had no idea how to transfer.  And so we didn't know where he

6    was during this period of time.  We were very worried about

7    him.  I'm thinking somebody had done him in, stole his things,

8    especially when we found out he left his phone in the room.  We

9    thought, this isn't good.

10       So he ended up befriending somebody on the bus.  At first

11   this person was irritated by Evan because he thought this guy

12   is putting me on.  He doesn't know how to change a bus, he

13   doesn't know how to get food.  Again, Evan's appearance is one

14   of a functioning 23 year old who knows what he's doing.  But in

15   reality, Evan was scared out of his mind and had no idea what

16   to do.

17       And this guy called us.  And so we were able to have some

18   say so in where things went.  And this guy fortunately was also

19   going to New Orleans.  So we met Evan at the bus stop and he

20   was -- it was a good meeting.  He was very happy to see us.

21   Q.  After your son returned home unexpectedly, where did he

22   go?  What did you do with him after that?

23   A.  Well, he stayed in a motel in -- about a half a mile from

24   us, and we arranged for him to go to Aspiro.  We did allow him

25   to come home one day, see the new puppy, see his one friend,

FRIEDRICHS HARRIS - DIRECT

1    Michael.  He had one friend, Michael, from grammar school, who

2    was as impaired as Evan was but without all the anger issues.

3    And then we took him to Aspiro after about a week.

4    Q.    And how long did he last at Aspiro?

5    A.    He finished the program.  It's an outdoor therapeutic

6    program also where they just hiked and did some rock climbing.

7    And, again, a very mentored situation.  He had to do some

8    cooking.  And he had to get along with the other six people who

9    were there, I think.  I think there were about six.

10        And I just dropped him off at the airport and they picked

11   him up and they brought all his gear.  And he lived outside for

12   three months and had to interact with the other kids and learn

13   how to deal with his anger.  He was away from his electronics.

14   I didn't visit him while he was there, Kathy did, and she could

15   tell you more about that visit.

16   Q.    After Aspiro, where did he go?

17   A.    He went to Q&A.  He had shown some improvement in

18   controlling his emotions and we were considering taking him

19   home.  But the counselor that was there by the name of Caitlin

20   didn't think it was a good idea.  And Christie Woodfin, our

21   other counselor, didn't think it was a good idea.  And Mark

22   Nye, the counselor at Waterfall Canyons, felt like he could --

23   this was the best time for Evan to transition to another

24   independent living program.

25        So of the five -- of the initial five programs that

FRIEDRICHS HARRIS - DIRECT

1  Christie Woodfin had given us, Q&A was in that, the first five,

2  but we didn't want to go there initially because Waterfall

3  Canyons had more vocational facilities and it was -- he had his

4  own room and he would be helped getting a job.  It seemed to be

5  more job related, and it didn't come to pass when he got the

6  gardening job so we chose them.

7      So we had this recommendation for Q&A from Christie

8  Woodfin at the first.  And I had talked to them, but I didn't

9  feel like it had enough vocational stuff to help Evan and it

10  was more isolated.  As few temptations as Ogden had, Evan was

11  able to find them.  So we didn't feel like he had could go back

12  to Waterfall, though they would have taken him.  They would

13  have taken him.  And it was something we were considering, but

14  we put him into Q&A instead.

15  Q.   Now --

16  A.   Caitlin recommended and Christie -- Caitlin didn't know

17  Christie.  This was two independent consultants who came up

18  with this idea.

19  Q.   When you completed the paperwork for your son to be

20  admitted into the program at Q&A, who signed, for instance, the

21  financial documents to guarantee the payment?

22  A.   I mean, I just remember visiting the place.  We had been

23  through -- as a parent going to a place that's going to take

24  care of your child, the most important thing is safety.  And

25  the other thing is efficacy.  And what they were worried about

FRIEDRICHS HARRIS - DIRECT

1  is that -- is your child violent and going to beat up other

2  kids here, and can you pay for this.  Those are the two things

3  from there.  And two things from my end when I would go there.

4      I don't remember talking about anything about paperwork.

5  I think they knew I was good for the money.  We didn't get into

6  the money.  All I did -- I wanted it to be safe.  It was a

7  farm, he liked animals.  What could be safer than a farm?

8      And then the other thing was they could -- they had a

9  restaurant where he could work in.  And if he lost the job he

10 might be able to go back.  You know, they would take him back

11 because that's what -- they owned the restaurant too and they

12 owned Q&A, so it seemed like that he could have a job there

13 too.

14     So I didn't -- I don't remember signing anything when I

15 visited them.  I visited them in November sometime.  And then

16 when I dropped him off November 22nd, I dropped him off at a

17 meeting spot about halfway between, so I didn't sign anything

18 then either.  So the first trip was mainly for inspection.  The

19 second trip was to drop him off.  And I didn't have any contact

20 with the contract, I don't remember.

21 Q.  When you met the Q&A people at the drop-off location,

22 first of all, where was that?

23 A.  Staunton, Virginia.

24 Q.  Okay.  And at that point in time, was there any

25 presentation of any paperwork for you to review or for your son

FRIEDRICHS HARRIS - DIRECT

1    to sign?

2    A.    No.

3    Q.    Were you told by anyone that your son would be asked to

4    sign paperwork after you dropped him off?

5    A.    No.  No.

6    Q.    And what were the financial arrangements, how were you to

7    pay and how much were you to pay Q&A for taking care of your

8    son?

9    A.    It was $9,500 a month.

10   Q.    And is that consistent with what you had paid at these

11   other places as well?

12   A.    It's a little bit more.  It's more than Waterfall.  For

13   Bachman, we paid 45,000 a year.

14   Q.    And when your son -- when you dropped him off at this

15   point, what was his mental condition like at that point?

16   A.    Subdued.  He -- he was scared.  I told him, you can do

17   this, that this was just temporary.  That he had to look at

18   this like a college where he went away for a while and learned

19   how to live on his own.

20        So we met in a church parking lot and said good-bye.  That

21   was the last time I saw him.

22   Q.    Sir, you've seen the document that's at issue in this

23   case, the contract authorization, binding arbitration document,

24   have you not?

25   A.    Yes.

FRIEDRICHS HARRIS - DIRECT

1    Q.    Had you seen that document at any time prior to the filing

2    of this lawsuit?

3    A.    No.

4    Q.    Did your son ever tell you, hey, I signed a document that

5    says I'm waiving my right to file a lawsuit in the event

6    there's a problem?

7    A.    No.

8    Q.    Had your son threatened to sue people in the past?

9    A.    Sure.  Me.  I mean, he called the police one time because

10   I was abusing him, he said.  And they came and they laughed.

11   And they saw his room and all the stuff he had in there.  Yes,

12   he's threatened to sue people in the past.

13   Q.    Your wife is a lawyer?

14   A.    Yes.

15   Q.    And did he ever threaten people with her suing on his

16   behalf?

17   A.    Sure, yeah.

18   Q.    And would your son have consented to them voluntarily

19   coming in at any time they wanted to and search his room or

20   search his belongings?

21   A.    That would be tough.  I don't think so.  No, he wouldn't.

22   Q.    And why do you say that?

23   A.    He was very protective of his stuff.  I mean, he had a

24   collection of mass that he liked to show off, and being one of

25   the precipitating factors that led to his admission to the

FRIEDRICHS HARRIS - DIRECT

1    psychiatric facility one time was that he was taking these male

2    enhancement products.  He was very concerned with penis size.

3    And he felt like he wasn't big enough.  And these male

4    enhancement products have things that rev you up.  Not

5    physically, just mentally.  So I knew he had it.  And I knew I

6    had to get it.  So to do it, I called the police and told them

7    what the story was and took the stuff.  He had a meltdown,

8    ended up in the psychiatric hospital.  And so he's pretty

9    protective of his stuff.

10   Q.   Doing your visit to Q&A, did anyone ever mention that your

11   son was going to have to sign a document that said he was

12   releasing Q&A from any liability in the event he would be

13   injured there?

14   A.   No.

15   Q.   Was your son capable of signing legal documents?

16   A.   No.

17   Q.   And why do you say that?

18   A.   He doesn't understand legal documents at all.  I mean, he

19   doesn't know what they -- he wouldn't even sign behavior

20   contracts that we would set up for him sometimes.  Because he

21   understood what those were.  He wouldn't sign them because he

22   understood it meant privileges, it meant responsibilities.  We

23   put it on the mirror, you would have to do that.  But other

24   things, there's no way he understood it, this.

25   Q.   Did he ever have a driver's license?

FRIEDRICHS HARRIS - DIRECT

1   A.   No.  He had an identification card.  Couldn't get a

2   driver's license.

3   Q.   Why could he not get a driver's license?

4   A.   Well, he couldn't pass the test, first off.  And,

5   secondly, he has anger problems.  And, thirdly, he would have

6   to plan how to drive.  He would get lost.  He would get in

7   wrecks.

8        So we had a deal.  You know, certain behaviors might get

9   him towards getting a driver's license.  And I put the burden

10  on Dr. Pelts for that.  I wouldn't -- I told him, Dr. Pelts

11  won't let you get a driver's license until you meet these

12  goals.  And he never could meet them.  So we never got him a

13  driver's license.

14            MR. SIMS:  Your Honor, that's all the questions I

15  have.

16            THE COURT:  Cross-examination.

17            MS. SAAD:  Your Honor, before I begin the

18  cross-examination, I would like to request that the other

19  individuals who will be proffered as witnesses in this action

20  be sequestered.

21            THE COURT:  Are they being offered as expert

22  witnesses?

23            MS. SAAD:  I do not know what plaintiff will be

24  offering them for.  I believe one at least will be offered as

25  an expert.  But if Mrs. Harris will be offered as a witness in

FRIEDRICHS HARRIS - CROSS

1   this action, Your Honor, I would ask that she be sequestered.

2            THE COURT:  Are you going to call Mrs. Harris?

3            MR. SIMS:  I do plan on doing that, Your Honor.

4            THE COURT:  She is not a party?

5            MR. SIMS:  You are correct.  She's just a beneficiary

6   of the estate.

7            THE COURT:  In that case, I will grant it with

8   respect to Mrs. Harris.  I apologize.

9            Do you have any others that are nonexpert witnesses?

10           MR. SIMS:  No, Your Honor.

11           THE COURT:  Okay.  Can you go out in the hall,

12  please.

13           MS. SAAD:  Can I move this a bit forward?

14           THE COURT:  You can.

15           MS. SAAD:  Your Honor, I may have to familiarize

16  myself very quickly with this Elmo.  I may need help, actually.

17                      CROSS-EXAMINATION

18  BY MS. SAAD:

19  Q.   Good morning, Mr. Harris.  I have just a couple quick

20  questions for you.

21       First, I just want to review, you discussed a little bit

22  of your background earlier in your testimony.  And you

23  testified that you are an nephrologist; is that correct?

24  A.   Yes.

25  Q.   You are not a psychiatrist; is that correct?

FRIEDRICHS HARRIS - CROSS

1   A.   No.

2   Q.   You have not completed any residencies or fellowships in

3   psychiatric care; is that correct?

4   A.   No.  I took rotations through --

5   Q.   Okay.

6   A.   -- psychiatry.

7   Q.   So you had a normal rotation, but you do not hold yourself

8   as an expert in psychiatric care; is that correct?

9   A.   I don't know.  After raising Evan, I might be.

10  Q.   Do you contend that you are a psychiatric expert?

11  A.   Not for the court reasons, just other people.

12  Q.   You are not qualified to deem someone legally competent or

13  incompetent; is that correct?

14  A.   When I see patients, I can attest to their competence for

15  deciding certain things in their life.  Like end of life

16  decisions, code/no code, if they are competent to do that.

17  Q.   But you have never deemed anyone legally incompetent; is

18  that correct?

19  A.   No.

20  Q.   I'm sorry, you said that's not correct?

21  A.   That -- well, this is a double negative.

22  Q.   It might have been.  That might have been a confusion of

23  terms.

24       Is it correct that you have never deemed anyone

25  incompetent?

FRIEDRICHS HARRIS - CROSS

1    A.    Yes.

2    Q.    And you're not offering expert witness opinions here

3    today?

4    A.    No.

5    Q.    You're here offering testimony as Evan Harris's father?

6    A.    Parent.

7    Q.    You've testified that it's your contention that Evan

8    Harris lacked capacity to enter a legal contract; is that

9    correct?

10   A.    Yes.

11   Q.    You contend that he lacked capacity to sign legal

12   documents; is that correct?

13   A.    He could sign them physically when people demanded that he

14   do it.

15   Q.    So you don't deny that he could sign them with his pen, as

16   in physically --

17   A.    Yes.

18   Q.    -- and capably write the letters of his name?

19   A.    Yes.

20   Q.    However, you -- you do not agree or it is your contention

21   that Evan Harris lacked the mental capacity or competency to

22   enter into a binding legal document?

23   A.    Right.  He wouldn't understand what he was signing.

24   Q.    Even if it's a simple contract, you contend that Evan

25   Harris lacked capacity to enter that simple contract?

FRIEDRICHS HARRIS - CROSS

1   A.   Well, as I said, behavior contracts that I had with him,

2   he could sign.  He sometimes would sign.  He initially would

3   sign them.  But after a while, he understood exactly what that

4   behavior contract was, it was privileges and responsibilities

5   and penalties.  He understood that.  So are you talking about

6   that?

7   Q.   So you actually used behavior contracts as a means of

8   parenting Evan Harris?

9   A.   We tried.

10  Q.   You did use behavioral --

11  A.   We tried --

12  Q.   -- contracts?

13  A.   We tried behavioral modification, it didn't work.

14  Q.   You used more than one behavioral contract throughout --

15  A.   Yes, several times.

16  Q.   -- his growth?

17  A.   Sure.  There were rewards and punishments, mainly tied to

18  money, mainly tied to money.  It would be a daily -- daily

19  thing where if he had good behavior that day, he would get $2,

20  like that.

21  Q.   So you agree that there are some agreements and some

22  contracts that Evan Harris could understand and enter?

23  A.   At a very primitive level.

24  Q.   But you do agree that he could understand and enter some

25  contracts?

FRIEDRICHS HARRIS - CROSS

1  A.   He would understand it that day.  The next day, he would

2  not.  His memory was that poor, that any contract that you

3  spent hours trying to help him understand what it was, the next

4  day it was all new to him.

5  Q.   I think what you're discussing is a memory problem, but

6  you are --

7  A.   Yes, that's important.

8  Q.   You're stating that --

9         THE COURT:  Okay.  We need to make sure that one

10  party talks and the other party talks so we are not both

11  talking at the same time.  Otherwise my court reporter is going

12  to hurt me.

13         MS. SAAD:  Yes, Your Honor, that's my fault.  I

14  apologize.

15  A.   So memory is important.

16  Q.   Mr. Harris, you agree, though, that at the time of signing

17  a contract, the time -- at the time that Evan signed a

18  contract, he could understand a contract if explained to him in

19  simple terms?

20  A.   No, I don't agree.

21  Q.   I think that's what you just said.  Did you not just say

22  that at the time of the contract, he could agree -- he could

23  understand it?

24  A.   The behavior contracts that we did with him that address

25  things that he was familiar with every day, like spitting, like

FRIEDRICHS HARRIS - CROSS

1   cursing, like doing his laundry, like keeping his room clean,

2   yes, he could understand those.  But any legal terms, no.  And

3   arbitration, no.

4   Q.   In fact, on these behavioral contracts, Evan Harris even

5   made modifications to those behavioral contracts; is that

6   correct?

7   A.   Okay.  Okay.  Sometimes he did.

8   Q.   So Evan Harris could read, understand and make

9   modifications to those behavioral contracts; is that correct?

10  A.   On a very primitive level.

11  Q.   Would you agree that the behavioral contracts that you

12  used with Evan Harris were more than five pages long?

13  A.   No.  I mean, I saw -- I remember two pages.  I don't

14  remember five.

15  Q.   You don't remember using a behavioral agreement that is

16  longer than five pages?

17  A.   Show me the example.  I don't know.  There may have been

18  one from when he left Three Springs.  I don't know that it was

19  my contract.  All my contracts that I made with him were very

20  limited.  I didn't make any five-page contracts.

21  Q.   If you signed a contract, was it one that you made?

22  A.   Again, I would have to look at it.  I remember the first

23  contract, behavior contract, we ever made with him, was with

24  the education consultant before he went to Bachman.  It was

25  something about summer.

FRIEDRICHS HARRIS - CROSS

1          I mean, again, you're right.  There was several

2     rudimentary, primitive behavior contracts that he took with

3     him.  It was nothing complex.  And he may have changed some

4     things on those things.  But again, it was nothing complex.

5     And it was something that he was familiar with that day.

6     Q.    You would agree those behavior contracts had multiple

7     pages and multiple terms?

8     A.    Simplistic terms.  Nothing --

9     Q.    But you do agree that they had multiple pages and multiple

10    terms?

11    A.    The longest I remember is like two pages, or maybe three

12    pages.  Five sounds a little long to me.  Maybe you can show me

13    an example.

14          MS. SAAD:  Your Honor, I would like to mark this for

15    identification.  Your Honor, if I may approach?

16          THE COURT:  You may.

17    Q.    Mr. Harris, I am going to hand you what's been marked as

18    Defendants' Exhibit A.

19    A.    My glasses are on the table.

20    Q.    Oh, do you need them, your glasses?

21          MS. SAAD:  I'm blind as a bat too.

22    Q.    Mr. Harris, do you recognize the document that I've just

23    handed you?

24    A.    Yes.

25    Q.    And what is the document that I just handed you?  This is

FRIEDRICHS HARRIS - CROSS

1    a behavioral contract that you --

2    A.    Right.

3    Q.    -- entered into with your son; is that correct?

4    A.    Yes.

5    Q.    Would you please count the number of pages in this

6    agreement?

