**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

Friedrichs Harris, Administrator of the
Estate of Evan M. Harris, deceased,

      Plaintiff,

v.

                                           Civil Action No. 2:16-cv-46
                                           Judge Bailey

Q & A Associates, Inc.
Angela Shockley, Individually,
Keith Bishop, Individually,
Matthew Shockley, Individually,
Sandy Schmiedeknecht, Individually, and,
Tammy Robbins, Individually,

      Defendants.

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Now Comes Plaintiff Friedrichs Harris, by and through his counsel, and does hereby respond to Defendants' Motion for Summary Judgment. (ECF #67). Said Response is based upon the following:

**BACKGROUND INFORMATION:**

      As this Court will recall, on January 24, 2016, Evan Harris committed suicide while participating in Q&A Associates, Inc.'s "troubled teen" program, The Journey WV [ECF #1 at ¶¶15-94]. (Order Denying Motion to Compel Binding Arbitration ECF #41). As this Court has already concluded in that Order, prior to his untimely death, Evan Harris was a deeply troubled young man who, as of August 18, 2015, had the following diagnoses: (1) Bipolar I Disorder; (2) Attention Deficit Hyperactivity Disorder ("ADHD"); (3) Intellectual Development Disorder; (4) Generalized Anxiety; (5) Depression; (6) Drug and Alcohol Abuse; (7) Borderline Cognitive Functioning; and (8) Learning and Developmental Delays.

[Doc. 26-1 at ¶ 11]. Evan Harris was adopted by Kathleen and Rick Harris, an attorney and nephrologist in the New Orleans, Louisiana area, when he was three days old [Doc. 26 at 3; Testimony of Friedrichs Harris, January 4, 2017]. Rick Harris testified that Evan Harris' birth mother used drugs while she was pregnant with Evan, and later committed suicide; his birth father had an alleged history of drug use as well, and was convicted of assault with a deadly weapon after using a screwdriver to attack someone [Testimony of Friedrichs Harris, January 4, 2017]. As the Court will recall, Evan continued to have problems until he enrolled at the Waterfall Canyon Academy in Utah in February 2015 in order to learn independent life skills [Doc. 26 at 3]. For several months, Evan did well in the program, and was able to cook for himself, do his own laundry, and attended a course at an applied technology school [Id. at 4]. He even maintained a horticultural job at Weber State in Ogden, Utah, where he was able to listen to his headphones whilst working outside [Testimony of Friedrichs Harris, January 4, 2017]. As Rick Harris testified:

> "We still were hopeful for him. We still -- I mean, the brain can still mature up until late 20s. This was at 22. So he had these glimpses that gave us hope that he would continue to mature to at least independent living."

[Id.]. However, Evan eventually gained access to the money that he earned from his job, and used it to purchase alcohol [Id.]. Evan also began to irritate his fellow residents, significantly disrespected the counselors, and began destroying his room at the residence [Id.]. He also engaged in self-harm cutting in July 2015 when "he was upset that he was not able to identify or meet his birth parents" [Doc. 26 at 5]. He was asked to leave Waterfall Canyon in August 2015 [Id.].

After he was asked to leave this program, the Harris family attempted to transfer him to an outdoors wellness program called Aspiro [Testimony of Friedrichs Harris,

January 4, 2017]. However, while Evan was staying in a motel room and awaiting transfer, he gained access to the internet, and abused drugs and alcohol, including the synthetic cannabinoid "spice" [Id.]. He befriended an unnamed group of ruffians who helped him to sell or pawn nearly all of his belongings, and somehow bought a bus ticket to return to his family in New Orleans [Id.]. While on the bus, Evan befriended a stranger who was able to communicate his whereabouts to the Harris family and generally help ensure that he was able to make it to New Orleans [Id.]. Evan then lived in a motel for a short time before the Harris family was able to enroll him in the Aspiro Wilderness Adventure Therapy program [Id.]. Evan reportedly did well in the Aspiro program, especially given that he was only required to hike and rock climb, and was in a heavily mentored situation where he was supervised by counselors at all times [Testimony of Friedrichs Harris, January 4, 2017]. However, the two primary counselors at Aspiro and the counselor at Waterfall Canyons all thought that Evan should transfer to another independent living program [Id.]. Accordingly, the Harris family elected to enroll Evan at Q&A in their Journey WV program [Id.]. Before they did, Evan was given his first truly comprehensive Psychological Evaluation by Kevin M. Fenstermacher, Ph.D., on October 13, 2015, and issued a report on the same on November 4, 2015 [Doc. 26]. The Harris family inspected the Q&A site before-enrolling Evan [Testimony of Friedrichs Harris, January 4, 2017]. Rick Harris was specifically looking for a "safe" place for Evan, and thought that a farm, like the one at Q&A, would be good for him [Id.]. Evan was enrolled in the program on November 19, 2015, and his parents dropped him off with the Q&A staff in Staunton, Virginia, to participate in the program in and around Davis, West Virginia [Id.]. Rick Harris testified that he was not

presented with any paperwork to complete at this time, but was required to pay Q&A $9,500 per month for Evan to participate in the program. [Id.]

