**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**

Friedrichs Harris, Administrator of the
Estate of Evan M. Harris, deceased,

    Plaintiff,

v.                                                                         Civil Action No. 2:16-cv-46
                                                                       Judge Bailey

Q & A Associates, Inc.
Angela Shockley, Individually,
Keith Bishop, Individually,
Matthew Shockley, Individually,
Sandy Schmiedeknecht, Individually, and,
Tammy Robbins, Individually,

    Defendants.

## AFFIDAVIT OF FRIEDRICHS HARRIS, M.D.

I am Friedrichs Harris, M.D. I am over the age of 18 and I am competent to make this Affidavit concerning my interactions with the Defendants in this case.

1.    Evan M. Harris is my son and that of my wife, Kathleen Stull Harris. He was adopted by us.

2.    My wife and I are residents of the State of Louisiana.

3.    On the 9th day of March 2016, I qualified as the Administrator of the Estate of Evan M. Harris following the death of our son on January 24, 2016.

4.    I am the Plaintiff in the lawsuit that was filed Q & A Associates, Inc. and the other Defendants.

5.    As the Court is aware, based upon my earlier testimony before his Honor, our son had a very difficult childhood, adolescence and young adulthood. I will not recount

those events, as they are already a matter of public record by way of the Court's transcript and the Order denying the Defendants' Motion to Compel Binding Arbitration.

6. One of the requirements for consideration of admission to the Q & A facility was a complete psychological evaluation. My wife and I arranged for the testing, as the Court is aware, the testing was extensive. It was performed by Dr. Fenstermacher, whom we have identified as a witness in this case. He is the psychologist who authored what has been referred to as the Fenstermacher report.

7. We welcomed the Fenstermacher report as it provided a clear picture of the kind of help our son really needed in order to succeed and to survive. We sent the Fenstermacher report to Q & A for consideration. We were told by Defendants a short while later that our son was accepted into their program.

8. In addition to the detailed history in the Fenstermacher report, my wife and I shared with Q & A representatives the problems that Evan had over the years. We wanted them to be aware of the problems he was having so that they could make certain that they could meet his needs.

9. When my wife and I decided to place our son in the care of Q & A Associates, Inc., we were assured that they had the people, the staff and the training to meet the needs of our son. We thought we were sending our son to a place that was licensed by the State of West Virginia to provide services to people like my son. What I have learned since my son's death is the only license these Defendants have from the State of West Virginia is a license to do business.

10. I have learned since the filing of this suit that in the announcement of the opening of Q & A, Angela Shockley stated that she has worked in the industry for many

2

years as the Director of Alldredge Academy and as a Regional Director at Eckerd Youth Alternatives, where she was responsible for the development of the Private Programming Division. I have since learned that there were injuries and deaths at these facilities, which were never disclosed to us. I wish the Defendants had been forthright with information about these problems, I would have then reconsidered the placement of our son at their facility.

11. Defendant Shockley was aware that at least one death by suicide had been reported at that facility and was aware that the young man who killed himself had asked his counselor to take away his knife before he hurt himself again, but that had not been done. I would have reconsidered my son's participation in her program at Q & A had I known that she had these previous experiences.

12. I have since learned Angela Shockley, Keith Bishop and others on the management team at Q & A Associates, Inc. had previously worked at other facilities where troubled teens and young adults have died by suicide and others were abused by staff and other residents within the facility. It would have been very helpful if these people would have shared their experiences with us before we decided to place our son in their care.

13. These Defendants were all uniquely aware of the problems associated with suicides at these types of facilities and that they were common, but they did not disclose these things to me or my wife, which they should have done.

14. Q & A Associates, Inc.'s officers, staff and colleagues claimed that they and their programs could effectively take a troubled teen or young adult and mold them into a productive member of society through leadership, education, training and supervision. What I have learned since the filing of the suit is that there were no measures of program

3

effectiveness in place nor was there any evidence to support the claims that they were making to us.

15. I thought that Q & A Associates, Inc. was a facility that would be providing mental health services to my son, which is what we were told when we considered placement there. We provided contact information for his psychiatrist Dr. Paul Pelts, M.D. We explained that Dr. Pelts had to manage his medications and that we did not want the local psychiatrist that Defendants offered to provide this service. We insisted they contact Dr. Pelts about any questions or concerns they had about our son before his arrival and while he was there.

16. We were told by these Defendants that they would and could provide the services that our son needed, as they were outlined in the Fenstermacher report. I have since learned that Q & A Associates, Inc. is not a mental health facility, nor is it licensed to provide mental healthcare services of any kind. Furthermore, I learned that they are life coaches with little or no training of any kind and they certainly did not take care of my son when they let him elope from the program and hang himself in the barn.

17. The Fenstermacher report provided a listing of medications and why our son was taking them. The report made it very clear that our son required consistent efforts to take his medications and that medications were crucial to our son's well-being.