7    A.    Seven.

8    Q.    And, Mr. Pelts, please turn to the last page of the

9    agreement.

10        Does that have your signature on it?

11   A.    I'm Dr. Harris, I'm not Mr. Pelts.

12   Q.    Oh, I'm so sorry if I said Dr. Pelts.  I'm very sorry.

13   Mr. Harris --

14   A.    Yes, that's my signature, the last page.

15   Q.    -- turn to the last page.  You identified that on the last

16   page, that is your signature on this behavioral contract?

17   A.    Yes.

18   Q.    Is that also -- you also identify Evan Harris's signature;

19   is that correct?

20   A.    Yes, it is Evan's signature.

21   Q.    And that is also your wife's signature?

22   A.    Yes, it is.

23   Q.    So all three of you signed this behavioral agreement that

24   you entered into with Evan Harris; is that correct?

25   A.    We did.  Do you want to ask me if it worked?

FRIEDRICHS HARRIS - CROSS

1  Q.   After this agreement, you actually entered into additional

2  behavioral agreements; is that correct?

3  A.   This was for the 2007, and I amended it to 2008.  This

4  particular period of time was the most horrendous time of Evan

5  and our interaction.

6        Originally -- actually, I didn't craft this originally.

7  This was originally from Three Springs.  Do you see it was

8  crossed out Three Springs and I put Bachman?  So I -- this was

9  when he came home from Three Springs, they made out this

10  contract originally.

11  Q.   But you --

12  A.   -- and then I amended it.

13  Q.   You not only used it in 2007, you used it in 2008; is that

14  correct?

15  A.   Yes, I had to.

16  Q.   Then you mentioned you used an additional behavioral

17  agreement then later; is that correct?

18  A.   I probably did, yeah.  It was -- it was more amended than

19  this.

20  Q.   So you used multiple contracts with Evan Harris as a means

21  of parenting.  And you used them -- you had him sign these

22  agreements and you have testified that he understood them?

23  A.   He would understand things like use of a computer, use of

24  telephone, watching television, playing video games, having

25  friends over, activity away from home after permission from

FRIEDRICHS HARRIS - CROSS

1    parents.  Watching one horror movie, shopping with dad once,

2    caffeine drinks, eating meals.  Music listening, swimming.

3    Watch R rated movies for -- that's what he would understand.

4        You know, he would get punished for hitting any family

5    member, playing with guns and knives, any instances of being

6    arrested.  Any refusal -- I didn't craft this originally.  This

7    was from Three Springs.

8    Q.   Moving on, you mentioned that -- you detailed that Evan

9    Harris was in multiple programs or --

10   A.   Yes.

11   Q.   -- facilities during his youth and actually as an adult;

12   is that correct?

13   A.   Yes.

14   Q.   And one of the programs that he was in, you mentioned, was

15   Waterfall Canyons independent living program in Utah; is that

16   correct?

17   A.   Yes.

18   Q.   And when Evan left that program, Waterfall Canyons, he

19   actually signed himself out; is that correct?

20   A.   I don't know.  They kicked him out.

21   Q.   Is it your -- is it your contention that you don't know

22   whether he signed himself out?

23   A.   Right.  I don't think there was a sign out.  I think they

24   called me and told me he was kicked out.  He wouldn't know what

25   to do.  I mean, they called me about him not being able to stay

FRIEDRICHS HARRIS - CROSS

1   there anymore.  I didn't know anything about him signing

2   something.

3              MS. SAAD:  Your Honor, I would like to have this

4   marked for identification.  Actually, before I do that, I would

5   like to move for the admission of Exhibit A into evidence.

6              THE COURT:  Any objection?

7              MR. SIMS:  No objection, Your Honor.

8              THE COURT:  Defendants' Exhibit -- you have it A?

9              MS. SAAD:  I think it's A.

10             THE COURT:  A will be admitted into evidence.

11             (Defendants' Exhibit A was admitted.)

12  Q.   Dr. Harris, I'm going to hand you what's been marked as

13  Defendants' Exhibit B.

14  A.   Winfall -- oh, Waterfall.  This was supposed to be

15  Waterfall Canyons.  That's a misstatement.  He didn't sign

16  himself out.

17  Q.   Dr. Harris, do you recognize the document I've just handed

18  you?

19  A.   No.

20  Q.   You do not recognize this document?

21  A.   Well, it's an email.  I recognize it's an email to

22  Dr. Pelts.  I don't remember sending this.

23  Q.   And this email is essentially signed electronically by

24  you.  It says Rick; is that correct?

25  A.   It is.

1  Q.   And it is sent to Dr. Pelts?

2  A.   Right.

3  Q.   That is Evan Harris's psychiatrist; is that correct?

4  A.   That is true.

5  Q.   And reading this email, it says -- this is you writing to

6  Dr. Pelts?

7  A.   Yes.

8  Q.   "Evan signed himself out of Windfall Canyons independent

9  living program in Utah and hocked his electronic equipment to

10 get money to take bus to New Orleans."

11      Did I read that correctly?

12 A.   Yes.

13 Q.   And you wrote this email to Dr. Pelts?

14 A.   Dr. Pelts.

15 Q.   So is it still your contention that he did not sign --

16 that Evan Harris did not sign himself out of Waterfall Canyons?

17 A.   I don't remember him signing himself out of Waterfall

18 Canyons.

19 Q.   You don't deny what's written in your email that you

20 wrote, do you?

21 A.   It's in the email.  I misspoke.

22 Q.   You misspoke in the email?

23 A.   In the email.

24 Q.   So you are denying what is written in this email

25 August 11, 2015?

FRIEDRICHS HARRIS - CROSS

1   A.   I'm denying that I knew that he signed himself out.   I

2   talked to Mark Nye and it was my understanding they were

3   kicking him out.

4        He couldn't have -- he wouldn't have signed himself out

5   because he didn't know how he could sign himself out.   He

6   didn't understand he could sign himself out.   So it's a

7   misstatement.   Sorry.   I also misstated the name of the

8   company, it's Waterfall, not Windfall.   So maybe I was

9   distraught.

10  Q.   The last sentence of this email states that "I am willing

11  to arrange a cheap motel to keep him off the streets;" is that

12  correct?

13  A.   Yes.

14  Q.   And you testified a bit earlier that you did, in fact, put

15  Evan Harris in a hotel room for -- by himself for about a week;

16  is that correct?

17  A.   That's correct.

18  Q.   So he did function independently in that hotel for about a

19  week?

20  A.   I wouldn't say it wasn't independent.   We brought him

21  peanut butter and jelly sandwiches and kept track of him.   He

22  didn't go anywhere.   We did everything for him.   We were his

23  enablers.

24  Q.   He was in a hotel prior to coming to Louisiana; is that

25  correct?

FRIEDRICHS HARRIS - CROSS

1    A.    Yeah.   What happened?   He got in a mess.

2    Q.    While Evan Harris was at Waterfall Canyons, did he have

3    any kind of conservatorship set up?

4    A.    You mean a trustee?

5    Q.    Did he have any type of --

6    A.    I don't know what you mean.

7    Q.    -- conservator, such as a legal guardian, that signed on

8    his behalf, had to sign on his behalf while he was at Waterfall

9    Canyons?

10   A.    I don't remember that specifically.   Legal guardian.   I

11   mean, what happens is -- I mean, we -- we had made -- when we

12   made a will out, we had a lawyer make that out and we talked to

13   him about Evan's problems and limitations and we set up a

14   trustee for that.   And Evan's best chance for survival was with

15   us.   If we weren't around, we had to pay somebody else to take

16   care of him.   And that's what we were doing with Q&A and that's

17   what they didn't do.

18   Q.    Let me rephrase my question.   You did not at any time have

19   Evan Harris deemed incompetent such that he was not a legal

20   adult in the eyes of law; is that correct?

21   A.    When we talked to this lawyer, we talked about

22   interdicting him.   And he said it would be better not to right

23   now.   You had to do it before they are 18.   I think he was at

24   18.   And it had to be adversarial and you take your adult to

25   court.   I'm not doing that.   So no, we did not interdict him.

FRIEDRICHS HARRIS - CROSS

1    We still had hope that he would come back to us.  We still had

2    hope that he would be independent on his own sometime.  There

3    is still literature out there showing that the brain can

4    develop until they're in like 20s, so yeah, we didn't interdict

5    him.

6    Q.    And because Evan Harris was an adult over the age of 18

7    and because he had never been deemed legally incompetent, he

8    was the proper party that would sign legal agreements on his

9    behalf; is that correct?

10   A.    Apparently.  It was demanded.

11   Q.    You testified that you didn't complete the application

12   process for Q&A, that you were unfamiliar with the contract and

13   the arbitration agreement; is that correct?

14   A.    Yes.

15   Q.    You are not contending that your household, that you or

16   your wife, neither one saw or completed that application

17   process, are you?

18   A.    No.

19   Q.    And did you trust your wife, who is an attorney, to

20   complete the application and review those documents and submit

21   them to Q&A on your behalf; is that correct?

22   A.    Completely.  It was a burden, actually.  I mean, we had

23   been through that process before, so...

24   Q.    In fact --

25   A.    Filling out paperwork.

FRIEDRICHS HARRIS - CROSS

1   Q.    And, in fact, your wife, Mrs. Harris, did complete the

2   application process and review those documents and submit them

3   to Q&A; is that correct?

4   A.    What she could fill out, she filled out.  She can address

5   that when she talks to you.

6         MS. SAAD:  Your Honor, if I could have a moment?

7         THE COURT:  You may.

8   BY MS. SAAD:

9   Q.    Dr. Harris, I just want to revisit what has been marked as

10  Exhibit A briefly, which is the behavioral contract that we've

11  discussed.

12  A.    Yes.

13  Q.    You mentioned that Evan Harris could only understand very

14  simple terms.

15  A.    Right.

16  Q.    But this behavioral contractually contains some legal

17  procedures and terms that are not so simple, such as amendment;

18  would you agree with that?

19  A.    Amendment is a word he would not have understood.

20  Q.    But yet you had him agree to this contract; and, in fact,

21  he did amend this contract; is that correct?

22  A.    Yes, he did; but he didn't know what he was doing in an

23  amendment.  He wasn't agreeing with the simple use of computer

24  to two hours, unlimited he put in.  Emily gets a turn.

25  Watching television, two hours, he scratched that out and put

FRIEDRICHS HARRIS - CROSS

1    unlimited.  We're talking very simple amendments.  He didn't

2    understand the term amendment.

3         Again, I used this from Three Springs.  They are the ones

4    who wrote this originally, seven pages.  I didn't write this.

5    They took it, they gave it to him on his departure from Three

6    Springs and I amended it after that for 2007 and 2008.

7         There were other behavioral contracts before this that I

8    wrote after it that were two or three pages, and that's what I

9    was referring to.  And what I was concentrating on when I would

10   give this to him were the privileges and required behavior and

11   expected personal responsibilities.  I wasn't concentrating on

12   anything else.

13             MS. SAAD:  I have no further questions.

14             THE COURT:  Any redirect?

15             MR. SIMS:  No, Your Honor.

16             THE COURT:  The witness may step down.  Plaintiff may

17   call his next witness.

18             MR. SIMS:  Your Honor, I would like to call Sandy

19   Schmeideknecht, the defendant in this case.

20             MS. SAAD:  Your Honor, he has not subpoenaed that

21   witness.  She is here as our witness.

22             THE COURT:  And?

23             MS. SAAD:  Your Honor, she may be in the building,

24   she may not.

25             THE COURT:  Well, if she's in the building, where

SANDRA SCHMEIDEKNECHT - DIRECT

1   would she be?

2           MS. SAAD:  Your Honor, we can go look.

3           THE COURT:  Thank you.

4           THE CLERK:  If you could come up here first and state

5   and spell your name for the court reporter.

6           THE DEFENDANT:  Yes, Sandra Jane Schmeideknecht,

7   S-c-h-m-e-i-d-e-k-n-e-c-h-t.

8           THE CLERK:  Please raise your right hand.

9           **SANDRA JANE SCHMEIDEKNECHT, DEFENDANT, SWORN**

10                      DIRECT EXAMINATION

11  BY MR. SIMS:

12  Q.   Good morning.

13  A.   Morning.

14  Q.   Ma'am, my name is David Sims and I've asked to question

15  you here today.

16       Would you tell the court your full legal name, please.

17  A.   Sandra Jane Schmeideknecht.

18           THE COURT:  Would you pull that microphone a little

19  closer to yourself so we can hear you?

20           THE WITNESS:  Is that better?

21           THE COURT:  Yes, thank you.

22  Q.   And, Ms. Schmeideknecht, did I pronounce that correctly?

23  A.   Close.

24  Q.   Close?  May I call you Sandy?

25  A.   Yes, you may.

SANDRA SCHMEIDEKNECHT - DIRECT

1    Q.    Thank you.

2          Sandy, what is your current occupation?

3    A.    I am a certified life coach.

4    Q.    A suicide life coach?

5    A.    No, a certified --

6    Q.    Certified life coach.

7    A.    -- life coach.

8    Q.    I'm sorry.  How long have you been a certified life coach?

9    A.    Approximately since 2008 or '6, I'm not really sure of the

10   exact year.

11   Q.    Where are you employed?

12   A.    I work with Q&A Associates.

13   Q.    Are you an employee of that company?

14   A.    I'm a contract employee.

15   Q.    And you have a written employment agreement or contract?

16   A.    Yes, I do.

17   Q.    Does it have binding arbitration as a clause in it?

18   A.    I don't recall.  I would have to look at it and see.

19   Q.    Now, tell me, if you would, what you told Evan Harris

20   about the binding arbitration agreement that's contained in the

21   contract at issue in this case.

22   A.    I explained to him that this was a -- an agreement that in

23   the event that there was a dispute of any kind, that he would

24   not go to court or his family would not go to court, but

25   instead go in front of an arbitrator.  And that arbitrator

SANDRA SCHMEIDEKNECHT - DIRECT

1    would listen to both sides and make the decision.

2    Q.    And was that the extent of what you told him about the

3    arbitration agreement?

4    A.    As I recall, yes.

5    Q.    Now, you signed an affidavit in this case, have you not?

6    A.    Yes.

7    Q.    And your affidavit was in response to or as a part of the

8    documents submitted to the Court to compel binding arbitration?

9    A.    Yes.

10   Q.    And it says that you -- the application information, form

11   contract were provided to the parents of Evan Harris prior to

12   his arrival at Q&A Associates?

13   A.    Yes.

14   Q.    Did you provide that to them?

15   A.    No, our admissions director did.

16   Q.    Okay.  So is the admissions director here today to testify

17   that she sent these documents to the Harrises before?

18   A.    Yes.

19   Q.    And who is that person?

20   A.    Audrey Peavey.

21   Q.    And so Audrey Peavey told you that she sent all these

22   documents to Evan Harris's parents prior to that, prior to his

23   admission?

24   A.    Yes.

25   Q.    And so that's why that's in your affidavit?

SANDRA SCHMEIDEKNECHT - DIRECT

1  A.    Yes.

2  Q.    Was the document at issue in this case, the contract, the

3  binding arbitration agreement, was it signed by Evan Harris?

4  A.    Not initially, no.

5  Q.    Okay.  And tell the Court, if you would, when that

6  document was presented to Evan to sign.

7  A.    I don't know exactly when it was presented to him because

8  there was emails pertaining to that, where it was sent out

9  where he was to fill out the paperwork, where he previously

10  was.  But I provided him that when I saw him, I believe it was

11  on the 20th of November.  That's when I went over that with

12  him.

13  Q.    Is that the normal process at Q&A, that the life skills

14  coach would present legal documents to applicants and have them

15  sign that?

16  A.    I review and go over -- yes, if they have not signed it

17  prior to enrollment, then I go over that.  And then if they

18  have signed it, I go over the release of information to be sure

19  that they are okay with the people listed.

20  Q.    Who was listed as authorized to release information to

21  about Evan?  Who did he tell you, I'm allowing you to share

22  information with these people?

23  A.    Well, it appears as if his mother wrote it in, and I just

24  asked him if these were okay.  I believe it was Dr. Pelts, and

25  there were two others.  And without seeing it, I don't -- I

SANDRA SCHMEIDEKNECHT - DIRECT

1   don't recall.

2   Q.    So it's your sworn testimony today that if the documents

3   are not signed before the student or the applicant gets there,

4   you go over it with them and have them sign it?

5   A.    Yes.

6   Q.    That's not somebody else's job?

7   A.    No.

8   Q.    It's not the admissions counselor's job?

9   A.    No.

10   Q.    It's your job?

11   A.    Yes.

12   Q.    Now, where is your office in relationship to where the

13   students or the participants in the program are?

14   A.    My office is in the town of Davis.

15   Q.    Where is that in relationship to where Evan Harris would

16   have been?

17   A.    Approximately six miles north.

18   Q.    Okay.  And did you go and see Evan at the location where

19   he was or did he come to see you?

20   A.    He came to see me.

21   Q.    Who brought him there?

22   A.    I do not recall.

23   Q.    He couldn't have walked, true?

24   A.    Well, he could have, but I don't believe so.

25   Q.    Well, how would he have gotten there?  Who would have

SANDRA SCHMEIDEKNECHT - DIRECT

```
 1   brought him?

 2   A.   Probably a mentor.

 3   Q.   Why did he have to come and see you?

 4   A.   Because he was coming in to do his initial assessment for

 5   life skills.

 6   Q.   All right.  And did you do an initial assessment of his

 7   life skills?

 8   A.   Yes.

 9   Q.   And what did that reveal?

10   A.   I don't have it in front of me, but -- so I can't state

11   specifically.

12   Q.   Well, did Evan have trouble understanding the life skills

13   book?

14   A.   Well, we didn't go over a book at the time.

15   Q.   I understand.  But later on.

16   A.   Later on?

17   Q.   Yes.

18   A.   He had some issues with money management was his most

19   significant.

20   Q.   Well, what were those issues?

21   A.   He liked to spend it as soon as he got it.

22   Q.   All right.

23   A.   And he didn't see the value in saving.

24   Q.   And what did you do to address that as his life skills

25   coach?
```

SANDRA SCHMEIDEKNECHT - DIRECT

1    A.    We worked on the decision-making process and on the

2    importance of budgeting and saving money.