According to the Affidavit of Rick Harris, [Exhibit 1], the Harrises chose Defendants to care for their son because of the assurances from the Defendants that they would take care of their son. The Parent Handbook clearly indicated that he would have 24/7 mentoring and that they would keep his child safe. [Exhibit 2]. Yet, as documented in the Harris affidavit, his son eloped from the program on at least four occasions. [Exhibit 1]. These elopements are verified in the Best Notes from Q & A. [Exhibit 3] In fact, the Parent Handbook states that The Journey WV program would provide Evan with individual life coaching and 24/7 mentoring. [Exhibit 2 at 4] In addition, the Handbook says that individual therapy would be provided to program participants as appropriate for each client. [Id.] Finally, the Defendants assured Plaintiff and his wife that they would provide medication management by either working with the home psychiatrist or establishing a relationship with the consulting psychiatrist. [Id.] As the Court will see from the documents from Defendants, Evan signed a contract stating he was responsible for his own medications and for taking them. [Exhibit 4]. As this Court is aware, Evan was not capable of understanding and agreeing to contracts. And, just prior to his death, Evan quit taking his medications. [Exhibit 5] As is documented in the Harris affidavit, Evan's parents were never told about their son's not taking his medications, nor was his counselor, Jennifer Randall, nor his psychiatrist, Paul Pelts, M.D., nor was Dr. Fenstermacher ever told. Yet, according to the Parent Handbook, these people were to be part of the medication management team. [Exhibit 2]. When Rick Harris learned of his son's death, on January 24, 2016, he immediately said to the Defendants that they were to keep his son safe. [Exhibit 6]

In fact, Rick Harris said he hung himself from the blue and white rope in the barn, which he had seen during his pre-admission visit, but was told the boys never go to the barn by themselves. Obviously, those facts were not true either. [Exhibit 3 at Bates No. 165] In fact, John Doe died in the same barn by suicide a month earlier, by himself. [Exhibit 7]

As this Court has already documented in its Order, Evan had significant trouble in the Q & A Journey WV program prior to his death.  Evan packed up his belongings and attempted to run away from the facility on December 3, 2015 [Doc. 1 at ¶ 60]. By December 24, 2015, Keith Bishop, a Q & A official, received reports that Evan was cutting himself and expressing suicidal ideas because of a breakup with a female participant in the program. [Id. at ¶ 61]. Evan continued to exhibit troubling behavior throughout December 2015 and January 2016. [Id. at ¶¶62-79]. Additionally, on December 21, 2015, a fellow Q & A program participant, delineated as "John Doe" in the Complaint, hung himself in the same barn on the property where Evan Harris would eventually hang himself [Id. at ¶ 80]. Evan then committed suicide on January 24, 2016 [Id. at ¶ 89]. As the Court will see, Plaintiff's allegation that John Doe committed suicide at Defendants' facility is true, despite Defendants' denial of the same in their Amended Answer.

In support of his position in this case, Plaintiff has previously identified Paul G. Pelts, M.D. as a witness to offer opinions about Evan M. Harris and his needs. (Rule 26(a)(1) Disclosures). Plaintiff previously provided Paul Pelts, M.D.'s entire chart to Defendants, including his Affidavit and curriculum vitae, and Defendants were provided the opportunity to cross examine him in detail at the evidentiary hearing. Furthermore, Plaintiff identified Kevin Fenstermacher, Ph.D. as a witness and provided Defendants with a copy of his 24-page comprehensive report and his credentials. [Exhibit 8] Finally, Plaintiff

5

identified Christine Woodfin, the Educational Consultant, as a witness and provided her credentials and her reports about Evan M. Harris. The Fenstermacher report and the Woodfin report were in the possession of Defendants prior to Plaintiff's son enrolling in the program. They cannot be a surprise to the Defendants and they were clearly identified in Plaintiff's 26(a) disclosures.