18. The Fenstermacher report provided previous self-injurious behaviors and suicidal statements our son had made in the past. These Defendants were well aware that our son needed to be closely monitored, which clearly was not done.

19. It documented that Evan M. Harris had been dealing with substance and addiction issues that needed to be addressed during his participation in the program. Dr.

4

Fenstermacher also detailed the requirement that Evan M. Harris be closely followed by a psychiatrist, which we have since learned was never done while he was in the program.

20.     What I want to say was most important to us was the representations that they would keep a close eye on our son and that he would be kept safe. Safety was tantamount to our decision to place our son there, but clearly the Defendants failed to keep him safe as he hung himself in the same barn where John Doe hanged himself. I was told the boys were not allowed to go to the barn by themselves, ever. I took a photo of a blue rope in the barn, the one my son hanged himself with, two months before.

21.     On November 19, 2015, I took our son to Washington, D.C. and drove him part way to Davis, West Virginia to meet up with Defendants' staff members. He was to participate in The Journey WV program. According to the program materials, he was to be engaged in some level of academic, vocational or training program. When we questioned our son's working at The Deerfield Inn, we were told that he needed to have a job and that dishwashing was all that was available to him. Washing dishes in the Defendants' other businesses was not the vocational or training program we had envisioned, but it was something for our son to do.

22.     According to the Best Notes provided by these Defendants, instead of meeting the psychological needs of our son, the Defendants' officers and staff members watched our son deteriorate physically, with cutting and purging, and emotionally by eloping, cutting, purging and expressing suicidal ideations. These Defendants did not advise me, my wife, Dr. Pelts or Dr. Fenstermacher that our son was not taking his medications nor did they report these other instances of self-injurious behaviors to any of us. Clearly, they had an obligation to let us know our son was not doing well. The Parent Handbook, a

copy of which is attached to the Response to the Motion for Summary Judgment, clearly told us that they were going to be watching our son twenty-four hours a day, seven days a week and would keep him safe, but neither of those things were true.

23. These items mentioned in the Best Notes, refusing his medications, not taking medications, not eating with the other housemates, not participating in activities, quitting his job, along with cutting, purging and suicidal ideations, mixed with a strong desire to drink alcoholic beverages, are all in strong and dark contrast to the assurances we were receiving from Defendants. We were assured that Evan was doing great and we needed to back away from our son and let him mature on his own, which is contained in the same Best Notes.

24. As is documented by the Best Notes, our son was expressing a desire to leave the facility and return home or to a previous program he had attended, part of which the Defendants admit in their Amended Answer to the Complaint. On December 3, 2015, our son eloped from the facility. Letting persons pack their things and run away is not consistent with keeping a close eye on our son.

25. On December 21, 2015, John Doe, another participant in the program and a housemate of Evan M. Harris, died from hanging himself in the barn on Q & A Associates, Inc.'s premises in the exact same barn that Evan hung himself. Our son and the other program participants knew that John Doe had committed suicide by hanging in the barn, but Q & A Associates, Inc. representatives told us that John Doe's death was a tragic accident and that additional details could not be revealed out of concern for the privacy rights of the parents of the deceased. What we have learned since the filing of this lawsuit is that Defendants had left him alone, while he was intoxicated on methamphetamines, and

6

let him hang himself in the barn, because no one was paying any attention to his whereabouts. One cannot be keeping a close eye on another and let him wander away from the facility, get intoxicated with methamphetamines, and hang himself in the barn. They lied to us about what had happened to John Doe. Had they told us John Doe had committed suicide, we would have made the trip to West Virginia and retrieved our son. We would have known on December 21, 2015 that our son was not in a proper placement.

26. When John Doe died, we were told that he died from an accident which had occurred on the property. We were very curious about what had happened to John Doe because we were afraid it may happen to our son. We were assured by Defendants that John Does' death was an accident. We thought he had fallen from a horse, or something like that, based upon the statements from these Defendants. We had a right to know that one of the other program participants had committed suicide, which is exactly what happened, and which we did not learn about until this suit was filed. What we learned after our son's death was the death certificate was a matter of public record. They could have easily shared it with us, but did not, because they knew that we would come and pick up our son. If they let one program participant run away and hang himself, who is to say that it would not happen a second time, which clearly it did. My wife searched the internet for days trying to find out about it.

27. On December 22, 2015, there was a conference call about Evan. My wife wanted to come visit our son over Christmas, but the Defendants said that she should not do it because it would be detrimental to his progress in the program. Instead, it is clear now that the Defendants did not want us to come visit our son because his housemate had committed suicide and they did not want us to know about it.

28.     On December 23, 2015, my wife spoke with Sandy Schmiedeknecht and advised her that Evan was going to be working and that Kathy should not come to visit.