3    Q.    Did he have a savings account?

4    A.    Yes.

5    Q.    As a matter of fact, it was a joint savings account with

6    you and him, was it not?

7    A.    It was.

8    Q.    And is that the normal process for applicants in the

9    program, participants?

10   A.    Yes.

11   Q.    So you take them to the bank and establish joint accounts

12   with them?

13   A.    Yes.

14   Q.    So your name is on it and the applicant's name is on it?

15   A.    Yes.

16   Q.    Why is that?

17   A.    So that when they are discharged, oftentimes they have

18   paychecks that come in after they're discharged or after they

19   leave, or after they decide they are not going to be there

20   anymore, whatever the case may be, and then I can go to the

21   bank.  And once all of their paychecks came in, I can obtain a

22   certified check to send to them.

23   Q.    So it wasn't to govern his spending, it was to close out

24   the account when he left?

25   A.    Pretty much, yes.

SANDRA SCHMEIDEKNECHT - DIRECT

1    Q.    Who was present when Evan Harris printed his name on the

2    contract?

3    A.    I don't recall specifically.

4    Q.    What else did you explain about the agreement, other than

5    the binding arbitration clause, if anything?

6    A.    I went through from the top to the bottom.  That he was

7    coming into the program voluntarily.

8         I think the second one is the -- to treat in case of an

9    emergency.  And I explained that to him, in the event that he

10   was knocked out or unconscious then one of the representatives

11   of Q&A would have the ability to get him to the hospital,

12   provide emergency care until his parents could be reached.

13        I think one of them is search and seizure, meaning that in

14   the event that -- usually that was for home visits.  So when

15   they returned, they were -- oftentimes if there was a question

16   that they had some marijuana or other drugs or paraphernalia or

17   alcohol, then we had the right to search.  And he understood

18   that.

19        Let me see.  Oh, if he left -- if he left the program and

20   wanted to return, that he would bear the cost of us having to

21   go get him.  And I can't remember the -- I think.

22   Q.    Did Evan ever threaten to sue after he signed this binding

23   arbitration agreement?

24   A.    No, not to my knowledge.

25   Q.    You're not aware of that?

SANDRA SCHMEIDEKNECHT - DIRECT

1    A.    No.

2    Q.    Now, as his life skills coach, you did present him with a

3    book, did you not, to read?

4    A.    He was given packets.  They are packets that he can work

5    through.  A book is often overwhelming.

6    Q.    And the packet that you gave him, he didn't have the

7    ability to read and understand that packet, did he?

8    A.    I don't -- yes, he did.  He understood the decision-making

9    process very well.  He understood that.

10   Q.    You never expressed any concern that he didn't understand

11   what he was reading?

12   A.    I don't recall.

13   Q.    You don't recall doing that?

14         THE COURT:  Mr. Sims, how much longer do we have, do

15   you imagine?

16         MR. SIMS:  Maybe 20 minutes, Your Honor.

17         THE COURT:  Okay.  Well, it's -- we're obviously

18   going to go well into the afternoon in this case, so let's take

19   a break until 1:15.

20         MR. SIMS:  Thank you, Your Honor.

21         (Recess taken from 11:59 a.m. to 1:25 p.m.)

22         THE COURT:  Be seated, please.

23         MS. SAAD:  May I go get the witness, Your Honor?

24         THE COURT:  You may.

25         MR. SIMS:  I have an exhibit I want to mark, Your

SANDRA SCHMEIDEKNECHT - DIRECT

 1   Honor.

 2                  (Witness resumes the stand.)

 3                  MR. SIMS:  Your Honor, does she have the exhibit?

 4                  THE COURT:  No.  Ask the clerk to pass the exhibit to

 5   the witness who has retaken the stand and we will continue with

 6   direct examination.

 7   BY MR. SIMS:

 8   Q.   Sandy, I have handed you or the clerk has handed you what

 9   has been called a contract, medical authorization release and

10   consent agreements.  This is the document we were talking about

11   earlier, is it not?

12   A.   Yes.

13   Q.   And when you were explaining this document to Evan Harris,

14   as you testified earlier, did he ask questions about who his

15   child is?

16   A.   Excuse me?

17   Q.   The last sentence of the consent to participate says --

18   A.   Oh, my child's property or person.  No, he did not.  I

19   explained that some of our clients are under guardianship.

20   That's why it says my child.

21   Q.   So this would have been signed by a parent?

22   A.   Yes, if they are under guardianship.

23   Q.   Okay.  So now with respect to the procedures and policies

24   for safety and well being, who did you tell him was going to be

25   the duly trained designated and supervised personnel to search

SANDRA SCHMEIDEKNECHT - DIRECT

1    his belongings?

2    A.    It would be our program director.

3    Q.    Did you tell him that person's name?

4    A.    Yes, Keith.  Uh-huh.

5    Q.    And so when you were explaining this to him, you told him

6    this person by the name of Keith, is that Keith Bishop?

7    A.    Yes, sir.

8    Q.    That he was going to be the one searching his things?

9    A.    Yes, if it was necessary.

10   Q.    Now, the last sentence of the agreement to arbitrate says,

11   "Instead, all parties accept the use of arbitration as an

12   economical and expeditious way of resolving any disputes."

13        Do you see that?

14   A.    Yes.

15   Q.    What did you explain -- or did you explain what the word

16   "economical" meant?

17   A.    I don't believe I explained economical.

18   Q.    Okay.  Did you explain to him what the word "expeditious"

19   meant?

20   A.    I don't believe so.

21   Q.    Ma'am, you have a program -- or Q&A has a program called

22   Best Notes, does it not?

23   A.    Yes, it does.

24   Q.    And Best Notes permits you to document what you have done

25   on any given day with respect to any given client, does it not?

SANDRA SCHMEIDEKNECHT - DIRECT

1    A.    Yes.

2              MR. SIMS:  Your Honor, if I may have that marked as

3    Plaintiff's Exhibit 2, please.

4    Q.    Ma'am, first of all, is this a document that has your name

5    on it?

6    A.    Yes.

7    Q.    Would you have been the one who authored it?

8    A.    Yes.

9    Q.    And you would agree with me, ma'am, that this says "Evan

10   came in and completed his initial assessment."

11             Do you see that?

12   A.    May I have a moment to read, please?  I don't see that in

13   this one.

14   Q.    I'm sorry, did I give you the wrong document?

15   A.    I don't know.  This is dated December 1st.

16   Q.    I'm sorry, I gave you the wrong one.

17   A.    Okay.

18   Q.    I want to go ahead and use that document.

19             MS. SAAD:  Dave, I have this one.  You can have this

20   one back.

21   Q.    Ma'am, this is Exhibit 3, Plaintiff's Exhibit 3 is the

22   November 20, 2015, note?

23   A.    Yes.

24   Q.    That you authored as well?

25   A.    This is what I -- yeah, may I read it?  Uh-huh.  Okay.

SANDRA SCHMEIDEKNECHT - DIRECT

1  Q.   Ma'am, do you see the first sentence, "Evan came in and

2  completed his initial assessment"?

3  A.   Yes.

4  Q.   Is that the life skill assessment you were talking about

5  earlier?

6  A.   Yes.

7  Q.   Ma'am, you would agree with me that this document, this

8  writing documents your conversation with Evan's mother, that

9  she called and that she was concerned that he was not on

10  lithium extended release?

11  A.   That's correct.

12  Q.   And that he was taking amantadine twice a day --

13  A.   Right.

14  Q.   -- when he was not supposed to be, correct?

15  A.   According to what she said, yes.

16  Q.   She gave you her -- Evan's home psychiatrist's contact

17  information?

18  A.   That's correct.

19  Q.   You said, "I sent him an email with the pharmacy contact

20  information"?

21  A.   That's correct.

22  Q.   Did you not?

23  A.   Yes, I did.

24  Q.   And you documented that they could follow by scheduling a

25  conference call or Skype sessions?

SANDRA SCHMEIDEKNECHT - DIRECT

1   A.   Yes.  But I also sent the information for Dr. Trefzger as

2   well in the event he is not going to follow him, meaning his

3   home psychiatrist.

4   Q.   And you documented that Evan's mother really wanted to

5   talk about how she had managed Evan and how difficult it was

6   going to be?

7   A.   Yes.

8   Q.   And you have a very detailed discussion or recitation of

9   that discussion, do you not?

10  A.   Yes.

11  Q.   Now, you would agree with me, ma'am, there is not one

12  mention on Exhibit 3 that you went over this contract with Evan

13  Harris, is there?

14  A.   No, there is not.

15  Q.   You documented everything else that happened during Evan's

16  meeting on that day, except the contract discussion; true?

17  A.   Yes; however, the contract is part of my initial

18  assessment when I meet with them.

19  Q.   Ma'am, your sworn testimony today is part of the life

20  skills assessment is going over this contract and having them

21  sign it?

22  A.   Part of it, if they have not signed it, yes, is going over

23  it and have them sign it.  Yes.

24  Q.   Why did you not document that?

25  A.   Because it was part of the initial assessment with Evan.

SANDRA SCHMEIDEKNECHT - DIRECT

1   Q.   Now, the December 1st exhibit, Exhibit 2 --

2   A.   Yes.

3   Q.   -- you authored this document as well, did you not?

4   A.   Yes.

5   Q.   And in this document, you state that he struggles with

6   making a plan which he is to work on regarding going home for

7   Christmas.

8   A.   Yes.

9   Q.   You would agree with me that Evan had difficulty in

10  planning any aspect of his life, did he not?

11  A.   No.

12  Q.   No, you disagree with that?

13  A.   That is correct.  I disagree.

14  Q.   He just struggled making a plan so he could go home?

15  A.   That is not unusual with the clients, all of the clients

16  that I work with.

17  Q.   All of them have trouble planning to go home?

18  A.   Planning to do anything, yes.

19  Q.   Okay.  So Evan had trouble planning to do anything as

20  well, did he not?

21  A.   As it said, he discussed the challenges of time management

22  through chores.  And so I encouraged him to set his alarm and

23  get up half an hour early so he would have plenty of time, so

24  he could eat a good breakfast.  I have encouraged him to drink

25  16 ounces of water with each set of pills so they don't settle

SANDRA SCHMEIDEKNECHT - DIRECT

1    in his stomach.  His call was uneventful.

2         And then his mother set up that she would call him in the

3    evening after dinner.  He struggles with making a plan which he

4    is to work on regarding going home for Christmas.  And he

5    explained what his parents said he could or could not do;

6    however, he did turn in a plan for an Xbox that he did not have

7    problems doing.

8    Q.   Ma'am, you had to explain to him that he had to set his

9    alarm clock a half an hour earlier --

10   A.   It was a suggestion.

11   Q.   -- so he could eat breakfast?

12   A.   It was a suggestion.  And that's not uncommon with all the

13   clients.

14   Q.   You have to tell them what time to get up so they can eat

15   breakfast?

16   A.   Oftentimes when they first come in, yes.  They need

17   assistance and support in getting up in a timely manner, yes.

18   Q.   All right.  The life skill assessment --

19   A.   Uh-huh.

20   Q.   -- is that a handwritten document like this one?

21   A.   That -- I can't see quite that far, but if it's a

22   handwritten part that has goals --

23   Q.   Yes.

24   A.   -- then that would be the part that is what Evan would

25   list as his goals, short-term, medium-term, long-term.

SANDRA SCHMEIDEKNECHT - DIRECT

1   Q.   All right.

2            MR. SIMS:   If you would mark that as Plaintiff's

3   Exhibit 4, please.

4   Q.   Ma'am, is that the life skill assessment completed by Evan

5   Harris?

6   A.   Yes.

7   Q.   If you look at the second page, under faiths or beliefs?

8   A.   Yes.

9   Q.   There is a question, "What is your faith or belief?"  What

10  did Evan write?

11  A.   Both.

12  Q.   Is that an answer that was responsive to the question?

13  A.   Yes, it could be.  He could have a faith or a belief and

14  it would be two different things.

15  Q.   The question is, "What is your faith or belief?"  And he

16  wrote the word "both"?

17  A.   Correct.

18  Q.   So explain to me how that was a logical response to that

19  question.

20  A.   Because he could have a faith or a belief.  And he

21  responded he had both.

22  Q.   The third question is, "What things do you believe that

23  give meaning to your life?"  And he wrote "friends and home"?

24  A.   Yes.

25  Q.   Under the next section, "Is it important in your life?"

SANDRA SCHMEIDEKNECHT - DIRECT

```
 1   He writes, "friends and home" again, correct?

 2   A.    Uh-huh, friends and home are important to his life, yes.

 3   Q.    "Have your beliefs influenced your behavior?"  What did he

 4   write?

 5   A.    "Some."

 6   Q.    Is that an appropriate response to that question?

 7   A.    Yes.

 8   Q.    Under Community, "Is there a person or group of people you

 9   really love or are really important to you?"  What did he

10   write?

11   A.    "No."

12   Q.    "How would you like me, your life coach, to address these

13   issues?"  What did he write?

14   A.    Question mark.  That's not uncommon.

15   Q.    So based upon his answers to these questions on the second

16   page of this exhibit, you believed he was providing normal

17   responses to a life skill assessment that you would expect and

18   receive from other program participants just like Evan?

19   A.    Yes.  This is a spiritual assessment.  This is not a life

20   skills assessment.  This is a spiritual assessment.

21   Q.    Okay.  On the next page, on the life skill assessment --

22   A.    Yes.

23   Q.    -- with respect to, "I know the products to use when

24   cleaning the kitchen and the bathroom" --

25   A.    Just a moment.
```

SANDRA SCHMEIDEKNECHT - DIRECT

1  Q.   He told you he didn't know what products to use, correct?

2  A.   I'm not on that page.  What number?

3  Q.   It's --

4  A.   Here it is.

5  Q.   110, the next-to-the-last thing on the list.

6  A.   110.  Here it is.  That's correct.  That also is not

7  uncommon.

8  Q.   "I know how to use a fire extinguisher," he said "no,"

9  correct?

10  A.   That's correct.  That's not uncommon.

11  Q.   When he was asked about where he could get help with his

12  income tax, he told you he didn't know, correct?

13  A.   That's correct.  That's not uncommon.

14  Q.   When he was asked where he could get tutoring or other

15  help with his school work, he told you he didn't know where to

16  do that either?

17  A.   That is correct.  And that is often the initial answer.

18  Q.   He didn't understand on housing and market management --

19  money management, I mean, he didn't understand interest rates.

20  He didn't understand the disadvantages of making purchases on a

21  credit card.  He didn't understand anything on that page except

22  "I put money in my savings account when I can," and he put --

23  checked "somewhat."  And "I use online banking to keep track of

24  my money."

25  A.   Correct.  That is --

SANDRA SCHMEIDEKNECHT - DIRECT

1   Q.   Everything else he didn't know anything about it, did he?

2   A.   That's not uncommon with the clients that I work with.

3   Q.   So how did Evan do with his life skill assessment?

4   A.   This isn't to judge how he did.  It is to assess where he

5   needs to focus to begin with his curriculum.

6   Q.   Okay.  So what curriculum was he going to be placed in?

7   A.   The first curriculum is the decision-making process.

8            MR. SIMS:  Plaintiff's Exhibit 5, please.

9   Q.   Ma'am, is that another document you created, Plaintiff's

10  Exhibit 5?

11  A.   Uh-huh, yes.

12  Q.   Do you remember me asking you earlier if Evan ever had any

13  trouble understanding his life skills book?

14  A.   It is not a book.  It is a --

15  Q.   Okay.  He didn't understand his life skills packet?

16  A.   Right.

17  Q.   And what did you write on that day, five days into the

18  program?

19  A.   This was that he did complete the first chapter on making

20  a decision, but we are going to move into an easier curriculum

21  as he has limited vocabulary and understanding.

22  Q.   So you recognized five days into the program that he had a

23  limited vocabulary and a limited understanding of basic life

24  skills, true?

25  A.   The initial making decision is at a college level, and

SANDRA SCHMEIDEKNECHT - DIRECT

1    I -- he had difficulty with that, but he did understand

2    English.  He just had a limited vocabulary but was able, once

3    it was chunked down, he was able to understand it.  So he

4    wouldn't become frustrated, we went to an easier curriculum for

5    him.

6    Q.   And you went to an easier curriculum because he wasn't

7    capable of understanding the curriculum you had given to him,

8    correct?

9    A.   Not independently, but he was when it was explained.

10   Q.   When you were explaining the arbitration agreement to him,

11   did you tell him he had to go to McLean, Virginia, to arbitrate

12   his case?

13   A.   I read what the arbitration statement said and then

14   explained it to him.  Not where he was going, no, I did not.

15   Q.   Did he ask you, how am I to get to McClain, Virginia?

16   A.   No.

17   Q.   Did he ask you where it is?

18   A.   No.

19   Q.   He didn't have any questions about it, did he?

20   A.   No.

21          MR. SIMS:  Your Honor, that's all the questions I

22   have of this witness.