This Court found that Dr. Pelts was duly qualified as an expert witness in the field of adolescent and adult psychiatry. (ECF # 41) And, the Court commented in its Order that Dr. Pelts gave compelling testimony regarding Evan Harris' limited intellectual capacity and emotional vulnerability [Testimony of Dr. Paul Pelts, January 4, 2017]. Dr. Pelts testified that he first met Evan in September 2006, at which time he and the family had a sort of, "meet and greet" [Id.]. At that time, Dr. Pelts testified that the Harrises expressed a variety of concerns that Evan was experiencing, primarily anger and frustration that at times would become physical as things escalated [Id.]. He was also having some difficulty with impulse control, mood fluctuation, that would fluctuate somewhere between him being euphoric, overly happy and angry [Id.]. Evan, they reported, would get fixated on things and was not be able to unstick from that [Id.]. Dr. Pelts further confirmed that Evan's biological mother had been diagnosed with bipolar disorder, that she used drugs during her pregnancy with Evan, and that she eventually committed suicide [Id.]. Further, Dr. Pelts confirmed that Evan's biological father was incarcerated either for murder or for some other violent act [Id.]. Dr. Pelts also confirmed Evan's many psychiatric hospital stays during his youth and treatment by other psychologists in the early 2000s [Id.]. Dr. Pelts then opined that Evan was not able to successfully work anywhere, because no job could provide him with truly constant supervision and redirection as to tasks to be completed

[Id.]. Dr. Pelts then testified that the Psychological Evaluation performed by Kevin Fenstermacher, Ph.D. [Doc. 26], is a truly important psychological and diagnostic read as to Evan Harris' mental functioning capacity [Testimony of Dr. Paul Pelts, January 4, 2017]. Dr. Pelts testified that it is very difficult to get someone with intellectual disabilities as severe as those possessed by Evan Harris to sit for a full battery of testing, and that Dr. Fenstermacher's psycho-educational evaluation and report is exceptionally important as to understanding Evan's mental acumen [Id.] Dr. Pelts testified that he relied upon the Fenstermacher report in formulating his opinions in the case. Plaintiff also identified Dr. Fenstermacher in his Rule 26(a)(1) disclosures and provided his report, which contains his qualifications and all of his opinions and recommendations as to how to meet Evan's needs.

This Court concluded following the evidentiary hearing in this matter that Evan Harris was mentally ill at the time of his arrival at the Defendants' facility, which Dr. Pelts' testimony and the Fenstermacher report clearly demonstrate. Defendants freely admit in their Amended Answer that they had the Fenstermacher report prior to his admission into The Journey WV program. (ECF #13 at ¶46). The Fenstermacher report clearly demonstrates that Defendants had knowledge of the troubled past that Evan M. Harris prior to his arrival and that they freely accepted him into the program. Plaintiff contends that he was accepted because of the $9500.00 per month that he was paying for Evan's participation in the program.  The Fenstermacher report makes it clear that Defendants were doing everything opposite of his recommendations:

> 1. Following his successful completion of the program at Aspiro, Mr. and Mrs. Harris are planning to have Evan transfer to another independent living program, and the examiner agrees with this course of action. This type of program will continue to provide Evan with the supervision, guidance, therapeutic supports, and guided experiences that he needs to help him as he works toward achieving independent living. Supporting Evan's compliance with the overall rule structure of his

subsequent treatment program will be important to his long-term success. That said, compliance with programmatic rules and structure should not come at the expense of developing a connected, firm, and nurturing relationship with Evan. This is especially important to remember as Evan can become quite rigid and "stuck in the mud" when encountering limits or situations that he deems unfair. Emphasizing concrete skill building and relationally-based supports rather than insight-oriented interventions will likely be most effective for Evan.

2. Evan should continue to participate in individual and group-related interventions. This type of therapeutic support can provide him with concrete feedback about his emotional coping, interaction style, and relational skills, as well as support his ability to tolerate limits and boundaries placed by others. It will also be important to facilitate Evan's ability to continue to tolerate critical feedback from others without becoming overly defensive or angry. Also, continuing to prompt his self-reflection and as well as reflecting upon the experiences of others should be encouraged to continue to encourage empathy. Evan is also struggling with adoption-related issues, and beginning to explore these issues will likely be important to his overall progress in treatment.

3. Throughout his development, Evan has struggled to find an adaptive anchor for his sense of personal identity and purpose, and this has left him vulnerable to the influence of pop culture, the substance use culture, and negative peer influences. Interventions targeting identity growth and development will be an important part of his ongoing treatment, but they will need to be concrete in nature rather than insight-oriented. Helping Evan identity an area of personal strength, coaching and supporting his efforts to become accomplished in that area, and then using that strength to support his growth will be important to establish resiliency and orientation towards the positive culture rather than the negative one. In addition, encouraging Evan to honestly explore his values, beliefs, and opinions, identifying short and longer-term goals, and examining how his behavioral choices impact his progress toward them will be important to his therapeutic process. Given his intellectual capacity, it will important to ensure that these efforts are concrete, specific, and attainable.