29.     According to the Best Notes documentation, as early as December 24, 2015, Keith Bishop was receiving reports that our son was cutting his arm and was expressing suicidal ideations over a breakup with a female participant in the program, which went unreported to us. Had we been told that Evan was thinking of killing himself, we would have contacted Dr. Pelts, his psychiatrist, and had him hospitalized, which is what these Defendants should have done. The problem is that they did not tell us because they did not want to lose the money we were paying them each month to keep our son safe.

30.     These suicidal ideations were being expressed right after the suicide of John Doe. At the time of John Doe's death, we were assured that grief counseling services were being offered to our son, by Jennifer Randall, but we have since learned from our expert against Ms. Randall that there were no such services being provided.

31.     Had these Defendants been honest with us, our son would not have been at their facility on January 24, 2016 when he committed suicide. Instead, he would have been in the hospital getting the medical treatment he needed.

32.     With respect to our son's purging, as a physician I know that purging limits the absorption of medications. It was also a warning sign that these Defendants ignored and as a result, our son is dead. These Defendants knew that Evan had to take his medicine, but they just did not care enough about him to make certain it was done, nor did they tell Jennifer Randall, Paul Pelts, M.D. or Dr. Fenstermacher that he was refusing his medicines.

33.     From the Best Notes, it was revealed on January 12, 2016 that our son borrowed money from Sandy Schmiedeknecht to buy cigarettes. He left the store and

8

walked to the bank where he withdrew money from a joint account he had with Sandy and used it to purchase a bottle of Jack Daniels whisky. Instead of alerting us of this behavior, or contacting his psychiatrist, it went unreported to anyone. They were supposed to be watching our son and watching out for his safety, but instead they let him sneak away from the program and go to the store to purchase alcohol. If they were watching our son, he could not have done those things.

34. According to the Best Notes, on January 14, 2016, Angela Shockley was supposedly going to the farm to speak with our son, but again he had eloped from the program. This information was kept from us as well. Had we been told of our son's elopements, we would have made the trip to West Virginia to get him. She told him during that visit that he was not going to be able to return to Waterfall Canyon, which was Evan's plan as documented in his Life Skills assessment.

35. According to the Best Notes, on January 18, 2016, our son again left the facility. He was found walking along Cortland Road in Tucker County by Angela Shockley after he had again gone missing yet a fourth time.

36. According to the Best Notes, on January 23, 2016, our son expressed a strong desire to drink alcohol and was provided counseling by Mark Shockley about addiction and he offered to take him to AA meetings, but this mention in the records from Q & A are the first mention of any intervention of any kind for our son's addictions and substance abuse problems.

37. As is documented in the Best Notes of Q & A Associates, Inc., members of the management team and the staff encouraged us to limit or end communications with our son early on in the program. It is evident now, why they wanted to limit our contact with

9

our son. They did not want him to tell us how miserable he was in the program and that he wanted to come home.

38. As is documented in the Best Notes of Q & A Associates, Inc., the "seed" was planted in our minds to discontinue the cellphone service that our son had.

39. Initially, my wife Kathleen Harris resisted the efforts of Q & A Associate, Inc.'s staff to turn off our son's cellphone. We were told that the cellphone was interfering with his progress and that she was merely enabling her son's refusal to become an adult and to be self-sufficient. While those reasons sounded legitimate at the time, she still did not want to disconnect his phone. In fact, my wife made up excuses as to why she had not disconnected the cell service. After more coaxing and finally a demand from Q & A Associates, Inc.'s staff, my wife discontinued our son's cellphone service. She continues to blame herself that she cut off our son's only method of communicating with us and as a result he is dead. We have been to grief counseling as a result of these events, even two years later, and I do not see that changing. Losing a child to suicide after you placed him where he committed that suicide is not a position any parents wants to find his or herself.

40. In a Charleston Gazette article about the death, Angela Shockley is quoted as saying: "In the wake of the first death, Shockley said, Q & A Associates, Inc. did not plan to increase monitoring of clients, and she said she was not worried about another death occurring." It is evident from this statement that she did not know what she was talking about, because she knew others were at risk, especially our son who was expressing suicidal ideations. In fact, Angela Shockley's statement to the media about the first death was false. Defendants knew from their prior experiences with suicides and deaths at these types of facilities that deaths of participants posed a particularly delicate and potentially

deadly effect on the remaining program participants, but fraudulently withheld such information from me and my wife.

41. Because there were no efforts made by Defendants to assist the other program participants in coping with the death of John Doe, our son was found hanging in the same barn. Evan M. Harris had also been missing from the program for 30 min before he was found hanging in the barn. Our son's death occurred because these people at Q & A disregarded the warning signs.

Further the Affiant Sayeth Naught.

_Friedrichs Harris_
Friedrichs Harris, Administrator

Taken and subscribed to before me on this 29th day of March 2018. GODUAL MARTINEZ, JR
NOTARY PUBLIC # 51166
JEFFERSON PARISH
STATE OF LOUISIANA
MY COMMISSION IS FOR LIFE

Notary Public

My Commission Expires: _FOR LIFE_.

11