23          THE COURT:  Cross-examination/direct examination.

24          MS. SAAD:  Got it.

25          THE COURT:  Short break.

SANDRA SCHMEIDEKNECHT - CROSS

```
 1        (Recess taken from 1:47 p.m. to  1:50 p.m.)

 2                      CROSS-EXAMINATION

 3   BY MS. SAAD:

 4   Q.   Okay.  Sandy, you've gone through a little bit of your

 5   background, but I do just want to touch on it a little bit

 6   further.

 7        You have been with Q&A Associates since its inception; is

 8   that correct?

 9   A.   That's correct.

10   Q.   And tell me a little bit about what kind of program is Q&A

11   Associates?

12   A.   Q&A Associates is best described as a community-based life

13   skill model program for young adults needing assistance in

14   developing independent living skills.

15   Q.   And is it a mental health facility?

16   A.   No.

17   Q.   Is it a lockdown facility?

18   A.   No.

19   Q.   I think you just called it a community-based facility; is

20   that correct?

21   A.   It would be a community-based program.

22   Q.   And I'm sorry, you know, I do a lot of other nursing home

23   work.  I call everything facilities nowadays so I'm sorry, this

24   program.  And tell me, why is it considered a community-based

25   program?
```

SANDRA SCHMEIDEKNECHT - CROSS

1    A.    Because we use all of the available assets within the

2    community to help support the clients.

3    Q.    And do the clients live in a community together?

4    A.    Yes, they live in a home.

5    Q.    Okay.  And so Evan Harris, was he part of a home?

6    A.    Yes.  He lived in a house with the rest of the boys.

7    Q.    And what is that basically, is that a cabin or a

8    farmhouse?

9    A.    Farmhouse.

10   Q.    Okay.  And they learn what kind of skills living in that

11   home?

12   A.    They live normal activities of daily living.  They learn

13   how to take care of themselves.  They learn how to take care of

14   their environment.  They learn cooking, they learn cleaning.

15   They learn relationships, about relationships and building

16   relationships.  They learn how to manage their money.  We do it

17   in a classroom setting and then it is put into practical

18   experience.

19   Q.    What about job skills?

20   A.    Oh, yes, I'm sorry, job skills.  Interviewing, how to

21   dress appropriately.

22   Q.    Do they hold jobs typically when they are at Q&A?

23   A.    Yes.

24   Q.    And your background, just briefly, your educational

25   background, what was your first degree that you obtained?

81

SANDRA SCHMEIDEKNECHT - CROSS

1    A.    I had a diploma as a licensed practical nurse and then I

2    went on to get my associate's degree in nursing.  And then I

3    went on afterwards to get a bachelor's in multidisciplinary

4    studies.  It was Christian counseling, business, and nursing.

5    I went and got a master's in human services, marriage and

6    family, and I am presently enrolled, working on my doctorate in

7    education.

8    Q.    Good for you.  Do you hold any other certifications or

9    certificates?

10   A.    Yes, I have a certificate as a certified life coach, as a

11   certified professional coach, as a certified addiction recovery

12   coach.  And multiple other certificates.

13   Q.    Okay.  There's been some discussion about your

14   interactions with Evan Harris.  And you know who I speak of

15   when I talk about Evan Harris, right?

16   A.    That's correct.

17   Q.    There's been some discussion about the initial assessment

18   that you completed with him; is that correct?

19   A.    Yes.

20   Q.    And did you do the initial assessment on the first day

21   that he came to Q&A?

22   A.    No.

23   Q.    And why is that?

24   A.    Give him time to settle in and get accustomed to the

25   environment and calm down and be more ready to be able to sit

SANDRA SCHMEIDEKNECHT - CROSS

1   and answer questions.

2   Q.    And Mr. Sims showed you some of the things that Evan

3   Harris stated in his life skills that he can't do, but he

4   didn't really bring up anything that he can do in those --

5   checked in those boxes --

6   A.    That's correct.

7   Q.    -- in the life skills?

8   A.    That's correct.

9   Q.    And you kind of answered frequently that this is not

10  uncommon for clients.  And in fact, being able to clean a

11  bathroom or know where to take your taxes to be done, would it

12  be uncommon for any 18 or 24 year old to not know answers to

13  all of the things like that?

14  A.    No, it would not be uncommon.

15  Q.    And the initial assessment included some paperwork,

16  including a contract, you reviewed in detail with Mr. Sims.

17        Do you remember that?

18  A.    Yes.

19  Q.    And he asked you some questions about insisting whether

20  you actually reviewed this contract with Evan Harris.

21        Do you remember that?

22  A.    Yes.

23  Q.    As part of your -- at Q&A, who does the initial

24  assessment?

25  A.    I do.

SANDRA SCHMEIDEKNECHT - CROSS

1   Q.   You do all of them, right?

2   A.   That's correct.

3   Q.   And so you are familiar, you are able to rattle off every

4   provision of that contract because you review it every time

5   that a new client comes in; is that correct?

6   A.   That's correct.

7   Q.   So you were comfortable reviewing the arbitration

8   agreement with Evan Harris?

9   A.   Yes, I was.

10  Q.   I think that was marked -- I think it was marked as one of

11  the plaintiff's exhibits, I think it was Plaintiff's Exhibit

12  Number 1, was the contract, medical authorization release and

13  consent agreement --

14  A.   Uh-huh.

15  Q.   -- that we were just discussing, this contract agreement.

16       Do you have that in front of you?

17  A.   Yes, I do.

18  Q.   And you've already testified that you explained the

19  arbitration agreement in simple terms; is that correct?

20  A.   That's correct.

21  Q.   And you verbally asked Evan Harris whether he understood;

22  is that correct?

23  A.   That's correct.

24  Q.   And you gave him an opportunity to ask questions; is that

25  correct?

SANDRA SCHMEIDEKNECHT - CROSS

1    A.    That's correct.

2    Q.    Now, when you were doing an initial assessment, what are

3    you looking for in the client's demeanor when you're going

4    through both the contract or any of the life skill plans?

5    A.    They are very detail oriented.  They are calm.  They are

6    able to understand the English language and be able to answer

7    the questions.  If they have trouble with that, then we'll --

8    we can use a different assessment.  But he did, as I saw,

9    pretty well and pretty normal responses on the -- on this one.

10   Q.    If someone, if a client showed signs of distress or signs

11   of confusion, would you have that person sign an agreement?

12   A.    No.

13   Q.    So it's important to you that they are in the right frame

14   of mind when you're going through this information and

15   particularly this agreement with the clients?

16   A.    That's correct.

17   Q.    When a client comes into Q&A, is it typical that you

18   would -- you would inquire or you would know if a client had a

19   conservatorship or some other legal guardian?

20   A.    Yes.

21   Q.    And if that client had a conservator or other legal

22   guardian, would you have that individual, that client sign this

23   contract?

24   A.    No.

25   Q.    As far as were you ever informed by Evan's parents, either

SANDRA SCHMEIDEKNECHT - CROSS

1   Dr. Harris or Ms. Kathy Harris, that Evan Harris in fact was

2   not competent, did they ever tell you that?

3   A.    No.

4   Q.    And as far as you knew, he was a over 18 year old

5   competent adult; is that correct?

6   A.    That's correct.

7   Q.    And he appeared to understand at the time of the signing

8   of the contract the contract as was described in simple terms

9   by you?

10  A.    That's correct.

11  Q.    There's one other document that wasn't discussed in much

12  detail.  It is the second page of Plaintiff's Exhibit Number 1.

13  A.    Uh-huh, yes.

14  Q.    That is the -- this is the release of information form.

15        Do you have that in front of you?

16  A.    Yes, I do.

17  Q.    There was some discussion about whether you had reviewed

18  this with Evan Harris.  And did you review it with Evan Harris?

19  A.    I did.

20  Q.    And, in fact, you reviewed each of the authorized persons

21  for that release of information; is that correct?

22  A.    That's correct.

23  Q.    And when you received -- when you received both the first

24  page of Plaintiff's Exhibit 1 and the second page of

25  Plaintiff's Exhibit 1, they had portions of them completed; is

 1   that correct?

 2   A.   That's correct.

 3   Q.   And on the first page, what portion was completed when you

 4   got this document?

 5   A.   The participant's full name, date of birth, social

 6   security number.

 7   Q.   And is it your understanding that this top portion was

 8   completed by Evan's parents and then provided to Q&A?

 9          MR. SIMS:  Objection.  Calls for speculation.

10          THE COURT:  Overruled.  If she knows.

11   A.   Yes.

12   Q.   And what about the second page.  Was this also

13   completed -- tell me -- I'm sorry.  This second page, what

14   portions were completed when you received this document, the

15   release of information?

16   A.   Everything was completed.  The name of the three people

17   and their contact information.  And that the date had been put

18   in as of 10/29/15, and Evan Harris was printed in.  And then

19   all of the bottom part, which has the name, the cell numbers,

20   social security, and you'll see the insurance information.

21   That was all filled in.

22   Q.   What about the signature of participant line, was that

23   completed?

24   A.   No, it was not.

25   Q.   And what about on this contract page, similarly, on the

SANDRA SCHMEIDEKNECHT - REDIRECT

1    bottom of this contract, was this signature for participant

2    line completed?

3    A.    Not prior to meeting with him.

4    Q.    When you met with Evan Harris, you reviewed these two

5    documents and had him sign them in your presence?

6    A.    That's correct.

7    Q.    After you obtained, sufficient for you, a belief that he

8    understood those documents and his verbal acknowledgment that

9    he understood those documents?

10    A.    That's correct.

11            MS. SAAD:  I don't have any further questions.  Thank

12    you.

13            THE COURT:  Any redirect?

14            MR. SIMS:  Just briefly, Your Honor.

15                    REDIRECT EXAMINATION

16    BY MR. SIMS:

17    Q.    Sandy, did you have the 24-page document prepared by Kevin

18    Fenstermacher, Ph.D., the psychological evaluation that was

19    done on Evan before he arrived?

20    A.    If it was sent prior to then I would have, yes.

21    Q.    Do you have any recollection of reading it?

22    A.    I read all of them, but I don't have a specific

23    recollection of his.

24    Q.    Do you know if Dr. Fenstermacher believed that Evan was

25    competent or not?

SANDRA SCHMEIDEKNECHT - REDIRECT

1   A.    I do not know.

2   Q.    Is it your sworn testimony that you read

3   Dr. Fenstermacher's report prior to the time you had Evan sign

4   this agreement?

5   A.    If it came in prior to his enrollment, I would have read

6   it.

7   Q.    Now, going back to Plaintiff's Exhibit 1, whose

8   handwriting is it for the 11/20/15?

9   A.    That is mine.

10  Q.    And is that the same on page 13, the second page by Evan's

11  signature, 11/20/15?

12  A.    Yes.

13  Q.    Did you tell Evan he needed to put a date?

14  A.    Yes, I said you need to put a date.

15  Q.    He didn't do it, did he?

16  A.    No.  That's not uncommon either.

17  Q.    Well, I want to ask you some questions about common.

18  A.    About what?

19  Q.    The word common.  You've used that word a lot today.

20  A.    Uh-huh.

21  Q.    And I want to know, was Evan a common person in your

22  programs or was Evan a common person in the world?

23  A.    I can't answer about the world.

24  Q.    You don't --

25  A.    I can answer that he had similar challenges with different

SANDRA SCHMEIDEKNECHT - REDIRECT

1    parts of basic life skills as is common with the clients who

2    come to our plan to learn those life skills.

3    Q.    Did you determine him to have a learning disability?

4    A.    Yes.

5              MR. SIMS:  Your Honor, that's all the questions I

6    have.

7              MS. SAAD:  Nothing further, Your Honor.

8              THE COURT:  You may step down.  May the witness be

9    excused?

10             MS. SAAD:  Yes, Your Honor.

11             MR. SIMS:  Yes, Your Honor.

12             THE COURT:  Thank you.

13             MR. SIMS:  Your Honor, I would move for the admission

14   of Plaintiff's Exhibit 1 through 5.

15             MS. SAAD:  No objection.  While we're clearing that

16   up, can I move for the admission of Defendants' Exhibit B,

17   please.

18             MR. SIMS:  No, Your Honor.

19             THE COURT:  Plaintiff's Exhibits 1 through 5 and

20   Defendant's Exhibit B will admitted into evidence.

21             (Plaintiff's Exhibits 1 - 5 and Defendants' Exhibit B

22   were admitted.)

23             MR. SIMS:  Your Honor, my next witness is Dr. Paul

24   Pelts, M.D.

25             THE COURT:  Are you still planning on calling

PAUL GERARD PELTS - DIRECT

 1  Mrs. Harris?

 2          MR. SIMS:  In all honesty, Your Honor, probably not.

 3  But I don't want to commit myself to saying no and my need to

 4  call her.  But my honest assessment right now is I will not be

 5  calling her.

 6          THE COURT:  Well, I'm not the one that has to deal

 7  with her for leaving her out in the hall.

 8          MR. SIMS:  I understand, and I will take

 9  responsibility for that, Your Honor.

10          THE COURT:  All right.

11          THE CLERK:  Please state and spell your name for the

12  court reporter first.

13          THE WITNESS:  Paul Gerard Pelts.

14  **PAUL GERARD PELTS, PLAINTIFF WITNESS, SWORN**

15                      DIRECT EXAMINATION

16  BY MR. SIMS:

17  Q.   Good afternoon, Doctor.  Would you tell us your full legal

18  name, please.

19  A.   Paul Gerard Pelts.

20  Q.   And, Dr. Pelts, what do you do for a living, sir?

21  A.   I am an adult, child and adolescent psychiatrist in

22  private practice in New Orleans.

23  Q.   And, sir, tell me, if you would, what's your business

24  address?

25  A.   It is 1539 Jackson Avenue, Suite 300, New Orleans,

PAUL GERARD PELTS - DIRECT

1   Louisiana, 70130.

2   Q.   And tell us, if you would, where did you obtain your

3   education to be a child, adolescent and adult psychiatrist?

4   A.   I attended undergraduate medical school at the University

5   of Missouri in Kansas City.  I did a fellowship in general

6   adult psychiatry at Ochsner Medical Foundation in New Orleans.

7   And I did a child and adolescent fellowship at Tulane

8   University Medical Center in New Orleans.

9   Q.   Tell the Court, if you would, what the importance of doing

10   a fellowship is in that field.

11   A.   The importance is understanding the things that are very

12   different between adults and children, developmental

13   perspectives, diagnoses that are more inherently common or

14   peculiar to children and adolescents, and the treatment and

15   treatment modalities which can be very different as well.

16   Q.   Sir, if you would, after you completed your fellowship

17   training in adolescent psychiatry, where did you begin

18   practicing?

19   A.   I began as the director of the child and adolescent

20   neuropsychiatric unit at Tulane University Hospital for

21   Children.

22   Q.   How long were in that role?

23   A.   I was in that role approximately probably about four to

24   five years.

25   Q.   And what did you do after completing that task, that job?

PAUL GERARD PELTS - DIRECT

1    A.    I went on to become the medical director of Tulane

2    DePaul's inpatient psychiatric unit.  And then I was the

3    director of their adolescent unit after that.

4    Q.    After that job, what did you do next?

5    A.    I went to private practice for a not-for-profit hospital

6    group, Mercy Family Center, seeing primarily children and

7    adolescents for evaluation and psychiatric treatment.

8    Q.    After completing that job, what did you do?

9    A.    I've been in private practice in a group practice for the

10   last 11 years.  Psychiatrists, psychologists, social workers

11   and one art therapist.

12   Q.    Are these people that work in your practice your

13   employees?

14   A.    They are not my employees.  They work -- they rent office

15   space and we have a cooperative practice.

16   Q.    All right.  And do you have experience in assessing people

17   like Evan Harris?

18   A.    Much of the work that I do does primarily center around

19   children and adolescents with developmental disabilities,

20   including autistic spectrum disorder.  Also intellectual

21   disabilities, attention deficit hyperactivity disorder and mood

22   disorders.

23   Q.    Have you testified as an expert witness in other cases?

24   A.    Yes, I have.

25   Q.    Have you ever not qualified as an expert witness?

PAUL GERARD PELTS - DIRECT

1  A.   No, I have not.

2           MR. SIMS:  Your Honor, at this time I would move to

3  treat Dr. Pelts as an expert witness in the field of adolescent

4  and adult psychiatry.

5           THE COURT:  Voir dire?

6           MR. JONES:  No objection, Your Honor.  No voir dire.

7           THE COURT:  All right.  Dr. Pelts will be able to

8  give opinion testimony in the fields of adolescent and adult

9  psychiatry.

10           MR. SIMS:  Thank you, Your Honor.

11  Q.   Dr. Pelts, if you would tell us about when you first met

12  the Harris family?

13  A.   The Harrises originally consulted with me in September of

14  2006.  That was an initial meeting with Evan's parents, Dr. and

15  Mrs. Harris.

16  Q.   And tell the Court, if you would, what took place during

17  that meeting, what the concerns of the Harrises were.

18  A.   The Harrises expressed a variety of concerns that Evan was

19  experiencing, primarily anger and frustration that at times

20  would become physical as things escalated.

21       He was also having some difficulty with impulse control,

22  mood fluctuation, that would fluctuate somewhere between him

23  being euphoric, overly happy and angry.  He would perseverate

24  or get fixated on things and was not be able to unstick from

25  that.

PAUL GERARD PELTS - DIRECT

1        He was having difficulty missing social cues and also was

2   having, at times, some delusional thinking or some thinking

3   that did not appear congruent with the situations.

4   Q.   Did you immediately begin caring for Evan after this

5   meeting with the Harrises?

6   A.   No, I did not.  There was a lapse between that meeting and

7   the next time I met with the Harrises.

8   Q.   And tell the Court, if you would, what the reason for that

9   delay was.

10  A.   Evan had been admitted at a residential treatment

11  facility, Three Springs, I believe very shortly after I had met

12  with them.  And I did not have contact with then again until

13  shortly after Evan was discharged from that program.