4. Given his history of marijuana and alcohol use, Evan should participate in a substance abuse prevention curriculum that is integrated into the overall treatment milieu. While his marijuana abuse is not the primary issue driving his struggles, Evan would benefit from exploring the underlying emotional, social and relational motivators behind his drug use.

5. Ongoing family contact and therapy will be an important component of Evan's overall treatment process and path toward becoming more independent. Evan's behavioral excesses and unwillingness to comply with his parents and assume a functional role within the family system has strained relationships. Nevertheless, his parents remain connected to Evan and are an important source of support for him. Although reaching an adaptive degree of independence is important for Evan, his

level of functioning is much lower than would be expected given his chronological age, and he remains fully engaged in the separation-individuation process of early to mid-adolescence. With this in mind, interventions should be targeted at helping Mr. and Mrs. Harris' negotiate Evan's ambivalent push-pull developmental process as he works to gain confidence in his ability to functioning independently while simultaneously managing his fear of separating from his parents (and possibly losing them in the processes).

6. Evan will benefit from being involved in prosocial, recreational or community oriented service once he has stabilized in his subsequent treatment program. These types of opportunities have the potential to expand his life experience and present him with chances to work on generalizing what he is learning in treatment. In addition, altruistic "giving back" is often useful in enhancing adolescents' self-esteem while also challenging egocentric patterns of thinking and relating.

7. Evan should continue to participate in regular physical exercise and related recreational activities as a part of his overall wellness plan.

8. Evan should continue to be followed by a psychiatrist specializing in the treatment of young adults as medication management will likely play an ongoing role in his treatment plan.

9. Evan would likely benefit from learning social thinking skills. Michelle Garcia Winner, a clinician well respected for her work with individuals with social deficits, uses the term Impaired Interactive Perspective Taker (IIPT). The interested reader is encouraged to visit the website www.socialthinking.com to better understand the world of social thinking and for links to books and other resources.

10. It is important that Evan's educators and therapist(s) gear his learning and treatment to the "growth zone" in terms of Vygotsky's Zone of Proximal Development. This means that the skills that Evan is learning should be challenging but not overwhelming and that he should be provided with the necessary support to encourage success while demanding growth. The time for optimal teaching, training, and development is when Evan is in the "growth zone" rather than when he is overwhelmed.

11. Therapeutic interventions should continue to target Evan's flexibility and ability to tolerate change and cope with unanticipated frustration or disappointment. Any of the following may be useful to improve flexibility and address rigidity:

a. Increase consistency to whatever degree is possible in the environments in which Evan is required to function.

b. Gradually introduce changes in routine, rules, or procedures that may occur for Evan.

c. Encourage Evan to focus on one thing at a time.

d. Set time limits around how long Evan can spend on the things that seem to trigger rigidity.

e. Brainstorm and problem-solve for several scenarios at a time so Evan can be prepared for unexpected change.

f. Teach specific coping skills, such as a specific "toolbox" of coping that Evan engages in when there is an unexpected change or when he is highly frustrated or stuck cognitively.

g. Educate Evan about his rigidity and help him gain insight into how enhanced flexibility can create improvements in his moods and relationships.

12. Evan needs assistance in applying the skills that he is learning in more real-world settings. He will need opportunities to "practice, practice, practice" functional, real-life skills in a variety of settings and his next placement should provide the context for him to practice these skills within the program but also in the broader community and at home.

13. While Evan would benefit from increased independence, it is important to provide him with reasonable expectations along these lines and realize it will take time and a great deal of scaffolding in order for him to learn to be independent. Scaffolding should be designed to be incremental and graduated and should include building connections to the broader community. It is critical that Evan be recognized and acknowledged when he does things independently (even small things) rather than be criticized when he is not independent. This type of approach will be beneficial in encouraging his sense of self-efficacy (relying on himself rather than those around him). Coaching will be important, including doing tasks of daily living with him and talking him step-by-step through them. He needs more direct, explicit instruction than would be expected given his intellectual abilities.