14  Q.   Now, as Evan's treating psychiatrist, did you have access

15  to his earlier mental health treatment?

16  A.   Yes, in a variety of ways.  The first was by some initial

17  assessment that the parents had filled out, which is in the

18  chart.  The other part is just doing a standard psychiatric

19  history, asking questions about development, previous symptoms,

20  previous treatments.  And also they had allowed me access to

21  any records that I had needed or wanted as we began the

22  process.

23       But I think it's very important to understand that a lot

24  of times when parents come to see me initially, it is as much a

25  meet and greet as anything else from the perspective of they

PAUL GERARD PELTS - DIRECT

1   are getting to meet me, get to know me a little bit, see if

2   they feel like we can work together.  I'm also starting to

3   formulate some history, as was in the case of Evan, very, very

4   complicated and lengthy.  So at that point when the Harrises

5   and I met back in September of 2006, we just began to discuss a

6   lot of the parts of the history.

7   Q.   You heard Dr. Harris testify today about the mother

8   being -- having mental illness?

9   A.   Yes.

10  Q.   Is that consistent with your records?

11  A.   Per my notes, my understanding was that the mother had

12  been previously diagnosed with bipolar disorder, that she had

13  committed suicide, and that she had used, I believe, drugs

14  during the pregnancy.

15  Q.   And what about the biological father?

16  A.   My understanding was that he had been incarcerated either

17  for murder or for some other violent act.

18  Q.   And did you -- do you know Dr. Perdigao, Evan's initial

19  psychiatrist?

20  A.   Yes, I do know him.

21  Q.   And did you have access to what Dr. Perdigao had done in

22  terms of care and treatment of Evan Harris?

23  A.   Only -- only by description from what the parents had told

24  me at that point.  And they had also told me that I was welcome

25  to talk with Dr. Mark Sands, who had been Evan's psychiatrist

PAUL GERARD PELTS - DIRECT

1    for many years.  And I had known Dr. Sands because we had

2    worked together previously as well.

3    Q.   And how often was Evan seeing Dr. Perdigao?

4    A.   I believe, per my notes, he was seeing Dr. Perdigao up to

5    three times per week when he was six years old.

6    Q.   Is that uncommon for -- in the field of adolescent

7    psychiatry?

8    A.   Maybe not 30 years ago, but it is highly uncommon in the

9    last ten to 20 years that any person, especially a child of

10   that age, would be seen with that frequency.

11   Q.   And was Evan hospitalized during this initial time period

12   after September the 6th of 2006?

13   A.   Well, Evan, as I understood it, per my history, had two

14   previous psychiatric hospitalizations.  And those were at San

15   Marcos in Texas.  And I don't have the exact dates of those.

16   But I think one was for five weeks' duration, yet again, that

17   would be a very lengthy hospitalization during that time.  And

18   then he had the stint at Three Springs in Tennessee, which was

19   a residential treatment facility.

20   Q.   And when you first assessed Evan, did you come up with a

21   diagnosis of his mental health condition?

22   A.   It was very unclear to me when I started working with Evan

23   what exactly the diagnoses were.  And there were several

24   problems with that.  The first problem is just as a child

25   psychiatrist in general, things are not always very clear cut

PAUL GERARD PELTS - DIRECT

1   and we're hesitant to give labels for fear that once you give a

2   child a diagnosis or label, it's very hard to take that away.

3        But certainly it was -- it became increasingly clear as I

4   worked with Evan.  Initially I didn't get to see Evan as often.

5   That he had some intellectual disabilities.  That certainly

6   there was a great deal of difficulty with attention, focus,

7   concentration impulse control.  And that also there were

8   difficulties with mood fluctuation, aggression and anger.

9   Q.   And did you prescribe medications to address these mental

10  health concerns?

11  A.   I did.

12  Q.   And --

13  A.   Some of those medications were simply the ones that

14  Dr. Sands had originally prescribed.  Certainly after I got to

15  see Evan, they were looking at schools for him so he was not

16  there all the time.

17       We had several hospitalizations.  We were working somewhat

18  on the medication, to be honest with you.  It was not really

19  until Evan got totally out of control, and that was back in

20  August of 2009, and he was immediately hospitalized in New

21  Orleans for a brief stay at River Oaks Hospital.  And I had

22  spoken with Dr. and Mrs. Harris, and had also spoken with the

23  attending physician at the hospital in New Orleans, because

24  they are only a short-term facility, about a longer

25  hospitalization at Meridell Achievement Center in Texas.

PAUL GERARD PELTS - DIRECT

1   Q.   And did he end up going to Meridell?

2   A.   He did.

3   Q.   And how long was he at Meridell?

4   A.   I would have to look back through the chart, but he was

5   there several weeks.

6   Q.   Okay.  And after you began seeing Evan, was he sent, for

7   instance, to Bachman Academy?

8   A.   Yes, he was going to Bachman Academy.  He was coming home

9   periodically and I would see him.  And then as Dr. Harris

10  explained after he got home, there was the arduous task of

11  trying to find a job.

12  Q.   And you have records in your file, do you not, about the

13  efforts that were made to assist Evan in finding work?

14  A.   Yes.

15  Q.   From Dr. -- from Mr. Schiro?

16  A.   Yes.  And I was originally contacted regarding my opinions

17  about that.  He was allowed into the program through LRS.  They

18  began trying to help find a job.  And most of those programs

19  are really programs, as was described earlier, where a business

20  is paid a set amount of money to allow that person to come work

21  with very close supervision and -- a job coach, so to speak,

22  with the hopes that they will ultimately learn the skills to be

23  able to procure more full-time employment.

24  Q.   There's been testimony that Evan graduated from Bachman

25  Academy.  What is your understanding of what Bachman Academy is

PAUL GERARD PELTS - DIRECT

1  about and how did you obtain that understanding?

2  A.   The day that Evan graduated from Bachman Academy was a

3  very happy day.  I was very proud of Evan for finishing the

4  program there, but it was not a traditional college prep

5  program where he was studying the ordinary courses that one

6  would study on an academic-based way, more of a vocational

7  program working on practical skills.  And so it was not really

8  the academic rigor that one might talk about as they were

9  discussing having completed a traditional high school.

10  Q.   After Bachman, did Evan begin working with the Rouses?

11  A.   Yes.

12  Q.   And tell the Court, if you would, who those people are and

13  why they do what they do.

14  A.   Rouses Grocery Store was originally formed out of a single

15  store in Thibodaux, Louisiana, and they quickly become the

16  number one local grocery store in southern Louisiana.  They

17  have a reputation for being very locally based and they try

18  very hard to work with and employ people with intellectual or

19  developmental disabilities and work with programs such as the

20  LRS program in trying to help teach job skills.

21  Q.   And was Evan ever able to maintain that job?

22  A.   He started out, per my understanding, relatively well.

23  Like so many things, unfortunately, for Evan did, that it

24  quickly unraveled.  And I think part of that was Evan was

25  having interpersonal difficulties with another one of the

PAUL GERARD PELTS - DIRECT

1  employees at work.  I recall that there was a change of

2  management at work.

3      And the other thing that I -- this is my personal opinion,

4  I think without Evan having direct constant one-on-one

5  supervision, things frequently would go downhill.  I mean, I

6  think if someone were there constantly reminding him what he

7  needed to do, he could be successful with it.  But the moment

8  someone looked away, the moment the management changed -- and

9  also Evan, whether he was working at Rouses Grocery Store or in

10 my office, he had to test limits.  You know, he had -- if I

11 asked him not to do something, he had to do it anyway, he had

12 to see if I really meant it.  Things were a constant battle

13 with Evan, even on a good day, even about the simplest of

14 things.

15 Q.  Now, you heard Dr. Harris testify about work he had gotten

16 for his son volunteering at the hospital.

17 A.  Yes.

18 Q.  And was he able to maintain that work?

19 A.  No.

20 Q.  Are you aware of any employment that Evan was able to

21 maintain for any length of time?

22 A.  No.

23 Q.  After Evan became an adult, did you then diagnose him or

24 make a diagnosis regarding his mental health?

25 A.  Well, as time went by, things began to become a little bit

PAUL GERARD PELTS - DIRECT

1   more clear.  And one of the things that was especially

2   helpful -- and I want to backtrack just a minute.  Evan had had

3   some previous psychological, psychoeducational evaluations, I

4   believe, they may even be here in my chart.  But one of the

5   difficulties with doing those assessments, when people are very

6   young or when they have intellectual disabilities, is the data

7   or the information that you might get may not be valid.

8       And so it was not until he had the evaluation that was

9   done while he was at Aspiro that I thought we really got a very

10  good read, psychologically, diagnostically on Evan.  And part

11  of the reason is not that there weren't good psychologists in

12  New Orleans who had attempted to evaluate Evan before.  Evan

13  was frequently not cooperative with that process.  And I would

14  challenge anyone in here, if you've ever been through that

15  process of sitting in a chair and have someone give you tests

16  for six or eight or ten hours straight, it's an arduous

17  process.

18      And that's why I was so pleased that Dr. Fenstermacher was

19  actually able to engage Evan and do a complete

20  psychoeducational evaluation back in October of 2015.

21  Q.   Is it your understanding that that evaluation was

22  completed because Q&A insisted upon it?

23  A.   I'm not really clear.

24          MS. SAAD:  Objection.  I think that's calling for

25  speculation and hearsay.

PAUL GERARD PELTS - DIRECT

1    A.    I'm not really clear.

2              THE COURT:  Overruled.  He's answered.

3    Q.    Dr. Fenstermacher saw Evan on what date?

4    A.    I believe the evaluation was on October 13th of 2015.

5    Q.    And the report has a date of November 4, 2015, does it

6    not?

7    A.    Yes, it does.

8    Q.    The report that Dr. Fenstermacher authored, it's 24 pages,

9    correct?

10   A.    Yes.

11             MR. SIMS:  That's Plaintiff's Exhibit 6, please.

12   Q.    Sir, do you have the report?

13   A.    Yes, I do.

14   Q.    If you would, tell the Court what the purpose of doing

15   these evaluations is and what information Dr. Fenstermacher was

16   able to elicit from the psychological testing he performed on

17   Evan?

18   A.    Certainly.  The first thing I would like to say is I don't

19   actually perform this type of evaluation, but I'm very familiar

20   with them because I do have colleagues that I would call on to

21   do one of these evaluations, and I would rely on the

22   information that they provided to help me in treatment.

23        Generally, the evaluation consists of interviewing the

24   individual, depending upon the age or the developmental issues

25   with that individual, interviewing the parents.  Reviewing any

PAUL GERARD PELTS - DIRECT

1   old records or previous treatments.  Engaging in an

2   intellectual or what we would call a cognitive assessment.

3   Intelligence.

4       The second part, depending, would be looking at things

5   from a psychological or psychiatric perspective, as far as

6   other diagnoses.

7       The third part would be, if there's any question about

8   intelligence, doing adaptive functioning scales as well that

9   would help with an understanding.  Because the current belief

10  is if you're looking at an intellectual disability, in the old

11  days, you simply would assess someone's IQ, their intelligence.

12  But these days, it's a much more complicated process of not

13  only looking at intelligence, but also looking at their

14  adaptive functioning.

15  Q.   Now, when you talk about an intellectual disability, is

16  that a relatively new term?

17  A.   Yes.  More common terms that some of us still interchange

18  or use would be things like mental retardation would have been

19  the older term, which is still used but because of federal law,

20  that was kind of struck down.  Intellectual disability would be

21  a much more common, or an intellectual developmental disorder.

22  Q.   In your opinion, to a reasonable degree of medical

23  probability, did Evan Harris suffer from an intellectual

24  disability?

25  A.   Yes, he did.

PAUL GERARD PELTS - DIRECT

1  Q.    Did he suffer from an intellectual developmental disorder?

2  A.    Yes.

3  Q.    And tell the Court, if you would, what the criteria is for

4  a diagnosis of intellectual disability and an intellectual

5  developmental disorder.

6  A.    Okay.  Well, the first thing that they did is they did the

7  Wechsler Intelligence Scale IV, basically looking at his IQ.

8  And it displayed that he had what would be determined a

9  borderline intellectual functioning.  So it would be below the

10  normal range of 80 to 120 for IQ.  His results put him in about

11  the fifth percentile.

12      Also they looked at some subtests to get a better

13  understanding of comprehension.  And that was done with a

14  very -- once again, very common assessment tool called the

15  Woodcock-Johnson.  In reading, Evan was in the third

16  percentile.  In reading comprehension, he was in the fourth

17  percentile.  And in verbal comprehension, he was in the fourth

18  percentile.

19  Q.    What's the significance of those findings?

20  A.    Those are very low scores.

21  Q.    And would a person with that level of reading skills,

22  comprehension skills be able to understand the arbitration

23  agreement that's at issue in this case?

24  A.    In my opinion, no.

25  Q.    And tell the Court, if you would, why it is you believe

PAUL GERARD PELTS - DIRECT

1   that Evan Harris lacked the ability to understand that

2   agreement.

3   A.    Well, you know, in addition to having looked at his

4   intelligence, they also looked at adaptive skills.  And his

5   adaptive skills, that's a much more practical social way of

6   looking at things.  He was in less than the first percentile.

7   And that is really about our ability to perform daily tasks.

8        Now, it would be one thing if Evan only suffered from an

9   intellectual disability, but he did not.  On top of that, he

10  had problems with severe impulsivity.  He had difficulty with

11  planning and organization.  He also had affective or mood

12  instability.  And all of those are just added things that would

13  have an impact on thinking and comprehension.  So there's the

14  intellectual disability, which is one thing.  But that's not

15  the only thing that Evan had going on.  He had much -- he had

16  other things going on in tandem.

17  Q.    Is an intellectual disability also a mental illness

18  diagnosis?

19  A.    According to the DSM-5, it is listed in the DSM-5.  There

20  is still, amongst some people, some differentiation between the

21  two.  But when we do our diagnoses, they are all listed

22  together.

23  Q.    And based upon the history that Dr. Fenstermacher

24  referenced in his report, what diagnoses did he conclude Evan

25  suffered from after completing his battery of diagnostic

PAUL GERARD PELTS - DIRECT

1   testing?

2   A.    He made three diagnoses.  Bipolar disorder type I, mild

3   rapid cycling; number two, an intellectual disability; and,

4   number three, a generalized anxiety disorder.

5       One of the things, though, that I think is very important

6   to understand is when you look at testing, you have to look at

7   it in the context of someone's functioning.  And this was

8   really done under the best of circumstances.  Evan was at

9   Aspiro when this was done.  He was regulated.  He was sleeping.

10  He was busy.  He wasn't using any drugs.  He was taking his

11  medications.  So what I would wager is this is kind of a

12  best-case scenario from the point of view that this was done at

13  a time when Evan was able to be cooperative.  His mood was

14  relatively stable.  He was taking his medications.  And he was

15  able obviously to form a relationship with the psychologist to

16  be able to complete the testing.

17  Q.    In your interaction with Evan, would you have been able to

18  have completed this testing on a given day with him?

19  A.    No.

20  Q.    And what was Evan like when you would be with him during

21  his, I guess, down times?

22  A.    Evan was frequently agitated.  He had trouble sitting

23  still.  He constantly wanted to be with Dr. Harris and me.

24  Dr. Harris generally brought Evan to those appointments.  Evan

25  alternated between wanting to be present in the room and not

PAUL GERARD PELTS - DIRECT

 1   wanting to be present in the room.  Asking the same questions

 2   over and over again.  Asking when we could leave.

 3        Some days he was a bit more talkative or a bit more

 4   cooperative.  Specifically if I were asking Evan about things

 5   that Evan was interested in, if I asked him about a Halloween

 6   movie, we could have a discussion about that.  If I asked about

 7   his collection of masks, we could talk about that.  If it were

 8   a subject that I knew interested him -- and that's part of my

 9   job, is to engage people -- I would always make every attempt.

10   But as far as being able to discuss anything beyond that, it

11   rarely had much substance.

12   Q.   Now, there's been testimony about this behavioral

13   contract.

14   A.   Yes.

15   Q.   And tell the Court, if you would, first of all, you do

16   have a copy of that behavioral contract in your file, do you

17   not?

18   A.   Yes, somewhere I do.

19   Q.   Okay.

20   A.   Yes, I've seen it.

21   Q.   And you would agree with Dr. Harris's testimony, this was

22   actually prepared by somebody else to send him home back to New

23   Orleans, was it not?

24   A.   Yes.  It's not uncommon when children or adolescents leave

25   treatment facilities for behavioral contracts to be written.

PAUL GERARD PELTS - DIRECT

1    There are a couple of problems.  I think that any time you're

2    writing a behavioral contract with someone who has intellectual

3    deficiencies, that's a huge problem.  My experience has been

4    that a lot of those contracts are far too complicated and they

5    are far too long.

6        My experience has also been that a lot of times the young

7    people would agree to anything written on a contract just to

8    see the person who was showing it to them get out of their

9    face, leave them alone, so they could go on to the next task or

10   go home.

11       So I don't do behavioral contracts with individuals with

12   cognitive limitations.  I don't think they are worth the paper

13   they are written on.

14   Q.   Did the Harrises have any success with the behavior

15   contracts that they had entered into with Evan?

16   A.   I don't think so.

17   Q.   When was the last time that you interacted with Evan prior

18   to his leaving to go to Q&A in Davis, West Virginia?

19   A.   I want to look it up just to be exact so I can have the

20   note here in front of me.  That would have been on August the

21   18th, 2015.

22   Q.   That would have been prior to the testing performed by

23   Dr. Fenstermacher?

24   A.   Yes.

25   Q.   And what was Evan's condition like on the day that you saw

PAUL GERARD PELTS - DIRECT

1    him?