14. To assist Evan in making the transition to more independent living when he is ready, the following recommendations are offered:

a. Identify ways Evan can broaden independent decision making and problem solving. Teach him to learn more from his own decision making and teach him to self-advocate.

b. Less is more. In his next setting and as he is ready, it is important to allow him to accomplish fewer tasks, but with more independence of thought and decision-making. In other words, slowly remove columns of supports.

c. Remove concrete, artificial behavior plans and help him seek natural, positive reinforcement.

d. Help him find ways to create peer networks.

e. Provide him with work experience.

f Support Evan in leisure planning outside of the house.

g. Encourage increased development of organization skills through direct teaching.

h. Teach problem-solving and emotional regulation.

i. Respect what Evan already knows and create a positive attitude for learning.

15. In the future, Evan and his parents may wish to contact the local vocational rehabilitation to see if they can help him gain and maintain employment.

16. Evan's parents are encouraged to look at resources set up by the PACER Center or to join their listserv, which focuses on adolescents or young adults with disabilities and their transition toward independence.

17. This evaluation can be helpful if Evan's parents want to consider any form of guardianship, power of attorney, and/or conservatorship for Evan. Given his adaptive scores, it is likely that he will need extra years before he will be competent to independently manage his own affairs.

18. Evan should apply for Social Security Disability benefits. Evan's mental health and cognitive problems are expected to be chronic. Even in a treatment setting, he continues to struggle with adaptive functioning at a level that would be required to maintain gainful, steady employment and independently navigate the world around him. This evaluation can be used to apply for benefits if desired.

[Exhibit 8 at 21-24]. Plaintiff has alleged in his Complaint that the Fenstermacher

report set the standard for the services that Evan M. Harris needed while

participating in The Journey WV program in order to be successful and to live.

Defendants were to follow his recommendations in taking care of Evan M. Harris.

Plaintiff avers in [Exhibit 1] that he was told that Defendants had the staff necessary

to provide the services necessary at its facility. As Plaintiff has since learned, the

staff are made up of life coaches and a social worker, but nothing more. If

11

Defendants were counting on Jennifer Randall, LPC as the person responsible for providing these services, she was not capable, qualified, nor did she provide such services. A screening certificate of merit has been provided to her, in compliance with the Medical Professional Liability Act, in preparation for a Complaint to be filed against her. [Exhibit 9].

These Defendants did not do what they told the Harris family that they were going to do. The Harrises are well-educated and articulate people. They asked lots of questions about their son after he arrived and were repeatedly told that Evan was doing well and progressing in the program. What they learned after the filing of this lawsuit is that the Defendants did not intend to provide any of the services that their son needed and deserved. [Exhibit 1] Yet, these Defendants knew in the days leading up to his death that Evan was talking about committing suicide, but let him go to the barn by himself anyway. [Exhibit 10] In fact, on the day in question, Evan had gone to the barn at least 2 times, if not more, by himself. [Exhibit 3 at Bates 165] Evan was clearly having problems on January 24, 2016, which is documented [Id], yet Defendant Keith Bishop never came to address them. [Id]. What is more disturbing is that Evan was found hanging in the barn at 3:00 p.m., but his parents were never called until 5:32 p.m. [Id at 166].  After Evan's death, the documentation of previous day's events occurred in a fury. [Id at 167]. The problems that Evan was experiencing could have been shared with his Mom on January 22, 2016, while she was speaking with Tammy Robbins, but there was no mention of them. [Id at 168]. The fail to share is especially troubling when you read the Best Note from Jen Randall from January 21, 2016, where she documents that Evan M. Harris had completely shut down physically and emotionally. [Id at 171]. The day before, Q & A mentors were expressing

12

concerns about Evan going to the barn to smoke and by himself, yet they continued to let him go. [Id at 172].

**SUMMARY JUDGMENT STANDARD:**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." Anderson, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. See Felty v. Graves–Humphreys Co., 818 F.2d 1126, 1128 (4th Cir.1987); Ross v. Comm'ns Satellite Corp., 759

F.2d 355, 365 (4th Cir.1985), abrogated on other grounds, 490 U.S. 228, 109 S.Ct. 1775, 104

L.Ed.2d 268 (1989).

**DISCUSSION OF LAW**

Defendants have moved for summary judgment on all counts of the Plaintiff's

Complaint on the basis that the appropriate standards of care must be established by

expert testimony.  The problem is that the Defendants have ignored their own pleadings in

the case in moving for summary judgment, which will negate their own arguments.

Plaintiff alleged in his Complaint that Defendants are not engaged in healthcare,

(ECF #1 at ¶26), which Defendants admitted in their Amended Answer to the Complaint.