2    A.   Evan had, as you may recall, had run away from a previous

3    program or signed himself out, depending -- you know.  And he

4    had been back in New Orleans about a week prior to my visiting

5    with him.  He was back on his medication.  He was recounting

6    some of the things that he had learned at Aspiro.  He was happy

7    that he had been there.  He was pleasant.  He was pretty

8    talkative.  He was in a pretty good frame of mind and willing

9    to go back to a program, willing to go to a program.

10   Q.   What role, if any, did you have in suggesting to the

11   Harrises that they have their son interdicted, as it's been

12   described here today?

13   A.   The interdiction process in the state of Louisiana is

14   called continuing tutorship.  And it must be entered into

15   before an individual turns 18 years of age.  The Harrises and I

16   had discussed that.  And I think they had also chosen to seek

17   legal counsel to discuss it.

18       The difficulty was trying to ascertain to what degree or

19   not Evan would see progress.  And also in understanding that

20   once that process has been done, at least in the state of

21   Louisiana, it's extremely difficult to undo.  And at the time

22   Evan was reasonably cooperative with treatments and his parents

23   were on board and had very close supervision of him and were

24   doing, in my opinion, an extraordinary job of trying to get his

25   needs taken care of.  So I didn't really feel the interdiction

PAUL GERARD PELTS - DIRECT

1   process was necessary.

2       I also thought that since he had borderline intellectual

3   functioning, I wasn't really sure that he would qualify,

4   necessarily, for continuing tutorship.  He might or might not.

5   Q.   Now, when Evan, as you said, ran away from the program,

6   what was your understanding about how he got back to New

7   Orleans?

8   A.   My understanding was through the good graces of someone he

9   met either at the bus station or on the bus.  They basically

10  helped him get back to New Orleans and were in contact with

11  Dr. and Mrs. Harris to let them know that they were on their

12  way back.

13      The Harrises had also contacted me because we weren't

14  really sure in what condition Evan would be when he arrived

15  back in New Orleans, so we were strategizing about whether he

16  would need psychiatric hospitalization or other interventions,

17  because it was uncertain at that point, or fairly clear that he

18  had not been taking his medication.

19  Q.   And what medications had you prescribed for Evan during

20  this time period that he was at Aspiro, what medications was he

21  to be taking?

22  A.   I wish I had the whole list right here.  He was taking

23  lithium carbonate.  He was taking Focalin.  He was taking

24  Deplin.  He was taking Trileptal.  He had been on Amantadine,

25  we had done some weaning of that dose over time.  I think I hit

PAUL GERARD PELTS - DIRECT

1   them all.

2   Q.    Dr. Pelts, do you have an opinion to a reasonable degree

3   of medical probability as to whether or not Evan Harris was

4   capable of understanding terms like "economical" and

5   "expeditious"?

6   A.    I do not feel that he could understand those terms.

7   Q.    You heard what Sandy Schmeideknecht said about her

8   explaining this arbitration to Evan.  Even if what she said is

9   true, would he have been able to understand what she was

10  talking about in the terms that she allegedly used?

11  A.    Although I certainly was not there, and just based on her

12  testimony in court today that I heard, I do not believe, given

13  her explanation of how she broke it down so to give Evan a

14  better understanding, that Evan would have been able to

15  understand and totally take it in and make a decision.

16  Q.    You knew Evan for ten years almost?

17  A.    Almost.

18  Q.    And during the nine-plus years that he knew Evan, would he

19  have ever consented to anyone searching his personal

20  belongings?

21  A.    Evan, the one thing Evan took great pride in was his

22  stuff.  He liked his stuff.  The stuff he had in his room, the

23  stuff he collected, the stuff he owned.  I think those

24  collections were a great source of pride and self esteem.  And

25  the Harrises and I had many discussions about that, about how

PAUL GERARD PELTS - DIRECT

1    many horror films were too many or how many masks were too many

2    or how many of this.  We tried to figure that out together.

3         But you know, one of the things that I will have to say

4    throughout that time was although he and I had multiple

5    discussions and he took great pride in these things, I don't

6    think he would have ever let anyone go through them or take

7    them, if he understood that were the case.  His discussions of

8    these almost bordered on hoarding.  It was such an obsessional

9    thing with him.

10   Q.   How did Dr. Fenstermacher classify Evan's intellectual

11   disability?

12   A.   Mild.

13   Q.   And tell the Court, if you would, what you would expect

14   from a person who has been labeled as having a mild

15   intellectual disability.

16   A.   Well, I would like to just speak a little bit from the

17   DSM-5.  And it really kind of separates that discussion out

18   into three separate domains.

19        The first would be conceptual, and I'm going to kind of go

20   down.  In adults, abstract thinking, executive functioning

21   issues.  Problems planning, priority setting, strategizing,

22   cognitive flexibility issues.  And issues with short-term

23   memory as well as difficulties with use of functional academic

24   skills, and that would be things like reading, money

25   management, those things are impaired.  And that these

PAUL GERARD PELTS - DIRECT

1   individuals tend to be -- take a concrete approach to problems

2   and solutions.

3        The other aspect would be looking at it as described in

4   the DSM-5 in the social domain.  And a lot of times they tend

5   to be immature, they miss social cues, difficulties regulating

6   emotion and behavior in an age appropriate way.  Limited

7   understanding of risk in social situations, immature social

8   judgment.  Gullibility.

9        And in a practical domain, competitive employment is often

10  seen in jobs that do not emphasize conceptual skills.  They

11  generally need support to make healthcare decisions and legal

12  decisions, and to learn to perform skilled vocation

13  competently, and support is typically needed to raise a family.

14       So many of those things which are right out of the DSM-5,

15  I think very much describe Evan.

16  Q.   In addition to his intellectual disability, would his

17  bipolar disorder affect his ability to understand and

18  comprehend the terms and conditions of the arbitration

19  agreement?

20  A.   I believe so.  Because a lot of times with bipolar

21  disorder and the swings that you can see in mood, having

22  difficulty with the thought processes in general.

23       Also Evan was taking some pretty high-powered psychotropic

24  medication, several of those can also affect cognition as well.

25       So you have both the mood disorder affecting judgment and

PAUL GERARD PELTS - CROSS

1   thinking.  But as much as I would like to say not, the

2   medications to treat them frequently being problematic as well.

3   Q.   That's actually demonstrated in the Bachman Academy, where

4   he had trouble sleeping in class and paying attention in class?

5   A.   It was very, very difficult regulating his medication.

6   And it was very hard to find a spot where he would be bright

7   enough and alert enough to be able to do more cognitive

8   thinking.  And that frequently came at the expense of the

9   Harrises in violence in their home, versus the medications to

10  try to control some of the anger, aggression and impulsivity,

11  which sadly, I think, at times did negatively impact Evan's

12  cognition.

13  Q.   Dr. Fenstermacher suggested in his report, did he not,

14  that the Harrises should consider having him declared

15  incompetent?

16  A.   Yes.

17          MR. SIMS:  Your Honor, that's all the questions I

18  have of this witness.

19          THE COURT:  Cross-examination.

20                    CROSS-EXAMINATION

21  BY MR. JONES:

22  Q.   Dr. Pelts, you provided approximately 482 pages of records

23  in this case.  They were obtained from your office.  Are those

24  all of the records, along with some billing records, that

25  you're aware of relating to your treatment of Evan Harris?

PAUL GERARD PELTS - CROSS

1   A.   Yes.

2   Q.   No other records in your possession, correct?

3   A.   No.  The only records I have are some notes that I took

4   that I brought with me in court today based on my review of the

5   chart and based on my review of testing and other things.

6   Q.   Do you mind if I take a look at those notes?

7   A.   No problem.

8        MR. JONES:  Your Honor, may I approach?

9        THE COURT:  You may.

10  A.   And the DSM-5 that I brought with me today.

11  Q.   Thank you.

12  A.   Certainly.

13  Q.   Dr. Pelts, you would agree that capacity generally means

14  that someone understands what they are reading, understands an

15  agreement, for instance, that they are reading; if someone has

16  capacity, they understand it, correct?

17  A.   Well, I think if you're talking about capacity, I'm going

18  to take that to mean competence.  And in looking at that, you

19  can look at that in very broad senses, and you can look at that

20  in very narrow senses.  If you said that Evan Harris had the

21  capacity to brush his teeth, I would say yes, he did.  If you

22  said, do I think he could understand that complex legal

23  document in the language even as explained by the lady earlier,

24  I do not.

25  Q.   Okay.  And in this particular situation, I want to focus

116

PAUL GERARD PELTS - CROSS

1    in on capacity to understand legal documents.

2    A.    Okay.

3    Q.    You would agree that if someone does not have capacity to

4    understand legal documents, they can't sign any legal

5    documents, correct?

6    A.    Well, whether they're allowed to do it or not is a

7    completely different thing.  I think that people are allowed to

8    sign documents all the time where their competency is not

9    necessarily something that someone has assessed.  I see things

10   all the time.  I see people with schizophrenia being allowed to

11   sign into psychiatric hospitals.  I don't think anyone with

12   active hallucinations is competent to sign into a psychiatric

13   hospital, but hospitals allow them to do that all the time.

14   Q.    Okay.  And if one of your patients that you believe to be

15   incompetent signed a document, a legal document, and you didn't

16   believe that they had the capacity to sign that document, you

17   would agree, in your opinion, that document wouldn't be valid

18   at that point, correct?

19   A.    Correct.  Unless there were extenuating circumstances to

20   why it was allowed to be signed.

21   Q.    What sorts of extenuating circumstances?

22   A.    We allowed Evan to sign a document so that he could apply

23   for social security disability.  I dealt with social security

24   enough that a long letter from me explaining why Evan probably

25   was not competent to sign it to release the records from my

PAUL GERARD PELTS - CROSS

1  office would have gone in the dead letter zone in social

2  security.  We did allow Evan to sign that document, but I had

3  to make a decision.  And the decision was I felt it was for his

4  greater good.  And that if Evan did not sign that document,

5  which his mother was there to witness, we could not have ever

6  applied for him to get disability benefits.  That would be an

7  exception, in my opinion.

8  Q.   So your testimony today is that you would allow someone to

9  sign a legal document even if you believe they were

10  incompetent?

11  A.   Once again, it would depend on the circumstances.  If they

12  were signing away legal rights, no, I would not.  If it were a

13  consent to get previous medical records so I could review them

14  to take better psychiatric care of them, yes, I would.  Depends

15  on the circumstance.

16  Q.   As far as Evan Harris goes, there's no record in your

17  entire file other than the Fenstermacher report which you have

18  indicated you believe says he was incompetent; there's no other

19  record mentioning Evan Harris lacking capacity, is there?

20  A.   Perhaps not.

21  Q.   Okay.  And there's no other document mentioning the word

22  or the term interdictment, is that --

23  A.   Interdiction.

24  Q.   Interdiction -- in your entire file, correct?

25  A.   Correct.

PAUL GERARD PELTS - CROSS

1   Q.   So prior to the affidavit, which you signed and gave to

2   Mr. Sims in this case, you had never signed a document

3   indicating that Even Harris was incompetent; is that correct?

4   A.   I had never been asked to, that's correct.

5   Q.   And you had never come to that conclusion; is that

6   correct?

7   A.   Well, one only need to spend some time with Evan, which I

8   was able to do on numerous occasions, to understand that he was

9   not able to have cognition concerning the medications he was

10  taking or other things.  It's a very slippery slope.

11      And by the time he was old enough that that was really

12  being considered, he was really too old for interdiction unless

13  it became a very complicated legal procedure.

14      And Evan was showing progress in some domains.  And I

15  wasn't sure that stripping him of those rights was necessary --

16  the timing was necessarily correct for that.  If it were a

17  process in the future, that would be extremely difficult to

18  undo.

19  Q.   So in other words, since you started treating Evan Harris,

20  you have never been of the opinion that he had capacity to sign

21  any legal document?

22  A.   Correct.

23  Q.   And you mentioned interdictment or interdiction?

24  A.   Interdiction, yes.

25  Q.   Did you ever discuss legal guardianship or a

PAUL GERARD PELTS - CROSS

1  representative for Evan Harris with his parents?

2  A.   I had discussed the subject with his parents, but my

3  personal opinion was that the Harrises were doing an excellent

4  job of providing for Evan's needs, so it really didn't come up

5  as an issue.  And the facilities to which Evan went, he went

6  voluntarily.

7  Q.   And yet you never took any record or notes in your entire

8  chart that you had, one, reached the conclusion that Evan

9  Harris did not have capacity; and, two, that his parents should

10  consider legal guardianship or interdiction, correct?

11  A.   Correct.

12  Q.   Is that typical in your practice to not document those

13  things in a patient's chart?

14  A.   It just depends on the person's level of severity.  It

15  depends on whether they are making progress or not.  It

16  depends.

17      He was also seeing other mental health professionals in

18  tandem.  And before Dr. Fenstermacher, I don't recall another

19  professional calling me or saying that was something that they

20  felt we should pursue.

21  Q.   The affidavit you signed in this case, you didn't draft

22  it, did you?

23  A.   No.

24  Q.   Did Mr. Sims draft that affidavit for you?

25  A.   He did.

PAUL GERARD PELTS - CROSS

1    Q.   And then did he send it to you for review?

2    A.   Yes, he did.

3    Q.   Did you make any changes to the affidavit whenever you got

4    it?

5    A.   I did not.

6    Q.   You signed it, I think you added maybe two numbers?

7    A.   I think there was a little bit of information I had to

8    add, but it was some relatively minor things.

9    Q.   Perhaps 2006, to indicate when you first started treating

10   him, and 25 years to indicate how long you had been in

11   practice; does that sound correct?

12   A.   There was some factual information, yes, that sounds

13   correct.

14   Q.   That's the first document that you ever signed indicating

15   that Evan Harris lacked mental capacity to sign legal

16   documents, correct?

17   A.   Correct.

18   Q.   Approximately ten months after his death, correct?

19   A.   Correct.

20   Q.   Did you know the Harrises before you began treating Evan?

21   A.   No, I did not.

22   Q.   In 2006, whenever you began treating him, that was your

23   first experience with Dr. Harris or Mrs. Harris?

24   A.   That's correct.

25   Q.   Moving on to Dr. Fenstermacher's report, you weren't

PAUL GERARD PELTS - CROSS

1   present for any of the testing that Dr. Fenstermacher

2   performed, correct?

3   A.    Correct.

4   Q.    You've never spoken to Dr. Fenstermacher about his testing

5   of Evan Harris, correct?

6   A.    I have not.

7   Q.    Your understanding of the testing and his conclusions is

8   limited solely to his report, correct?

9   A.    Yes.

10  Q.    In your affidavit, you actually indicated that it was a

11  requirement of Q&A for Evan Harris to go through this testing.

12  Are you indicating that you don't know whether that's true or

13  not today?

14  A.    Well, what I knew was that he was being considered for

15  alternative placements.  I knew that they were looking at some

16  different facilities.  I did not know whether the requirement

17  or the requesting for testing was specifically made by Q&A

18  specifically, or whether that was done in a blanket way.

19      I'll give you an example.  Sometimes a consultant who's

20  going to do a placement will call me.  And they will say before

21  we proceed with looking at facilities, we need some new testing

22  or we need the testing updated.  And I'm never sure when that's

23  being requested, whether it's to one facility, ones that they

24  all wanted, they believe that up-to-date information will help

25  a facility determine whether they are the right placement for

PAUL GERARD PELTS - CROSS

1    that individual or not.  So the circumstances under which it

2    was -- I knew it had been requested, but I didn't know

3    specifically whether it was Q&A or not.

4    Q.   So in paragraph number 15 in your affidavit, when you --

5    what you signed stating, I'm aware that Dr. Fenstermacher

6    completed his evaluation and report for Evan M. Harris as a

7    requirement for his admission into the program as Q&A

8    Associates, Inc., you don't know whether that's true or not?

9    A.   All I know is that the program, it was requested that

10   testing be done.  I didn't know it was Q&A, so that part I can

11   tell you, yes, I wasn't sure.

12   Q.   So it's incorrect, you're not aware of that, correct?

13   A.   Correct.

14   Q.   Okay.  In fact, doesn't his report actually say who

15   requested the testing?

16   A.   Yes.

17   Q.   Okay.  It actually says Evan, his parents and his

18   treatment team, correct?

19   A.   Yes.

20   Q.   You don't know who his treatment team is, correct, that

21   requested this?

22   A.   No.  I think, you know, as far as the treatment team, no,

23   I did not.

24   Q.   Dr. Fenstermacher's report actually says that it's for a

25   specific point in time, correct?

PAUL GERARD PELTS - CROSS

1   A.    Yes.

2   Q.    And that specific point in time would be the day of

3   testing, correct?

4   A.    Correct.

5   Q.    October 13th, 2015, correct?

6   A.    Correct.

7   Q.    It wouldn't be for November 20th, 2015, would it?

8   A.    Not necessarily.

9   Q.    And Dr. Fenstermacher's not here to say whether it would

10  or not, correct?

11  A.    Correct.

12  Q.    And you weren't there for the testing?

13  A.    I was not.

14  Q.    Haven't talked to him about it, correct?

15  A.    I have not.

16          MR. JONES:  May I approach, Your Honor?

17          THE COURT:  You may.

18  Q.    Dr. Pelts, I have handed you what's been marked

19  Plaintiff's Exhibit 6.  I would like you to turn to page 24.

20  At the bottom, it's Pelts 000271.  Do you recognize this

21  document?

22  A.    Yes.  The psychological report, yes.

23  Q.    That's in your chart, correct?

24  A.    That's correct.

25  Q.    Okay.  Yeah.  Page 24 at the top, or if you look at the

PAUL GERARD PELTS - CROSS

1   bottom, it's Pelts 000271.