(ECF # 13 at ¶26). Plaintiff alleged in his Complaint that Defendants are not engaged in

mental health care, (ECF #1 at ¶27), which Defendants admitted in their Amended Answer

to the Complaint. (ECF # 13 at ¶27). In fact, Defendant Q & A has admitted in its Amended

Answer that the only license it has is to do business in the State of West Virginia. (ECF # 13

at ¶28). It is axiomatic that one would need to an expert witness to establish the standards

for a company that has just a business license and nothing more. The program description

for what Evan M. Harris was attending is as follows:

> Our clients often struggle with recurring issues from adolescence, causing
> difficulties in transitioning effectively to independence. Many of our clients
> have participated in numerous forms of therapy, but have struggled
> translating what they have learned to real life. Supported and guided by
> Certified Life Coaches and mentors, clients are presented with real life
> situations on a daily basis. This provides opportunities for them to have
> genuine experiences rather than contrived outcomes...All of our clients are
> engaged in some level of academic, vocational or training program. Some of
> our clients have not been able to complete high school due to extenuating
> circumstances, so we offer the opportunity to complete a high school diploma
> through National High School, which requires a combination of online and
> book/paper work. We provide individual tutoring as needed. We also work
> with Eastern WV Technical and Community College where our clients can
> take college level courses in a variety of vocational areas or take entry-level

> core courses as they prepare to attend a four-year college or university. Some of our clients complete online courses in an Ed-To-Go program, which provides a certificate of completion. Our clients are permitted to take a Certified Nurse Assistant (CNA) course through our local assisted living program. We also work with local professionals to provide apprenticeship opportunities as appropriate. These areas can include electrician, farrier, construction, cable TV, phone, Internet line work, and mechanic.

(ECF #1 at 47). As program participants are supported and guided by Certified Life Coaches and mentors, it does not seem that an expert witness would be required for establishing what certified life coaches and mentors do. In fact, a review of the Certified Coaches Federation provides that:

> Coaching is a professional relationship that helps people break through their limitations to achieve extraordinary results in their lives, careers, businesses or organizations. The process of coaching encourages clients deepen their learning, improve their performance, and enhance their quality of life through self-discovery and self-empowerment.

[Exhibit 11]. The problem is that Evan M. Harris was a deeply disturbed young man who needed therapy and treatment, not just life coaching. Plaintiff intends to question each of the Defendants as to which, if any, of the recommendations from Dr. Fenstermacher they were following and which ones were they ignoring. As the Court will see from reviewing Exhibits 1 and 3, Evan Harris did not receive the services that the Fenstermacher report required them to perform.

**COUNT ONE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:**

Defendants do not contend in their Motion for Summary Judgment that Plaintiff has failed to alleged facts to support his claim of intentional infliction of emotional distress. Instead, they contend that proof by an expert witness is required in order for them to be liable for the tort, but they do not offer any legal authority to support such a contention, which ought to be fatal to their motion as Plaintiff will demonstrate.

15

Under West Virginia law, it is clear that in order to maintain a cause of action for intentional infliction of emotional distress, all a plaintiff must show is that the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. The second element is to demonstrate that the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. The third element is satisfied when plaintiff can demonstrate there was a causal connection between the wrongdoer's conduct and the emotional distress. And, finally, a plaintiff must demonstrate that the emotional distress was severe. Harless v. First Nat'l Bank of Fairmont, 169 W.Va. 673, 289 S.E.2d 692, 704 (1982). In performing this analysis, a court must consider whether a defendant's actions might reasonably be interpreted as outrageous. The West Virginia Supreme Court of Appeals explained:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

Hatfield v. Health Mgmt. Assocs. of W. Va., 223 W.Va. 259, 672 S.E.2d 395, 404 (2008), (citing Travis v. Alcon Labs., Inc., 202 W.Va. 369, 504 S.E.2d 419 (1998)). The tort does not require a finding of physical injury. Hines v. Hills Dep't Stores, Inc., 193 W.Va. 91, 454 S.E.2d 385, 389 (1994) and Woods v. Town of Danville, W.V., 712 F. Supp. 2d 502, 511 (S.D.W. Va. 2010). When this Court looks at the totality of the circumstances, the Court may reasonably conclude that the conduct of the Defendants was outrageous. These Defendants have a road