2          MR. SIMS:   Those may not be Bates stamped like yours.

3   A.   I'm not following.

4   Q.   It's the last page, I believe.

5   A.   Okay, I'm on the last page.

6   Q.   Okay.   Perfect.   Okay.

7          Previously you testified that Dr. Fenstermacher actually

8   made a determination that Evan Harris was incompetent, correct?

9   A.   Based on what he was saying in this report, I felt it was

10  congruent with his being incompetent, yes.

11  Q.   Well, are you saying he made the determination that he was

12  incompetent?

13  A.   To make decisions as it resulted to the specifics that I

14  had been asked about the document.

15  Q.   So are you saying that he didn't make a determination of

16  incompetency and that you made that determination?

17  A.   No.  No.  No.  I think if you let me review it, I think he

18  did make some mention of that.  I would have to review.

19         Yes, it says in number 17, that the evaluation could be

20  helpful -- can be helpful if they want to consider

21  guardianship, power of attorney and/or conservatorship.  It's

22  likely that he will need extra years before he's competent to

23  independently manage his own affairs.

24  Q.   Okay.  It says this can be helpful if they want to proceed

25  with a guardianship, power of attorney and/or conservatorship?

125

PAUL GERARD PELTS - CROSS

1   A.   In the future.

2   Q.   That decision had already been made in the past that it

3   wasn't the right move at this point?

4   A.   Well, it's my understanding, and I'm not an expert on

5   this, I think one still can pursue that when someone is over

6   18, it's just a much more arduous process when someone is

7   already an adult.

8   Q.   But you would agree he didn't state definitively that Evan

9   Harris needs to have a guardian, conservator or a power of

10  attorney?

11  A.   Correct.

12  Q.   Right?  It says this could be helpful if you choose to

13  pursue that, correct?

14  A.   Correct.

15  Q.   And this document also doesn't say that he lacks capacity

16  to sign a contract, does it?

17  A.   It doesn't speak to capacity or noncapacity.

18  Q.   Right.  It doesn't say that he's incompetent to sign a

19  contract, does it?

20  A.   It does not.

21  Q.   It says he might be -- he might not be competent to manage

22  his -- independently manage his own affairs?

23  A.   It doesn't.  But I've never read a psychological

24  evaluation that spoke to that issue specifically before.

25  Q.   So it says, "it is likely that he will need extra years

PAUL GERARD PELTS - CROSS

1    before he will be competent to independently manage his own

2    affairs."  What is Dr. Fenstermacher talking about, his own

3    affairs?

4    A.    I'm assuming he's talking about living, money, day-to-day

5    things.

6    Q.    Let's not assume.  What does he mean by "affairs"?

7    A.    Well, we would have to ask him.

8    Q.    You don't know?

9    A.    I don't know.  I'm presuming, though, he's talking about

10   day-to-day living skills as I read it.

11   Q.    So this document, which you relied upon to say that Evan

12   Harris is incompetent, doesn't say that he's incompetent, nor

13   does it say that he needs a conservatorship, guardianship or

14   power of attorney?

15   A.    No.  What I'm saying is, I think based on this document,

16   it is my personal opinion, coupled with the mental illness from

17   which he suffers, coupled with my having had numerous visits

18   and treating him over numerous years, I do not believe he had

19   the intellectual capacity and understanding of the contract

20   that was placed in front of him specifically when it came to

21   signing away rights.

22   Q.    That's the same opinion you had for nine years, correct?

23   A.    I haven't been asked that opinion before.

24   Q.    So in 2011, do you think Evan Harris had capacity to sign

25   a release?

PAUL GERARD PELTS - CROSS

1    A.    No, I do not.

2    Q.    Okay.  In 2014, do you think he had capacity to sign a

3    release?

4    A.    Not as far as to understand something like this legal

5    document as it was explained in court today.

6    Q.    Okay.

7    A.    I don't think it could have been explained in a way that

8    Evan could have really grasped what he was signing.

9    Q.    That's why you set up a guardianship or power of attorney

10   or a conservatorship, because someone doesn't understand what

11   they're signing, correct?

12   A.    Correct.

13   Q.    As a doctor, that's your duty to ensure and protect your

14   patients, correct?

15   A.    If I have concerns that the care that they are not

16   currently receiving is meeting their needs.

17   Q.    And you thought all of the care that Evan Harris was

18   receiving was meeting his needs over the course of treatment,

19   correct?

20   A.    Up until his untimely death, yes, I do.

21   Q.    Relating to this arbitration agreement, you weren't

22   present whenever it was signed, were you?

23   A.    No, I was not.

24   Q.    You don't know if it was signed in the morning, in the

25   evening, in the afternoon, correct?

PAUL GERARD PELTS - CROSS

1   A.   It wasn't dated and timed.  And it was not documented when

2   it was signed, so it's hard for me to know.  I was a bit

3   surprised that that was the case, to be honest with you, that

4   it was not documented when it was signed -- you know, when it

5   was signed or what was going on with that.  That's kind of

6   standard procedures.

7   Q.   As far as your opinions, you reached a conclusion that he

8   didn't have capacity to sign this document regardless of how it

9   was explained to him?

10  A.   Well, number one, no, I don't think he would.  But number

11  two, I got to hear the lady explain what she said to him.  And

12  I can assure you, I don't think, given what she said in court

13  today, that he would understand that.

14  Q.   Right.  And your --

15  A.   That anyone should perform.  If she said in court today

16  what she actually did, truly, in person, with Evan.

17  Q.   Okay.  Your opinion hasn't changed then, it was the same

18  back in November whenever you signed your affidavit as it is

19  today?

20  A.   Correct.

21  Q.   So it wouldn't have mattered how she explained it;

22  according to you, he wouldn't have understood the document,

23  correct?

24  A.   Correct.  If anything, her testimony today only further

25  made me believe and question whether he was understanding what

PAUL GERARD PELTS - CROSS

1    he was signing.  It only reinforced that.

2    Q.   And you wouldn't want him to sign something he doesn't

3    understand, correct?

4    A.   Correct.

5    Q.   You mentioned some terms that Evan wouldn't understand, in

6    your opinion, such as the word "arbitration."

7         Did you ever discuss the word "arbitration" with Evan?

8    A.   No.

9    Q.   So for all you know, Evan could have learned about

10   arbitration in high school?

11   A.   I don't know.  But I would seriously doubt it given his

12   curriculum in school.

13   Q.   But you don't know definitively, correct?

14   A.   I don't.

15   Q.   The same with "economic," you wouldn't know whether he

16   learned that in high school or not, correct?

17   A.   Correct.

18   Q.   You wouldn't know whether he learned that in signing

19   another arbitration agreement at another facility, correct?

20   A.   I would not.

21   Q.   Same thing goes for --

22   A.   I can only speak to the simplicity of Evan's vocabulary

23   and his interactions with me and his very limited range of

24   understanding anything but the simplest of words and simplest

25   of terms.

PAUL GERARD PELTS - CROSS

1   Q.   You keep use the word simple.   What's a simple word?

2   A.   Smoking is a simple word.

3   Q.   Is there a list of simple words?

4   A.   TV.  No, I'm talking about -- I'm a child psychiatrist.  I

5   have to use language that people understand.  And a lot of

6   times my part is trying to figure out how can we explain things

7   in a way that someone can understand using simplistic language,

8   or no matter how simplistic the language that we use would they

9   not understand.

10       And I don't think arbitration, no matter who were

11   explaining it, would have been something that Evan would have

12   understood.

13   Q.   So there's no list of simple words that you can use with

14   someone like Evan Harris, correct?

15   A.   It depends on what you're trying to explain.  Like I said,

16   I think when you're getting into complex terms, it's a whole

17   different ballgame.

18       I also will tell you I don't think if Evan Harris, given

19   the number of times he said he wanted to sue somebody, had

20   understood that he was totally completely giving up his right

21   to do that, that he would have said hand it over, here, let's

22   sign it and be done.  He was threatening to sue all the time.

23           MR. JONES:  Approach, Your Honor?

24           THE COURT:  You may.

25           MR. JONES:  Have this marked as the next defense

PAUL GERARD PELTS - CROSS

1   exhibit.

2           Do you mind helping me with the Elmo?

3   Q.   Dr. Pelts, I've handed you what's been marked, I believe,

4   Defendants' Exhibit C.  My apologies.  This is an

5   authorization.  I believe this is one of the authorizations you

6   had actually mentioned earlier, correct?

7   A.   Correct.

8   Q.   And it's signed by Evan Harris?

9   A.   Correct.

10  Q.   Do you know whether Evan Harris could understand all of

11  the terms in this authorization?

12  A.   I wasn't there, because this was signed at the social

13  security office.  So I wouldn't know.  But my first guess

14  looking at it is I would say maybe yes, probably not.

15  Q.   Maybe yes, probably not?

16  A.   I wasn't there when it was explained to him.  But what I

17  understand about this form -- and I might mention, his mother

18  was the witness.  So someone was there who is responsible for

19  his well being.  And I take that to be a great important thing

20  to be mentioning here, is Evan was signing a form to let me

21  send social security his records.

22          His mother was there, she signed off on it.  I think

23  that's a pretty innocuous thing.  And I know social security

24  would not have allowed that to proceed without Evan's

25  signature.

PAUL GERARD PELTS - CROSS

1   Q.   So -- okay.  Do you know whether it's a HIPAA violation to

2   release records with a release that's signed by an

3   incapacitated person?

4          THE COURT:  Let's keep on point.  You're getting too

5   far astray here.

6          MR. JONES:  Okay.  Yes, Your Honor.

7   Q.   So you were not present with this -- this document,

8   correct?

9   A.   I was not.

10  Q.   But it means something to you that his mother,

11  Mrs. Harris, was actually present whenever this was signed,

12  correct?

13  A.   Yes.

14  Q.   Would it be important to you if she was present or had

15  reviewed other documents that Evan Harris had signed?

16  A.   You have to understand.  If someone signs a release of

17  records at the social security office, for example, I'm not

18  releasing the records just because I received this in the mail.

19  I have that individual come into my office and sign a release

20  on my end, which is in the chart, and was witnessed by his

21  mother to release the records as well.

22  Q.   So it would be important that his mother signed this

23  document -- or was present whenever he signed this document,

24  correct?

25  A.   Correct.

PAUL GERARD PELTS - CROSS

1   Q.    And had reviewed this document; that would be important to

2   you, correct?

3   A.    Correct.

4   Q.    Because she wouldn't let him sign something that she

5   didn't think was okay, correct?

6           MR. SIMS:  Objection.

7   A.    I can't speculate.

8           THE COURT:  Sustained.

9           MR. JONES:  Approach, Your Honor?  Have this marked

10  as the next defense exhibit.

11  Q.    Dr. Pelts, this is another release signed by Evan Harris,

12  correct?

13  A.    Correct.

14  Q.    And this one is signed in 2014, correct?

15  A.    Correct.

16  Q.    And you, again, would have provided records based upon

17  Evan Harris's signature on this document, correct?

18  A.    Correct.

19  Q.    And you agree it's a legal document, correct?

20  A.    Correct.

21          MR. JONES:  No further questions at this time, Your

22  Honor.

23          THE COURT:  Redirect?

24          MR. SIMS:  No, Your Honor.

25          THE COURT:  May the witness be excused?

PAUL GERARD PELTS - CROSS

1              MR. SIMS:  Yes.

2              THE COURT:  Thank you.  Plaintiff may call his next

3    witness.

4              MR. SIMS:  Your Honor, may I have a two-minute

5    recess?

6              THE COURT:  You may.

7              (Recess taken 3:22 p.m. to 3:27 p.m.)

8              THE COURT:  Mr. Sims.

9              MR. SIMS:  Your Honor, I would move for the admission

10   of Plaintiff's Exhibit 6 and I don't have any other witnesses,

11   Your Honor.

12             THE COURT:  Any objection to 6?

13             MS. SAAD:  No, Your Honor.

14             MR. JONES:  And, Your Honor, we would move for the

15   admission of Defendants' Exhibits C and D.

16             THE COURT:  All right.  Plaintiff's 6, Defendants' C

17   and D will be admitted into evidence.

18             MR. SIMS:  No objection, Your Honor.

19             (Plaintiff's Exhibit 6 and Defendants' Exhibits C and

20   D were admitted.)

21             THE COURT:  I assume there's no objection to them

22   calling no further witnesses.

23             Welcome back, Mrs. Harris.  And defense may call its

24   first witness.

25             MS. SAAD:  Your Honor, on that point, we may call

                        AUDREY PEAVEY - DIRECT

 1    Kathy Harris still in the future and would like for her to

 2    continue being sequestered.  We have one witness we are going

 3    to call and we would like her to be sequestered through that

 4    witness, and then we will make the determination of whether to

 5    her call her.

 6              THE COURT:  Who is your witness?

 7              MS. SAAD:  Your Honor, next we will call Audrey

 8    Peavey.

 9              THE COURT:  All right.

10              THE CLERK:  If you'll come over here first and state

11    and spell your name for the court reporter.

12              THE WITNESS:  Audrey Peavey.  A-u-d-r-e-y,

13    P-e-a-v-e-y.

14         **AUDREY PEAVEY, DEFENSE WITNESS, SWORN**

15                        DIRECT EXAMINATION

16    BY MS. SAAD:

17    Q.   Good afternoon.  Would you please state your full name for

18    the record, please.

19    A.   Audrey Ann Peavey.

20    Q.   Where do you work?

21    A.   Q&A Associates.

22    Q.   What is your role and position there?

23    A.   I'm the admissions and marketing director, as well as

24    parent coach.

25    Q.   And in November of 2015, what was your role at Q&A?

AUDREY PEAVEY - DIRECT

1   A.    I was the admissions and marketing director.

2   Q.    And prior to -- well, how long have you been with Q&A?

3   A.    Since fall of 2012.

4   Q.    Have you been in the role of admissions that entire --

5   your entire work period at Q&A?

6   A.    Yes.

7   Q.    And prior to coming to work at Q&A, have you worked in

8   admissions for other similar programs?

9   A.    Yes.

10  Q.    And give us roughly how many years have you worked in

11  admissions for this type of industry?

12  A.    About 16, 17 years.

13  Q.    Okay.  And in your role of admissions at Q&A, do you have

14  interactions with the parents of clients?

15  A.    Yes.

16  Q.    And what type of interactions do you have?

17  A.    Phone conversations, emails, sometimes face-to-face

18  meetings if they come to tour.

19  Q.    Is it your role that you try to help acquire the

20  information that Q&A needs to evaluate a client, also provide

21  information to the client and the client's family?

22  A.    Yes.

23  Q.    Do you recall being involved in the admission process for

24  Evan Harris?

25  A.    Yes.

137

AUDREY PEAVEY - DIRECT

1   Q.   And do you recall specifically who you were in contact

2   with regarding his admission?

3   A.    Both Rick and Kathy Harris.

4   Q.   And does Q&A require some forms to be completed prior to a

5   client's admission to Q&A?

6   A.    Yes.

7   Q.   And has Q&A ever rejected someone, ever evaluated a client

8   and said this person is not the right fit for Q&A?

9   A.    Yes.

10  Q.   And what are some of the forms that Q&A requires?

11  A.    We have a 13-, 14-page application.  If there's been any

12  prior psychoeducational testing, transcripts.  You know,

13  educational background, medical background, that type of thing.

14  Q.   Okay.  And you mentioned you exchanged some emails for the

15  admission process of Evan Harris.  Did you exchange some emails

16  with Kathy Harris?

17  A.    Yes, I did.

18  Q.   Is that mostly how you communicated with Mrs. Harris?

19  A.    Yes.

20          MS. SAAD:  Your Honor, I would like to mark this as

21  Defendants' Exhibit E.

22          May I approach, Your Honor?

23          THE COURT:  You may.

24  Q.   I'm going to hand you what's been marked as Defendants'

25  Exhibit E.  Ms. Peavey, are you familiar with the document I

AUDREY PEAVEY - DIRECT

1    just handed you?

2    A.    Yes.

3    Q.    Have you seen it before?

4    A.    Yes.

5    Q.    And what is this document that I just handed you?

6    A.    Some email exchange between myself and Kathy Harris.

7    Q.    And I want to focus first on the earliest email that you

8    exchanged with Kathy Harris on October 30th.

9          Can you please read that for the Court, please?

10   A.    "Audrey, I filled out my portions and attached them.

11   Caitlin will assist Evan in completing pages 4, 5, 6, 12 and

12   13, but does not expect to send them before this coming

13   Tuesday.  Sorry, Evan is out in the wilderness somewhere.  I

14   will forward his most recent psychological testing results as

15   soon as I get them.  Keep us posted on his likelihood of being

16   accepted into your program, and please let me know how soon I

17   should order the cold weather clothing" and "the packing

18   list" -- "on the packing list.  He does have some ski clothing

19   but he lost weight, will need a new wardrobe prior to transfer.

20   Thanks, Kathy Harris."

21   Q.    At one in point in there, the psychological or

22   psychoeducational testing as I've heard it called, is that

23   required by Q&A?

24   A.    No, it is not.

25   Q.    But if it's been conducted for a client, is it then just

AUDREY PEAVEY - DIRECT

1   requested that a copy be provided?

2   A.   Yes.

3   Q.   And this email, who is it signed by?

4   A.   Kathy Harris.

5   Q.   And it's addressed to you; is that correct?

6   A.   Yes.

7   Q.   I want to focus on the first two lines.  Mrs. Harris says

8   that she filled out my portions and attached them.  What is she

9   speaking of?

10  A.   The application.

11  Q.   Okay.  And then she specifically says that Evan -- or

12  Caitlin will assist Evan in completing pages 4, 5, 6, 12 and

13  13.  Do you know who Caitlin is?