16

map from a highly skilled and qualified psychologist, who spent hours with Evan, and gave them his report outlining what it was going to take to meet Evan's needs. Yet, Defendants did not provide any of the services that Evan needed. They alienated him from his parents; [Exhibit 1], they cut off his support system by requiring them to cut off his cellphone, and they watched Evan Harris shut down physically and emotionally. [Exhibit 3 at 171]. They knew he was contemplating suicide; he had quit taking his medications; yet, they did not alert anyone who could help, including all of the professionals who could help, Dr. Pelts and Dr. Fenstermacher. They did not want him to leave the program because they wanted his parents' money. It is just that plain and simple. These Defendants lied about the death of John Doe and continued the lie in their Amended Answer to the Complaint. This young man died from suicide, while being intoxicated with methamphetamines, in the same barn. [Exhibit 7] Evan's father had already said in his Affidavit, had they told them John Doe died by suicide, they would have come to West Virginia and picked up their son. [Exhibit 1] That would have been clear evidence that the Defendants were not providing the care and services these young people needed; but these Defendants lied about it. When the Court looks at the facts, including these Defendants permitting Evan to get drunk, it will conclude that the conduct is reasonably consistent with outrageous conduct. [Exhibit 3 at 178]

### COUNT TWO: NEGLIGENCE IN PERFORMING ASSESSMENTS ON EVAN M. HARRIS

Although Count Two is styled as negligence in performing assessments, the underlying allegations are that the Defendants were negligent in proximately causing the death of Evan M. Harris (ECF #1 at ¶117), and that there were no assessments performed by these Defendants on Evan M. Harris to determine if he was a proper candidate for their program. (ECF #1 at ¶118). The only assessment was completed by Sandy Schmiedeknecht

17

after his arrival. [Exhibit 12] It is the Life Skill Assessment that was addressed at the Evidentiary Hearing. Audrey Peavy said she scanned the Fenstermacher report before Evan arrived, but that was all. [Testimony at Evidentiary Hearing at 145]. There was no other assessment ever provided by Defendants in discovery. She says that she sent the report to others on the treatment team by email, but no such email has been produced in discovery that Plaintiff has seen. [Id]. Based upon the Fenstermacher report and this young man's troubled past, a jury could easily conclude that the assessments that were done were not sufficient to meet his emotional needs and to make certain those needs were being met. In fact, they were not even able to ensure that he was taking his medicine.

### COUNT THREE: NEGLIGENCE SUPERVISION

These Defendants let two young men hang themselves in the barn, a little more than a month apart. Rick Harris was told that the boys were not permitted to go to the barn by themselves, but that clearly was not true. [Exhibit 1] Rick Harris had been to the barn on his pre-admission visit and saw all kinds of dangerous instruments hanging there. [Exhibit 13] Most telling is the photograph that Rick Harris took of the barn with the white and blue rope hanging in it. [Exhibit 14] Unfortunately, it was that rope that Evan used to hang himself. A jury could easily conclude that they were not watching Evan Harris closely, like the parents were promised, which is represented in the Parent Handbook, and in light of all the times he had eloped, [Exhibit 3 at 176, 177, 217, and 219] getting drunk, buying cigarettes and doing drugs [Exhibit 3 at 167, 168, 170, 171, 172, 174, 175, 176, 177, 178, 179, 180, 183, 184 and 203] cutting and purging, along with suicidal ideations [Exhibit 3 at 181, 187, 193, 195, 197, and 224] shutting down emotionally and physically, [Exhibit 3 at 171], while the Defendants watched and did nothing about.

## COUNT FOUR: NEGLIGENT HIRING

A jury could easily conclude that the Defendants were negligent in hiring employees when they failed to take care of Evan while he was in the Journey WV Program. Defendants employees were to be watching Evan Harris and taking care of him. They clearly did not do that. Defendants had a duty to comply with what they said they were going to do in the Parent Handbook, [Exhibit 2] which is to provide 24/7 mentoring for the young men in the program, and to keep them safe from harm. [Exhibit 1]

## COUNT FIVE: NEGLIGENT TRAINING

These Defendants had a clear road map from the Fenstermacher report as to how Evan needed to be told how to do things in a way that he could understand and perform tasks. These Defendants did not recognize Evan's difficulties in understanding how to do simple tasks until January 14, 2016. [Exhibit 3 at 177]. It was not until that date that Angie Shockley first suggested that the mentors needed to be trained and told Keith Bishop to do it, but there is nothing in the records to demonstrate that such training ever took place. [Id.] Furthermore, the mentors let two young men hand themselves in the barn. They could not have been properly trained in preventing suicides, recognizing the signs or reporting those signs to others. Angie Shockley documented in the Best Notes that Matthew Shockley did not believe Evan was smart enough to be an addict. [Exhibit 3 at 175] There was no mention of Evan going to any addiction treatment or AA meetings until after he was deceased. [Exhibit 3 at 167] There is no way possible that a jury could conclude that these people were properly trained to take care of people like Evan Harris. As a result, he hung himself in their barn.