14  A.   Yes.

15  Q.   Who is Caitlin?

16  A.   She was the therapist working with Evan at the program

17  that he was at prior to enrolling with us.

18  Q.   So that was someone that could have possibly given the

19  other portions for Evan's completion to Evan at that program?

20  A.   Correct.

21  Q.   I want to move to the next email in the chain, which is

22  dated November 11th.

23       Do you see that email?

24  A.   Yes.

25  Q.   And who is the email from?

AUDREY PEAVEY - DIRECT

1    A.    That's from myself to Kathy.

2    Q.    Okay.  And without reading the whole thing, what are you

3    generally requesting in this email?

4    A.    More supportive documents.  And the original application

5    she sent came through unlegible or unreadable, so I asked her

6    to resend it.

7    Q.    And is the next email in this chain of November 12th, is

8    that a response from Kathy Harris?

9    A.    Yes.

10   Q.    And what does she say?

11   A.    "I'm scanning everything again right now.  Please let me

12   know if you don't get it."

13   Q.    Did she then attach the application and those documents to

14   that email?

15   A.    Yes.

16   Q.    And are those documents hereto attached to the exhibit

17   you're holding in your hand, Exhibit D?

18   A.    Yes.

19   Q.    And I want to just briefly walk through what has been

20   discussed a bit today.  The documents that are attached, what

21   is it as a whole?

22   A.    The application with some supportive documents, his

23   insurance, passport, things like that.

24   Q.    Okay.  And when you received the document from Kathy

25   Harris, was it complete, partially complete or uncomplete at

AUDREY PEAVEY - DIRECT

1    all?

2    A.    It was very thoroughly complete, other than the portions

3    that Evan needed to fill out.

4    Q.    I just want to focus on a couple of things.  So if we look

5    at -- there are several pages, and to save time for the Court

6    I'm not going to have all this made part of the record, but the

7    handwriting that we've seen, this is what you received from

8    Kathy Harris; is that correct?

9    A.    Yes.

10   Q.    And then there's a blank page on page 4, and it says

11   Caitlin will forward pages 4, 5, 6, 12 and 13.

12         Do you see that there?

13   A.    Yes.

14   Q.    And then flipping through, there are some other blank

15   pages.  And are those for the client to complete, the ones that

16   were blank in the packet?

17   A.    Yes.

18   Q.    If we skip to page 12, what is page 12?

19   A.    Contract, medical authorization, release and consent

20   agreements.

21   Q.    And when you received this document, what was completed on

22   this form?

23   A.    The name of participant, date of birth and social security

24   number.

25   Q.    Just as we see here in front of us on page 12, right, it's

142

AUDREY PEAVEY - DIRECT

1    just that top three lines were completed?

2    A.    Correct.

3    Q.    If we flip back to the October 30th email from Kathy

4    Harris, does she state specifically anything about page 12?

5    A.    Just that she's left them blank for Evan to complete.

6    Q.    Okay.  And is that also the case for page 13?

7    A.    Yes.

8    Q.    If we turn to page 13, what is page 13?

9    A.    Release of information, as well as insurance information.

10   Q.    And you received this document completed as we have shown

11   here, except for the signature of the participant; is that

12   correct?

13   A.    Correct.

14   Q.    At any point in your communications with Mr. or -- I'm

15   sorry -- Dr. or Mrs. Harris, did either of them tell you that

16   Evan either lacked capacity to enter a legal document or that

17   he had some sort of conservatorship or legal guardian?

18   A.    No, they did not.

19   Q.    In fact, the email that you received actually indicates

20   that Mrs. Harris filled out the portions of the application

21   that were for the parent and left the blanks that were for the

22   client, for Evan to sign; is that correct?

23   A.    Yes.

24   Q.    Do you know what Mrs. Harris's line of work or background

25   was?

                          AUDREY PEAVEY - CROSS

1   A.    I believe she's a nurse.

2   Q.    Did she do anything else, do you know?

3   A.    Not that I'm aware of.

4   Q.    Nowhere on this form or nowhere in those emails was there

5   any indication or note from Dr. or Mrs. Harris that Evan Harris

6   should not sign any legal document; is that correct?

7   A.    Yes, that's correct.

8             MS. SAAD:  No further questions.  And, Your Honor, I

9   would move for the admission of Defendants' Exhibit D.

10            THE COURT:  D?

11            MS. SAAD:  E, I'm sorry.

12            THE COURT:  E, okay.  Any objection?

13            MR. SIMS:  No, sir.

14            THE COURT:  All right.  Defendants' Exhibit E will be

15   admitted into evidence.  Cross-examination.

16            (Defendants' Exhibit E was admitted.)

17            MR. SIMS:  Thank you, Judge.

18                         CROSS-EXAMINATION

19   BY MR. SIMS:

20   Q.    Is it Mrs. Peavey?

21   A.    Ms. is fine.

22   Q.    Okay.  Ms. Peavey, I'm David Sims.

23   A.    Hello, Mr. Sims.

24   Q.    And you understand that I filed a lawsuit on behalf of the

25   Harrises against Q&A?

                       Linda Mullen, RDR, CRR
                (304) 234-3987     PO Box 452, Wheeling, WV  26003

AUDREY PEAVEY - CROSS

1   A.   Yes.

2   Q.   And you understand that part of that lawsuit concerns this

3   arbitration agreement that's a part of the admission packet?

4   A.   Yes.

5   Q.   You understand, ma'am, that pages 12 and 13 clearly say

6   signature of participant?

7   A.   Yes.

8   Q.   Do you know what that means?

9   A.   Signature of participant, yes.

10  Q.   Okay.  So that means the parent is not to sign it, does it

11  not?

12  A.   Yes, unless they have guardianship.

13  Q.   And you testified that no one ever said anything about

14  Evan having a guardianship, correct?

15  A.   Yes, not that we were aware of.

16  Q.   Now, you said, and I think I wrote this down correctly,

17  that they have to fill out a 14- or 15-page application, psycho

18  testing if it's available, transcripts; did I get that right?

19  A.   Yes.

20  Q.   So you were expecting to receive a psychological

21  examination for Evan Harris, were you not?

22  A.   Through the discussion with his parents, yes.

23  Q.   Well, did you not tell them that one was required?

24  A.   I never use the word require, I would not use that word.

25  Q.   Okay.  So you admit people that you don't have a

AUDREY PEAVEY - CROSS

1   psychological test for?

2   A.   Yes.

3   Q.   What did you do when you got the psychological evaluation

4   done by Dr. Fenstermacher?

5   A.   We did not have the test done by anybody.

6   Q.   No, I'm asking --

7   A.   We received a copy.

8   Q.   What did you do with it?

9   A.   I sent it to the rest of the treatment team to review.

10  Q.   How did you do that?

11  A.   By email.

12  Q.   And how did you get it?

13  A.   I believe by email, but I don't recall for sure.

14  Q.   Did you read it?

15  A.   I scanned it.  It's not my job to review that information.

16  Q.   It is your job to make sure this packet is filled out, is

17  it not?

18  A.   Yes.

19  Q.   Including pages 12 and 13, correct?

20  A.   Except for the participant's signature.  That's usually

21  left to our life coaches when the client arrives if they have

22  not signed it prior to arrival.

23  Q.   So who was the life coach that was going to assist Evan in

24  signing pages 12 and 13?

25  A.   It would have been Sandy Schmeideknecht.

AUDREY PEAVEY - CROSS

1   Q.   Why her?  You have other life coaches, don't you?

2   A.   Because she's our head life coach and she does all the

3   initial enrollments and assessments.

4   Q.   This is not an enrollment or assessment.  This is a

5   contract, is it not?

6   A.   Right, which is part of the enrollment process.

7   Q.   So the person in charge of admissions is only in charge of

8   of part of the admission packet, somebody else is in charge of

9   the other parts, do -- am I understanding you correctly?

10  A.   We are in charge of receiving -- I am in charge of

11  receiving the information and passing it on to the rest of the

12  treatment team to review.

13  Q.   Well, did you notice that pages 12 and 13 were unsigned?

14  A.   Yes.

15  Q.   When did you notice that?

16  A.   When the application was received.  Because it was noted

17  by the mother that they would not be signed.

18  Q.   Where is that email?

19  A.   They would be coming later.  Pardon me?

20  Q.   Where is that email?

21  A.   Which email?

22  Q.   The one where Mom said she was not -- that he was not

23  going to sign those documents.

24  A.   It's right here.

25  Q.   Is that the one you were just reading from?

AUDREY PEAVEY - CROSS

1    A.    Yes.

2    Q.    The one that says Evan will -- or Caitlin will send you

3    pages 4, 5, 6, 12 and 13?

4    A.    Yes.

5    Q.    Okay.  Did you get those from Caitlin?

6    A.    No, I don't think they came until he arrived with us.

7    Q.    All right.  So you didn't even have them from Caitlin or

8    anybody else at the time that Evan arrived at the facility,

9    true?

10   A.    True.

11   Q.    And do we have pages 4, 5, 6 completed by anyone of this

12   application packet?

13   A.    Not in this, no.

14   Q.    Is there another packet that I don't have that these are

15   filled out?

16   A.    Those were completed later, yes.

17   Q.    When were they completed and by whom?

18   A.    I have no -- I don't have the exact information on that.

19   Q.    So he was admitted without 4, 5 and 6 completed, correct?

20   A.    Yes.  Or they came with him, I'm not sure of that.  I

21   don't recall.

22   Q.    And how is it that pages 12 and 13 got into the hands of

23   Mrs. Schmeideknecht?

24   A.    That would have been sent probably by email.

25   Q.    Where is that email?

AUDREY PEAVEY - CROSS

1   A.   It was forwarded by me to the treatment team when the

2   application came in.

3   Q.   Do you have those emails?

4   A.   I don't have it with me, it's not here, no.

5   Q.   Okay.  So as we sit here today, you don't have any proof

6   that you sent it to Sandy, do you?

7   A.   I don't, no, not with me.

8   Q.   All right.  Now, so what did your email say to Sandy about

9   getting this document signed?

10  A.   I don't have it in front of me so I don't know what

11  exactly it said.  It was over a year ago.

12  Q.   Well, you knew we were going to be here today talking

13  about these two pages, 12 and 13, did you not?

14  A.   I assumed so, yes, or understood that that would be the

15  case.

16  Q.   You understood that completely, did you not?

17  A.   Yes.

18  Q.   Not a surprise.

19          MS. SAAD:  Objection.  If you're getting into the

20  realm of attorney-client privileged information and

21  conversations with counsel, then I would object.

22          THE COURT:  Sustained.

23          MR. SIMS:  I'm not asking for that.  But thank you.

24  BY MR. SIMS:

25  Q.   Ma'am, did you look for emails where you actually sent

AUDREY PEAVEY - CROSS

1   this to Ms. Schmeideknecht prior to your testimony today?

2   A.   I'm not sure.  I sent all the emails that concerned Evan

3   to my boss.  And to -- I assume it was forwarded to our

4   attorneys.

5   Q.   Who is your boss?

6   A.   Angie Shockley.

7   Q.   Is your office at Q&A or is it somewhere else?

8   A.   I have an office in -- you know, we have an office in one

9   of the buildings that we use.  And I also work from home at

10  times.

11  Q.   You work from home all the time, do you not?

12  A.   Not all the time, no.

13  Q.   Do you come to the office and have students or applicants

14  complete forms like this, pages 12 and 13?

15  A.   They wouldn't do that with me, no.  No.  They would not do

16  that with me.  They would do that in the life skills office

17  with their life coaches.

18  Q.   Did you meet Evan?

19  A.   Yes.

20  Q.   Did you ask anyone, specifically Mrs. Schmeideknecht, did

21  you ask her if she got Evan's signature on 12 and 13?

22  A.   It's part of our process, it's always done that way.  I

23  did not ask her specifically if she got those signatures, no.

24  Q.   Well, when those signatures were obtained, why was that

25  not supplemented or put in this packet that you had with the

AUDREY PEAVEY - CROSS

1   signature on it?

2   A.   Because these are electronic files and they are passed on

3   electronically.

4   Q.   Okay.  When you printed it, you left 12 and 13 in their

5   original form, did you not?

6   A.   Yeah, that was the email that I received and how I

7   received it.

8   Q.   Ma'am, who was going to pay for Evan's care and treatment

9   while he was at Q&A?

10  A.   His parents, as far as I knew.

11  Q.   You knew that, did you not?

12  A.   Yes.  That is where the funds came from, but I have no

13  idea where they got their funds.

14  Q.   I understand.  But you knew Kathy and Dr. Harris were

15  going to be paying the bill, correct?

16  A.   Yes.

17  Q.   And the bill was like $9,500 a month?

18  A.   Correct.

19  Q.   You didn't trust Evan to sign that document saying he was

20  going to agree to pay $9,500 a month, did you?

21  A.   There was no document about the payment.

22  Q.   I'm sorry.  The Harrises didn't sign an agreement that

23  they would pay you $9,500 a month and give you a credit card

24  authorization so you could charge --

25  A.   That gets sent by our accounts office, that's not part of

AUDREY PEAVEY - REDIRECT

1   the admissions process.  That's our accountant takes care of

2   that as soon as the enrollment has been approved.

3   Q.   My question, though, was, you weren't counting on Evan to

4   pay, you were counting on Dr. and Mrs. Harris to pay?

5   A.   No, we were not counting on Evan to pay.

6   Q.   And so when it came time to be financially responsible,

7   you expected Dr. and Kathy Harris to do that, correct?

8   A.   Yes.

9   Q.   Not Evan?

10  A.   Correct.

11          MR. SIMS:  Your Honor, that's all the questions I

12  have?

13          THE COURT:  Redirect?

14          MS. SAAD:  I just have a couple of questions and it's

15  just to clarify what is -- the testimony that's just come in.

16                  REDIRECT EXAMINATION

17  BY MS. SAAD:

18  Q.   The email and the attachments that we just discussed with

19  the blank pages for Evan Harris, that is how you received those

20  documents from Mrs. Harris in the attachment to the email; is

21  that correct?

22  A.   Yes.

23  Q.   There is -- is it your understanding that those blank

24  pages to be completed by Evan Harris were then later completed

25  by Evan Harris and were placed in the electronic file?

AUDREY PEAVEY - RECROSS

1    A.    Yes.

2    Q.    In fact, I think they are an exhibit.

3          THE COURT:  They are.

4    Q.    Plaintiff's Exhibit Number 4.  I don't know if we can pull

5    this up briefly, the Elmo.

6          This is the same life skills assessment and -- let me see

7    the other pages -- well, to save time, it's your understanding

8    that Sandy Schmeideknecht went through those blank pages and

9    assisted Evan Harris in completing those portions of the

10   application; is that correct?

11   A.    Yes.

12   Q.    As for the payment by Dr. and Mrs. Harris, they agreed to

13   pay those fees; is that correct?  It's not that you didn't

14   trust Evan Harris or that you even requested from Evan Harris,

15   but that Dr. and Mrs. Harris agreed to pay?

16   A.    Yes.

17          MS. SAAD:  I have nothing further.

18          MR. SIMS:  Just briefly, Your Honor.

19                    RECROSS-EXAMINATION

20   BY MR. SIMS:

21   Q.    Page 4 that you're looking at up there?

22   A.    Yes.

23   Q.    It has on it, "to be completed by the client," does it

24   not?

25   A.    Yes.

153

AUDREY PEAVEY - FURTHER REDIRECT

1  Q.   Did you just see that on the board?

2  A.   See what on the board?

3  Q.   The words, "to be completed by the client"?

4  A.   What she put on the board was the life skills assessment,

5  it was not the application.

6  Q.   Wasn't this document at all, was it?

7  A.   No.

8  Q.   And it wasn't page 5, correct?

9  A.   Not that I saw up there, no.

10 Q.   And it wasn't page 6, true?

11 A.   I did not see that.

12       MR. SIMS:  That's all the questions I have, Your

13 Honor.  Thank you.

14       THE COURT:  Re-redirect.

15       MS. SAAD:  Yes, please.

16                FURTHER REDIRECT EXAMINATION

17 BY MS. SAAD:

18 Q.   Just so we can be clear.  Does this page say "to be

19 completed by the client" at the top of the page?

20       And does -- if you read, that says "please describe

21 primary reason for enrollment."  Does that then reflect what

22 was sent to you by Kathy Harris?  If you can see that, "to be

23 completed by the client"?

24 A.   Yes, I see that.  But that did not come with the

25 application that Kathy sent.

154

AUDREY PEAVEY - FURTHER REDIRECT

1  Q.   Right.   This would have been completed with Sandy

2  Schmeideknecht?

3  A.   Correct.

4          MS. SAAD:   No further questions, Your Honor.

5          THE COURT:   May the witness be excused?

6          MS. SAAD:   Yes, Your Honor.

7          THE COURT:   Thank you.

8          MS. SAAD:   Your Honor, no further witnesses.

9          THE COURT:   All right.   Thank you all.

10

11                      - - -

12          PROCEEDINGS CONCLUDED AT 3:57 P.M.

13                      - - -

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2              I, Linda S. Mullen, Registered Diplomate Reporter,

3    Certified Realtime Reporter and Official Reporter of the United

4    States District Court for the Northern District of West

5    Virginia, do hereby certify that the foregoing is a true and

6    correct transcript of the proceedings had in the above-styled

7    action on January 4, 2017, as reported by me in stenotypy.

8              I certify that the transcript fees and format comply

9    with those prescribed by the Court and the Judicial Conference

10   of the United States.

11             Given under my hand this 5th day of September, 2017.

12                        /s/ Linda S. Mullen
                          Linda S. Mullen, RDR, CRR
13                        Official Reporter, United States
                          District Court for the Northern
14                        District of West Virginia

15

16

17

18

19

20

21

22

23

24

25