19

**COUNT SIX: NEGLIGENCE PROGRAM DESIGN**

There is no way possible that a jury could conclude that the Defendants' program was the right one for Evan M. Harris. All you have to do is to recognize that two young men hanged themselves in the same barn, less than a month a part, and they did nothing to prevent either death. The programs could not have been successful. These Defendants had a clear roadmap from the Fenstermacher report, which would have provided them with the program that Evan needed. As far as we know today, the only person that claims to have read it is Sandy Schmiedeknecht, but she testified at the Evidentiary Hearing that she did not recall having read it. [Transcript at p. 87]. When you are ignoring what the psychologist says the young man needed, the program was not properly designed or implemented.

**COUNT EIGHT: NEGLIGENT PROGRAM ASSESSMENTS**

Count Eight makes it clear that that the Defendants were negligent in proximately causing the death of Evan M. Harris (ECF #1 at ¶117), and that there were no assessments performed by these Defendants on Evan M. Harris to determine if he was a proper candidate for their program. (ECF #1 at ¶118). The Defendants have not produced any evidence of any kind that there were program assessments or how they were performed. Two young men died a little more than one-month apart from each other. How in the world could these programs have been properly assessed for their effectiveness? As Dr. Harris states in his Affidavit, they represented that their programs were successful, but there is no evidence produced that would support that conclusion.

**COUNTS NINE AND TEN: NEGLIGENT MISREPRESENTATION OF FACTS OR INTENTIONAL MISREPRESENTATIONS**

These Defendants misrepresented the effectiveness of their programs. They require the Plaintiff to have a psychological evaluation performed for his son. The report says what

they needed to do in order to support him, and they told the parents they were supporting

him, but the facts just do not bear that out. They were either negligent in their actions in

reporting what was happening to their son or they lied to the Harrises about their son's

condition. Either way, these Defendants prevented the Harrises from knowing their son's

condition. As a result of those representations, Evan Harris hanged himself in the barn with

a rope, while no one was watching him. Evan had given up; they knew he had given up;

they knew he was not taking his medicines and they knew he was in trouble. They just did

not bother to tell the Harrises. [Exhibit 1]

### Count Eleven: Violations of the WV Consumer Credit and Protection Act

There is no requirement for expert testimony to prove that these Defendants

violated the West Virginia Consumer Credit and Protection Act.  Plaintiff alleged in his

Complaint that Defendants engaged in violations of the Act by misrepresenting the services

that they were going to provide to the Defendant. [ECF #1 184-199] There is no question

that has occurred. Defendants just say that they did not violate the Act in their Amended

Answer. It not sufficient to deny these allegations and suggest to the Court that they are

somehow entitled to summary judgment. Plaintiff has clearly demonstrated numerous

times where the services represented were not provided.

### Conclusion

These Defendants are not entitled to an award of summary judgment from this

Court. They were provided, at their request, the Fenstermacher report. The report was

ignored, and the recommendations he made, went unheeded. As a result, two young men

died at their place of business. These Defendants had an obligation to tell the Harrises the

truth, but they chose not to because they did not want to lose the revenue that Evan Harris

was generating. What the Defendants did was negligent, grossly negligent, willful wanton and reckless. They should be punished for it. Therefore, we respectfully suggest to the Court to deny the Defendants' Motion for Summary Judgment as unfounded. They have set forth any information, by way of affidavit, discovery responses, or anything else that would warrant this Court granting the same. All reasonable inferences are to be resolved in favor of the Plaintiff and we ask that you do so.

Respectfully submitted,

Friedrichs Harris, Administrator

s/David A. Sims
_____
David A. Sims (#5196)
Law Offices of David A. Sims, PLLC
P.O. Box 5349
Vienna, West Virginia 26105
304-428-5291
304-428-5293 (fax)
david.sims@mywvlawyer.com

22

## <u>CERTIFICATE OF SERVICE</u>

I David A. Sims as counsel for Plaintiff do hereby certify that I served PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT by CM\ECF counsel for Defendants:

Lindsey M. Saad, Esquire
FLAHERTY SENSABAUGH BONASSO, PLLC
48 Donley Street
Suite 501
Morgantown, WV  26501
lsaad@flahertylegal.com

Dated at Vienna, West Virginia on this 29th day of March 2018.

Friedrichs Harris, Administrator
By counsel,

/s/David A. Sims
_____
David A. Sims (W.Va. Bar No. 5196)

LAW OFFICES OF DAVID A. SIMS, PLLC
P. O. Box 5349
Vienna, West Virginia 26105
(304)-428-5291
david.sims@mywvlawyer.com