# CURRICULUM VITAE
# PAUL GERARD PELTS, M.D.

**RESIDENCE:**

4002 St. Charles Avenue
New Orleans, LA, 70115
(504) 529-2495

**CURRENT EMPLOYMENT:**

Child, Adolescent and Adult Psychiatrist
Pelts, Kirkhart, and Associates, LLC
1539 Jackson Avenue, Suite 300
New Orleans, Louisiana 70130
(504) 581-3933 Fax: (504) 596-3933

**PAST EMPLOYMENT:**

2001 – 2005

Child, Adolescent and Adult Psychiatrist
Mercy Family Center
Metairie, Louisiana

1995 – 2001

Assistant Professor of Psychiatry
Clinical Assistant Professor of Pediatrics
Tulane University School of Medicine
New Orleans, Louisiana

**EDUCATION:**

1993 – 1995

Fellow in Child and Adolescent Psychiatry
Tulane University Medical Center
New Orleans, Louisiana

1990 – 1993

Resident in General Psychiatry
Alton Ochsner Medical Foundation
New Orleans, Louisiana

1983-1990

Bachelor of Arts in Biology
Doctor of Medicine (M.D.)
University of Missouri – Kansas City
School of Medicine
Six Year Combined BA / MD Program
Kansas City, Missouri

# CURRICULUM VITAE
## PAUL GERARD PELTS, M.D.

**CLINICAL ADMINISTRATION:**

| | |
|---|---|
| 2000 – 2001 | Director, Acute Adolescent Services<br>DePaul-Tulane Behavioral Health Center |
| 1998 – 2000 | Director, Acute Child Services<br>DePaul-Tulane Behavioral Health Center |
| 1995 - 1998 | Director, Children's Neuropsychiatric Inpatient Unit<br>Tulane University Medical Center |

**CONSULTATIONSHIPS:**

| | |
|---|---|
| 1995 – 2008 | Medical Director<br>Friends' Alliance for the Mentally Ill<br>Goal: to assist in treatment planning and medication management for adult psychiatric rehabilitative services |
| 2000 – 2001 | Medical Director<br>Milestones Mental Health Agency<br>Goal: to assist in treatment planning and medication management for children's psychiatric rehabilitative services |
| 1997 - 1999 | Medical Director<br>Children's Assertiveness Community Treatment Program<br>Lafourche, Terrebonne and the River Parishes of Louisiana<br>Goal: in-community resource development targeting chronic severe children and families in need of intensive outpatient support services |

**HOSPITAL AFFILIATIONS:**

| | |
|---|---|
| 1995 – 2001 | Tulane University Medical Center<br>New Orleans, Louisiana |
| 1995 – 2001 | Medical Center of Louisiana<br>(Charity Hospital of New Orleans)<br>New Orleans, Louisiana |
| 1998 – 2001 | DePaul-Tulane Behavioral Health Center<br>New Orleans, Louisiana |

# CURRICULUM VITAE
## PAUL GERARD PELTS, M.D.

**SCHOOL AFFILIATIONS:**

2001 – Present

Assistant Clinical Professor of Psychiatry
Assistant Clinical Professor of Pediatrics
Tulane University School of Medicine
New Orleans, Louisiana

**CURRENT TEACHING ACTIVITIES:**

Medical Students:

Group Leader in Human Behavior Course
Foundations in Medicine for First Year Students

Supervisor and Instructor for Third Year Psychiatry
Clerkship outpatient experience

Residents:

Lecturer, supervisor and seminar leader for Tulane
child and adolescent fellows and general psychiatry
residents

**LICENSURE:**

1991

Medical License, State of Louisiana
License Number 08889
Diplomat, National Board of Medical Examiners

1994

Medical License, State of Mississippi
License Number 14096
Reciprocity

1999

Board Certified, General Psychiatry

2000

Board Certified, Child and Adolescent Psychiatry

**PROFESSIONAL ORGANIZATIONS:**

American Psychiatric Association
Louisiana Psychiatric Medical Association
- Chairman, Child and Adolescent Committee
- Treasurer, 2000 – 2001
- Member, Executive Council, 2000 – 2004

# CURRICULUM VITAE
## PAUL GERARD PELTS, M.D.

**PROFESSIONAL**      American Academy of Child and Adolescent
**ORGANIZATIONS:**      Psychiatry
**(Continued)**      Faculty Practice Plan
Tulane University School of Medicine
- Executive Committee Member
- Clinic Operations Subcommittee Member, 2000 – 2001
- Billing and Collections Subcommittee Member, 1997 – 2000

Tulane Preferred Health Plan
- PPO Committee Member
- Credentialing Committee Member
- Psychiatric Consultant, 1997 – 2001

New Orleans Area Psychiatric Association
- President, 2000 – 2003
- Executive Council Member, 1996 – 2003
- Secretary, 1997 – 2000

Department of Psychiatry and Neurology, Tulane University School of Medicine
- Executive Finance Committee Member, 1998 – 2001

## CLINICAL TRIALS / PRINCIPAL INVESTIGATOR:

Double-Blind Placebo-controlled Study of Venlafaxine ER in Children and Adolescents with Generalized Anxiety Disorder. 2001

The Efficacy and Safety of Risperidone in the Treatment of Children and Adolescents with Schizophrenia. 2001

## PRESENTATIONS:

"Prozac, et al: What's the Big Deal?" Psychiatry Grand Rounds, Ochsner Medical Foundation, March 1992.

"A Louisiana Gumbo: Family-centered treatment on an adolescent, brief-stay, psychiatric unit," Building on Family Strengths Conference, Portland State University, Portland, Oregon, May, 1995.

"Neuropsychiatric Aspects of Primary Care II, Anxiety and Depression: Manifestations and Interventions Across the Life Cycle," Course Director and Moderator, New Orleans, Louisiana, February, 1996.

## CURRICULUM VITAE
## PAUL GERARD PELTS, M.D.

**PRESENTATIONS: (Continued)**

"Emergencies in Child and Adolescent Psychiatry," Department of Pediatrics, Tulane University School of Medicine, September, 1996.

"Psychiatric Consultation and Psychopharmacology," Department of Social Work, Louisiana State University, Baton Rouge, Louisiana, October, 1996.

"Psychopharmacology in Children and Adolescents I and II," (2 workshops), Neuropsychiatric Aspects of Primary Care III, Clinical Child and Adolescent Neuropsychiatry, Course Director and Presenter, New Orleans, Louisiana, February, 1997.

"Kids and Drugs: An Overview," Louisiana Academy of Family Practice Annual Meeting, Orlando, Florida, July, 1997.

"Antipsychotics in Children and Adolescents," Physician Dinner sponsored by Eli Lilly Pharmaceuticals, New Orleans, Louisiana, June, 1998.

"Gender Issues in the Treatment of Adolescent Depression," Gender Specific Treatments of Depression Conference, Destin, Florida, September, 1998.

"Psychosis: Newer Treatment Strategies," Dinner Presentation, The Museum of Discovery, Little Rock, Arkansas, 1998.

"A Modern Look at Inpatient Child Psychiatry," Tulane University School of Medicine, Child Psychiatry Grand Rounds, August 21, 1998.

"The Use of Psychotropic Agents in Children and Adolescents," Physician Dinner, sponsored by Eli Lilly Pharmaceuticals, Baton Rouge, Louisiana, March, 1999.

"The Assessment of Aggression and Suicide in Children and Adolescents," National Association of Social Workers Meeting, Baton Rouge, Louisiana, March, 1999.

"The Assessment of Aggression and Suicide in Children and Adolescents," North Coast Mental Health Professionals, Winter Meeting Keynote Address, Eureka, California, September 28, 1999.

"Eating Disorders in Children," Tulane University School of Medicine, Child Psychiatry Grand Rounds, December 10, 1999.

"Pharmacology with Aggressive Adolescents," Women's Mental Health Program, Tulane University School of Medicine, May 5, 2000.

# CURRICULUM VITAE
## PAUL GERARD PELTS, M.D.

### PRESENTATIONS: (Continued)

ADHD Missed or Over-diagnosed?"  DePaul-Tulane Breakfast Serial, New Orleans, Louisiana, April 28, 2000.

"Psychiatric Rehabilitation,"  National Alliance for the Mentally Ill Louisiana State Conference, Baton Rouge, Louisiana, August 5, 2000.

"Ask the Psychiatrist:  A Question and Answer Session,"  National Alliance for the Mentally Ill Louisiana State Conference, Baton Rouge, Louisiana, August, 2001.

"Advancing the Cornerstone of ADHD Therapy,"  Physician Dinner sponsored by Novartis Pharmaceutical, New Orleans, Louisiana, November, 2001.

### ABSTRACTS:

Dalton, R., Forman, M.A., Pelts, P.  "Are Children Sicker or Poorer? – A Retrospective Inpatient Study,"  Abstracts, Eleventh International Congress on Child Abuse and Neglect, 253-254, Dublin, Ireland, 1996.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

Friedrichs Harris, Administrator of the
Estate of Evan M. Harris, deceased,

     Plaintiff,

v.                                                              Civil Action No. 2:16-cv-46
                                                                Judge Bailey

Q & A Associates, Inc.
Angela Shockley, Individually,
Keith Bishop, Individually,
Matthew Shockley, Individually,
Sandy Schmiedeknecht, Individually, and,
Tammy Robbins, Individually,

     Defendants.

### Affidavit of Paul G. Pelts, M.D.

My name is Paul G. Pelts, M.D. I am over the age of 18 years of age and I am competent to make this Affidavit. Upon being duly sworn, I do hereby affirm the following statements upon my oath and under the penalty of perjury:

1.  I have a group physician practice called Pelts, Kirkhart & Associates LLC.

2.  My business address is 1539 Jackson Avenue, Suite 300, New Orleans, LA 70130

3.  I am a licensed physician with the State of Louisiana.

4.  I have been a licensed physician for 25 years.

5.  My current curriculum vitae outlining my education, training and experience is attached hereto as Exhibit 1.

6.  My curriculum vitae accurately depicts my qualifications as a psychiatric medicine physician.

7.    In my years of practice, I have provided care and treatment to Evan M. Harris, the decedent in the above-styled civil action.

8.    I began seeing Evan M. Harris as a patient in _2006_ and I continued to provide care and treatment to him until his death.

9.    In my care and treatment of Evan M. Harris, I had numerous evaluations and examinations performed in order to properly diagnose and provide treatment to him.

10.   Evan M. Harris has a long-standing history of mental illness, developmental delays, and other complicating medical conditions.

11.   At the time of Evan M. Harris's last visit to my office, which occurred on _8.18.15_, Evan M. Harris had the following diagnoses:

    a.  Bipolar I Disorder;

    b.  ADHD

    c.  Intellectual Developmental Disorder;

    d.  Generalized anxiety;

    e.  Depression;

    f.  Drug and alcohol abuse;

    g.  Borderline cognitive functioning; and,

    h.  Learning and developmental delays.

12.   I am familiar with the psychological testing and report done by Kevin Fenstermacher, Ph.D. concerning Evan M. Harris on November 4, 2015. It was the most recent psychological testing performed on Evan M. Harris before his death.

2

13.   I have reviewed Dr. Fenstermacher's report in completing this Affidavit, a copy of which is attached hereto as Exhibit 2.

14.   I am aware that Dr. Fenstermacher did his evaluation of Evan M. Harris on October 13, 2015 and completed his report on November 4, 2015.

15.   I am aware that Dr. Fenstermacher completed his evaluation and report for Evan M. Harris as a requirement for his admission into the program at Q & A Associates, Inc.

16.   Dr. Fenstermacher's report of his findings concerning Evan M. Harris is consistent with my own findings as to Evan M. Harris, which are:

   a.  Evan had a long standing diagnosis of Bipolar I Disorder, which has required numerous in-patient and out-patient treatment programs throughout his life;

   b.  Evan had attention deficit hyperactivity disorder ADHD;

   c.  Evan had Intellectual Developmental Disorder;

   d.  Evan struggled with emotional problems from a very young age, including anxiety and depression;

   e.  Evan had a history of drug and alcohol abuse;

   f.  Evan had borderline cognitive functioning;

   g.  Evan had suffered from learning and developmental delays;

   h.  Evan had a stringent medication regimen that must be followed;

   i.  Evan had a diagnosis of a growth hormone deficiency for which he received injections;

3

j.  As documented in the Fenstermacher report, Evan would always provide a response to testing items, but would not realize that his response was irrelevant to the questions being asked, which is consistent with my assessment of him;

k.  Evan had struggled with impulse control most of his life;

l.  Evan had demonstrated poor judgement and his insight was always markedly underdeveloped for his age;

m.  Evan's full scale IQ score of 75 was in the borderline range of functioning at the 5th percentile;

n.  Evan was given Behavior Rating Inventory of Executive Function— Adult Self Report Version (BRIEF-A-SR) testing by Dr. Fenstermacher;

o.  The BRIEF-A-SR testing demonstrated Evan had quick thoughts and intense emotions that dictate how he responded in the moment and demonstrated significant concern for behavioral regulation, which is underlies most areas of executive functioning; and,

p.  Based upon the BRIEF-A-SR testing, Evan had significant difficulties with executive functioning.

17. In preparing this Affidavit, I was asked to review a document titled "Contract, Medical Authorization, Release, and Consent Agreements", a copy of which is attached hereto as Exhibit 3.

18. I was asked to state my professional opinion, based upon my education, training and experience, along with my evaluations and treatment of Evan, as

4

to his ability to understand and comprehend the document he purportedly signed as Exhibit 3.

19.  In reviewing the document, I hold the following opinions to a reasonable degree of medical probability:

   a.  The document was obviously written by someone capable of using language that Evan M. Harris was not capable of using or understanding;

   b.  The document uses language that Evan M. Harris was not capable of processing based upon his lack of intellectual development;

   c.  Based upon Evan's borderline cognitive level of functioning, the document would have been confusing to Evan, in light of the number of different topics that are addressed in the same document, and he would not have understood what he was signing;

   d.  Evan was not capable of reading and comprehending the language that is used in the document based upon his lack of intellectual and executive functioning skills;

   e.  Evan would not have recognized that the document he signed was actually a document that his parents should have been signing based upon the language contained in the Consent to Participate section, which says, in pertinent part, that "...damages of any kind to my child's property or person..."

f.  Evan would not have understood that he was giving consent to physicians and dentists to treat him that were contacted by the staff at Q & A Associates, Inc.;

g.  Evan would not have understood that he was consenting to searches and seizures of his property by staff at Q & A Associates, Inc. or that Q & A staff could take any property they perceived to be dangerous from him and destroy it;

h.  Evan would not have understood that he was agreeing to submit disputes that he had with Q & A Associates, Inc. to binding arbitration; and,

i.  Evan would not have understood what the word "arbitration" means.

20.  It is my opinion to a reasonable degree of medical probability that Evan M. Harris lacked the intellectual ability to read, understand and comprehend the document attached as Exhibit 3.

21.  It is my opinion to a reasonable degree of medical probability that Evan M. Harris was not competent to sign legal documents of any kind because of his lack of intellectual and executive functioning, his emotional and intellectual immaturity, and his basic lack of understanding of the world around him.

22.  It is my opinion to a reasonable degree of medical probability that Evan M. Harris should not have been permitted to print his name on Exhibit 3 based upon the report from Dr. Fenstermacher, which Q & A Associates, Inc. had prior to his writing his name on the document.

6

Further the affiant sayeth naught.

_____

Paul G. Pelts, M.D.

State of Louisiana:

~~County~~ of Orleans :

I, _James H. Mounger_ a notary public in and for the State of Louisiana

do hereby state the Affidavit of Paul G. Pelts, M.D. was signed by Paul G. Pelts before me,

after he was duly sworn, on this _11_ day of November 2016.

My commission expires: _at death_

_____

Notary Public

JAMES A. MOUNGER
NOTARY PUBLIC
BAR NUMBER 9783
STATE ID 24220

---

SANDRA SCHNEIDERKNECHT - REDIRECT    89

1  parts of basic life skills as is common with the clients who

2  come to our plan to learn those life skills.

3  Q.   Did you determine him to have a learning disability?

4  A.   Yes.

5       MR. SIMS:  Your Honor, that's all the questions I

6  have.

7       MS. SAAD:  Nothing further, Your Honor.

8       THE COURT:  You may step down.  May the witness be

9  excused?

10      MS. SAAD:  Yes, Your Honor.

11      MR. SIMS:  Yes, Your Honor.

12      THE COURT:  Thank you.

13      MR. SIMS:  Your Honor, I would move for the admission

14 of Plaintiff's Exhibit 1 through 5.

15      MS. SAAD:  No objection.  While we're clearing that

16 up, can I move for the admission of Defendants' Exhibit B,

17 please.

18      MR. SIMS:  No, Your Honor.

19      THE COURT:  Plaintiff's Exhibits 1 through 5 and

20 Defendant's Exhibit B will admitted into evidence.

21      (Plaintiff's Exhibits 1 - 5 and Defendants' Exhibit B

22 were admitted.)

23      MR. SIMS:  Your Honor, my next witness is Dr. Paul

24 Pelts, M.D.

25      THE COURT:  Are you still planning on calling

Linda Mullen, RDR, CRR
(304) 234-3907    PO Box 452, Wheeling, WV 26003

---

PAUL GERARD PELTS - DIRECT    90

1  Mrs. Harris?

2       MR. SIMS:  In all honesty, Your Honor, probably not.

3  But I don't want to commit myself to saying no and my need to

4  call her.  But my honest assessment right now is I will not be

5  calling her.

6       THE COURT:  Well, I'm not the one that has to deal

7  with her for leaving her out in the hall.

8       MR. SIMS:  I understand, and I will take

9  responsibility for that, Your Honor.

10      THE COURT:  All right.

11      THE CLERK:  Please state and spell your name for the

12 court reporter first.

13      THE WITNESS:  Paul Gerard Pelts.

14      PAUL GERARD PELTS, PLAINTIFF WITNESS, SWORN

15             DIRECT EXAMINATION

16 BY MR. SIMS:

17 Q.   Good afternoon, Doctor.  Would you tell us your full legal

18 name, please.

19 A.   Paul Gerard Pelts.

20 Q.   And, Dr. Pelts, what do you do for a living, sir?

21 A.   I am an adult, child and adolescent psychiatrist in

22 private practice in New Orleans.

23 Q.   And, sir, tell me, if you would, what's your business

24 address?

25 A.   It is 1539 Jackson Avenue, Suite 300, New Orleans,

Linda Mullen, RDR, CRR
(304) 234-3907    PO Box 452, Wheeling, WV 26003

---

PAUL GERARD PELTS - DIRECT    91

1  Louisiana, 70130.

2  Q.   And tell us, if you would, where did you obtain your

3  education to be a child, adolescent and adult psychiatrist?

4  A.   I attended undergraduate medical school at the University

5  of Missouri in Kansas City.  I did a fellowship in general

6  adult psychiatry at Ochsner Medical Foundation in New Orleans.

7  And I did a child and adolescent fellowship at Tulane

8  University Medical Center in New Orleans.

9  Q.   Tell the Court, if you would, what the importance of doing

10 a fellowship is in that field.

11 A.   The importance is understanding the things that are very

12 different between adults and children, developmental

13 perspectives, diagnoses that are more inherently common or

14 peculiar to children and adolescents, and the treatment and

15 treatment modalities which can be very different as well.

16 Q.   Sir, if you would, after you completed your fellowship

17 training in adolescent psychiatry, where did you begin

18 practicing?

19 A.   I began as the director of the child and adolescent

20 neuropsychiatric unit at Tulane University Hospital for

21 Children.

22 Q.   How long were in that role?

23 A.   I was in that role approximately probably about four to

24 five years.

25 Q.   And what did you do after completing that task, that job?

Linda Mullen, RDR, CRR
(304) 234-3907    PO Box 452, Wheeling, WV 26003

---

PAUL GERARD PELTS - DIRECT    92

1  A.   I went on to become the medical director of Tulane

2  DePaul's inpatient psychiatric unit.  And then I was the

3  director of their adolescent unit after that.

4  Q.   After that job, what did you do next?

5  A.   I went to private practice for a not-for-profit hospital

6  group, Mercy Family Center, seeing primarily children and

7  adolescents for evaluation and psychiatric treatment.

8  Q.   After completing that job, what did you do?

9  A.   I've been in private practice in a group practice for the

10 last 11 years.  Psychiatrists, psychologists, social workers

11 and one art therapist.

12 Q.   Are these people that work in your practice your

13 employees?

14 A.   They are not my employees.  They work -- they rent office

15 space and we have a cooperative practice.

16 Q.   All right.  And do you have experience in assessing people

17 like Evan Harris?

18 A.   Much of the work that I do does primarily center around

19 children and adolescents with developmental disabilities,

20 including autistic spectrum disorder.  Also intellectual

21 disabilities, attention deficit hyperactivity disorder and mood

22 disorders.

23 Q.   Have you testified as an expert witness in other cases?

24 A.   Yes, I have.

25 Q.   Have you ever not qualified as an expert witness?

Linda Mullen, RDR, CRR
(304) 234-3907    PO Box 452, Wheeling, WV 26003

1 A. No, I have not.

2 MR. SIMS: Your Honor, at this time I would move to

3 treat Dr. Pelts as an expert witness in the field of adolescent

4 and adult psychiatry.

5 THE COURT: Voir dire?

6 MR. JONES: No objection, Your Honor. No voir dire.

7 THE COURT: All right. Dr. Pelts will be able to

8 give opinion testimony in the fields of adolescent and adult

9 psychiatry.

10 MR. SIMS: Thank you, Your Honor.

11 Q. Dr. Pelts, if you would tell us about when you first met

12 the Harris family?

13 A. The Harrises originally consulted with me in September of

14 2006. That was an initial meeting with Evan's parents, Dr. and

15 Mrs. Harris.

16 Q. And tell the Court, if you would, what took place during

17 that meeting, what the concerns of the Harrises were.

18 A. The Harrises expressed a variety of concerns that Evan was

19 experiencing, primarily anger and frustration that at times

20 would become physical as things escalated.

21 He was also having some difficulty with impulse control,

22 mood fluctuations, that would fluctuate somewhere between him

23 being euphoric, overly happy and angry. He would perseverate

24 or get fixated on things and was not be able to unstick from

25 that.

1 He was having difficulty missing social cues and also was

2 having, at times, some delusional thinking or some thinking

3 that did not appear congruent with the situations.

4 Q. Did you immediately begin caring for Evan after this

5 meeting with the Harrises?

6 A. No, I did not. There was a lapse between that meeting and

7 the next time I met with the Harrises.

8 Q. And tell the Court, if you would, what the reason for that

9 delay was.

10 A. Evan had been admitted at a residential treatment

11 facility, Three Springs, I believe very shortly after I had met

12 with them. And I did not have contact with them again until

13 shortly after Evan was discharged from that program.

14 Q. Now, as Evan's treating psychiatrist, did you have access

15 to his earlier mental health treatment?

16 A. Yes, in a variety of ways. The first was by some initial

17 assessment that the parents had filled out, which is in the

18 chart. The other part is just doing a standard psychiatric

19 history, asking questions about development, previous symptoms,

20 previous treatments. And also they had allowed me access to

21 any records that I had needed or wanted as we began the

22 process.

23 But I think it's very important to understand that a lot

24 of times when parents come to see me initially, it is as much a

25 meet and greet as anything else from the perspective of they

1 are getting to meet me, get to know me a little bit, see if

2 they feel like we can work together. I'm also starting to

3 formulate some history, as was in the case of Evan, very, very

4 complicated and lengthy. So at that point when the Harrises

5 and I met back in September of 2006, we just began to discuss a

6 lot of the parts of the history.

7 Q. You heard Dr. Harris testify today about the mother

8 being -- having mental illness?

9 A. Yes.

10 Q. Is that consistent with your records?

11 A. Per my notes, my understanding was that the mother had

12 been previously diagnosed with bipolar disorder, that she had

13 committed suicide, and that she had used, I believe, drugs

14 during the pregnancy.

15 Q. And what about the biological father?

16 A. My understanding was that he had been incarcerated either

17 for murder or for some other violent act.

18 Q. And did you -- do you know Dr. Perdigao, Evan's initial

19 psychiatrist?

20 A. Yes, I do know him.

21 Q. And did you have access to what Dr. Perdigao had done in

22 terms of care and treatment of Evan Harris?

23 A. Only -- only by description from what the parents had told

24 me at that point. And they had also told me that I was welcome

25 to talk with Dr. Mark Sands, who had been Evan's psychiatrist

1 for many years. And I had known Dr. Sands because we had

2 worked together previously as well.

3 Q. And how often was Evan seeing Dr. Perdigao?

4 A. I believe, per my notes, he was seeing Dr. Perdigao up to

5 three times per week when he was six years old.

6 Q. Is that uncommon for -- in the field of adolescent

7 psychiatry?

8 A. Maybe not 30 years ago, but it is highly uncommon in the

9 last ten to 20 years that any person, especially a child of

10 that age, would be seen with that frequency.

11 Q. And was Evan hospitalized during this initial time period

12 after September the 6th of 2006?

13 A. Well, Evan, as I understood it, per my history, had two

14 previous psychiatric hospitalizations. And those were at San

15 Marcos in Texas. And I don't have the exact dates of those.

16 But I think one was for five weeks' duration, yet again, that

17 would be a very lengthy hospitalization during that time. And

18 then he had the stint at Three Springs in Tennessee, which was

19 a residential treatment facility.

20 Q. And when you first assessed Evan, did you come up with a

21 diagnosis of his mental health condition?

22 A. It was very unclear to me when I started working with Evan

23 what exactly the diagnoses were. And there were several

24 problems with that. The first problem is just as a child

25 psychiatrist in general, things are not always very clear cut

PAUL GERARD PELTS - DIRECT                                                97

1   and we're hesitant to give labels for fear that once you give a

2   child a diagnosis or label, it's very hard to take that away.

3        But certainly it was -- it became increasingly clear as I

4   worked with Evan. Initially I didn't get to see Evan as often.

5   That he had some intellectual disabilities. That certainly

6   there was a great deal of difficulty with attention, focus,

7   concentration impulse control. And that also there were

8   difficulties with mood fluctuation, aggression and anger.

9   Q.   And did you prescribe medications to address these mental

10  health concerns?

11  A.   I did.

12  Q.   And --

13  A.   Some of those medications were simply the ones that

14  Dr. Sands had originally prescribed. Certainly after I got to

15  see Evan, they were looking at schools for him so he was not

16  there all the time.

17       We had several hospitalizations. We were working somewhat

18  on the medication, to be honest with you. It was not really

19  until Evan got totally out of control, and that was back in

20  August of 2009, and he was immediately hospitalized in New

21  Orleans for a brief stay at River Oaks Hospital. And I had

22  spoken with Dr. and Mrs. Harris, and had also spoken with the

23  attending physician at the hospital in New Orleans, because

24  they are only a short-term facility, about a longer

25  hospitalization at Meridell Achievement Center in Texas.

Linda Mullen, RDR, CRR
(304) 234-3987    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - DIRECT                                                98

1   Q.   And did he end up going to Meridell?

2   A.   He did.

3   Q.   And how long was he at Meridell?

4   A.   I would have to look back through the chart, but he was

5   there several weeks.

6   Q.   Okay. And after you began seeing Evan, was he sent, for

7   instance, to Bachman Academy?

8   A.   Yes, he was going to Bachman Academy. He was coming home

9   periodically and I would see him. And then as Dr. Harris

10  explained after he got home, there was the arduous task of

11  trying to find a job.

12  Q.   And you have records in your file, do you not, about the

13  efforts that were made to assist Evan in finding work?

14  A.   Yes.

15  Q.   From Dr. -- from Mr. Schiro?

16  A.   Yes. And I was originally contacted regarding my opinions

17  about that. He was allowed into the program through LRS. They

18  began trying to help find a job. And most of these programs

19  are really programs, as was described earlier, where a business

20  is paid a set amount of money to allow that person to come work

21  with very close supervision and -- a job coach, so to speak,

22  with the hopes that they will ultimately learn the skills to be

23  able to procure more full-time employment.

24  Q.   There's been testimony that Evan graduated from Bachman

25  Academy. What is your understanding of what Bachman Academy is

Linda Mullen, RDR, CRR
(304) 234-3987    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - DIRECT                                                99

1   about and how did you obtain that understanding?

2   A.   The day that Evan graduated from Bachman Academy was a

3   very happy day. I was very proud of Evan for finishing the

4   program there, but it was not a traditional college prep

5   program where he was studying the ordinary courses that one

6   would study on an academic-based way, more of a vocational

7   program working on practical skills. And so it was not really

8   the academic rigor that one might talk about as they were

9   discussing having completed a traditional high school.

10  Q.   After Bachman, did Evan begin working with the Rouses?

11  A.   Yes.

12  Q.   And tell the Court, if you would, who those people are and

13  why they do what they do.

14  A.   Rouses Grocery Store was originally formed out of a single

15  store in Thibodaux, Louisiana, and they quickly become the

16  number one local grocery store in southern Louisiana. They

17  have a reputation for being very locally based and they try

18  very hard to work with and employ people with intellectual or

19  developmental disabilities and work with programs such as the

20  LRS program in trying to help teach job skills.

21  Q.   And was Evan ever able to maintain that job?

22  A.   He started out, per my understanding, relatively well.

23  Like so many things, unfortunately, for Evan did, that it

24  quickly unraveled. And I think part of that was Evan was

25  having interpersonal difficulties with another one of the

Linda Mullen, RDR, CRR
(304) 234-3987    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - DIRECT                                               100

1   employees at work. I recall that there was a change of

2   management at work.

3        And the other thing that I -- this is my personal opinion,

4   I think without Evan having direct constant one-on-one

5   supervision, things frequently would go downhill. I mean, I

6   think if someone were there constantly reminding him what he

7   needed to do, he could be successful with it. But the moment

8   someone looked away, the moment the management changed -- and

9   also Evan, whether he was working at Rouses Grocery Store or in

10  my office, he had to test limits. You know, he had -- if I

11  asked him not to do something, he had to do it anyway, he had

12  to see if I really meant it. Things were a constant battle

13  with Evan, even on a good day, even about the simplest of

14  things.

15  Q.   Now, you heard Dr. Harris testify about work he had gotten

16  for his son volunteering at the hospital.

17  A.   Yes.

18  Q.   And was he able to maintain that work?

19  A.   No.

20  Q.   Are you aware of any employment that Evan was able to

21  maintain for any length of time?

22  A.   No.

23  Q.   After Evan became an adult, did you then diagnose him or

24  make a diagnosis regarding his mental health?

25  A.   Well, as time went by, things began to become a little bit

Linda Mullen, RDR, CRR
(304) 234-3987    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - DIRECT          101

1  more clear.  And one of the things that was especially

2  helpful -- and I want to backtrack just a minute.  Evan had had

3  some previous psychological, psychoeducational evaluations, I

4  believe, they may even be here in my chart.  But one of the

5  difficulties with doing those assessments, when people are very

6  young or when they have intellectual disabilities, is the data

7  or the information that you might get may not be valid.

8       And so it was not until he had the evaluation that was

9  done while he was at Aspiro that I thought we really got a very

10 good read, psychologically, diagnostically on Evan.  And part

11 of the reason is not that there weren't good psychologists in

12 New Orleans who had attempted to evaluate Evan before.  Evan

13 was frequently not cooperative with that process.  And I would

14 challenge anyone in here, if you've ever been through that

15 process of sitting in a chair and have someone give you tests

16 for six or eight or ten hours straight, it's an arduous

17 process.

18      And that's why I was so pleased that Dr. Fenstermacher was

19 actually able to engage Evan and do a complete

20 psychoeducational evaluation back in October of 2015.

21 Q.   Is it your understanding that that evaluation was

22 completed because QAA insisted upon it?

23 A.   I'm not really clear.

24      MS. SAAD:  Objection.  I think that's calling for

25 speculation and hearsay.

Linda Mullen, RDR, CRR
(304) 234-2907     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          102

1  A.   I'm not really clear.

2       THE COURT:  Overruled.  He's answered.

3  Q.   Dr. Fenstermacher saw Evan on what date?

4  A.   I believe the evaluation was on October 13th of 2015.

5  Q.   And the report has a date of November 4, 2015, does it

6  not?

7  A.   Yes, it does.

8  Q.   The report that Dr. Fenstermacher authored, it's 34 pages,

9  correct?

10 A.   Yes.

11      MR. SIMS:  That's Plaintiff's Exhibit 6, please.

12 Q.   Sir, do you have the report?

13 A.   Yes, I do.

14 Q.   If you would, tell the Court what the purpose of doing

15 these evaluations is and what information Dr. Fenstermacher was

16 able to elicit from the psychological testing he performed on

17 Evan?

18 A.   Certainly.  The first thing I would like to say is I don't

19 actually perform this type of evaluation, but I'm very familiar

20 with them because I do have colleagues that I would call on to

21 do one of these evaluations, and I would rely on the

22 information that they provided to help me in treatment.

23      Generally, the evaluation consists of interviewing the

24 individual, depending upon the age or the developmental issues

25 with that individual, interviewing the parents.  Reviewing any

Linda Mullen, RDR, CRR
(304) 234-2907     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          103

1  old records or previous treatments.  Engaging in an

2  intellectual or what we would call a cognitive assessment.

3  Intelligence.

4       The second part, depending, would be looking at things

5  from a psychological or psychiatric perspective, as far as

6  other diagnoses.

7       The third part would be, if there's any question about

8  intelligence, doing adaptive functioning scales as well that

9  would help with an understanding.  Because the current belief

10 is if you're looking at an intellectual disability, in the old

11 days, you simply would assess someone's IQ, their intelligence.

12 But these days, it's a much more complicated process of not

13 only looking at intelligence, but also looking at their

14 adaptive functioning.

15 Q.   Now, when you talk about an intellectual disability, is

16 that a relatively new term?

17 A.   Yes.  More common terms that some of us still interchange

18 or use would be things like mental retardation would have been

19 the older term, which is still used but because of federal law,

20 that was kind of struck down.  Intellectual disability would be

21 a much more common, or an intellectual developmental disorder.

22 Q.   In your opinion, to a reasonable degree of medical

23 probability, did Evan Harris suffer from an intellectual

24 disability?

25 A.   Yes, he did.

Linda Mullen, RDR, CRR
(304) 234-2907     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          104

1  Q.   Did he suffer from an intellectual developmental disorder?

2  A.   Yes.

3  Q.   And tell the Court, if you would, what the criteria is for

4  a diagnosis of intellectual disability and an intellectual

5  developmental disorder.

6  A.   Okay.  Well, the first thing that they did is they did the

7  Wechsler Intelligence Scale IV, basically looking at his IQ.

8  And it displayed that he had what would be determined a

9  borderline intellectual functioning.  So it would be below the

10 normal range of 80 to 130 for IQ.  His results put him in about

11 the fifth percentile.

12      Also they looked at some subtests to get a better

13 understanding of comprehension.  And that was done with a

14 very -- once again, very common assessment tool called the

15 Woodcock-Johnson.  In reading, Evan was in the third

16 percentile.  In reading comprehension, he was in the fourth

17 percentile.  And in verbal comprehension, he was in the fourth

18 percentile.

19 Q.   What's the significance of those findings?

20 A.   Those are very low scores.

21 Q.   And would a person with that level of reading skills,

22 comprehension skills be able to understand the arbitration

23 agreement that's at issue in this case?

24 A.   In my opinion, no.

25 Q.   And tell the Court, if you would, why it is you believe

Linda Mullen, RDR, CRR
(304) 234-2907     PO Box 453, Wheeling, WV  26003

PAUL GERARD PELTS - DIRECT          105

1  that Evan Harris lacked the ability to understand that

2  agreement.

3      A.  Well, you know, in addition to having looked at his

4  intelligence, they also looked at adaptive skills.  And his

5  adaptive skills, that's a much more practical social way of

6  looking at things.  He was in less than the first percentile.

7  And that is really about our ability to perform daily tasks.

8      Now, it would be one thing if Evan only suffered from an

9  intellectual disability, but he did not.  On top of that, he

10 had problems with severe impulsivity.  He had difficulty with

11 planning and organization.  He also had affective or mood

12 instability.  And all of those are just added things that would

13 have an impact on thinking and comprehension.  So there's the

14 intellectual disability, which is one thing.  But that's not

15 the only thing that Evan had going on.  He had much -- he had

16 other things going on in tandem.

17     Q.  Is an intellectual disability also a mental illness

18 diagnosis?

19     A.  According to the DSM-5, it is listed in the DSM-5.  There

20 is still, amongst some people, some differentiation between the

21 two.  But when we do our diagnoses, they are all listed

22 together.

23     Q.  And based upon the history that Dr. Fenstermacher

24 referenced in his report, what diagnoses did he conclude Evan

25 suffered from after completing his battery of diagnostic

Linda Mullen, RDR, CRR
(304) 234-2967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          106

1  testing?

2      A.  He made three diagnoses.  Bipolar disorder type I, mild

3  rapid cycling; number two, an intellectual disability; and,

4  number three, a generalized anxiety disorder.

5      One of the things, though, that I think is very important

6  to understand is when you look at testing, you have to look at

7  it in the context of someone's functioning.  And this was

8  really done under the best of circumstances.  Evan was at

9  Aspiro when this was done.  He was regulated.  He was sleeping.

10 He was busy.  He wasn't using any drugs.  He was taking his

11 medications.  So what I would wager is this is kind of a

12 best-case scenario from the point of view that this was done at

13 a time when Evan was able to be cooperative.  His mood was

14 relatively stable.  He was taking his medications.  And he was

15 able obviously to form a relationship with the psychologist to

16 be able to complete the testing.

17     Q.  In your interaction with Evan, would you have been able to

18 have completed this testing on a given day with him?

19     A.  No.

20     Q.  And what was Evan like when you would be with him during

21 his, I guess, down times?

22     A.  Evan was frequently agitated.  He had trouble sitting

23 still.  He constantly wanted to be with Dr. Harris and me.

24 Dr. Harris generally brought Evan to these appointments.  Evan

25 alternated between wanting to be present in the room and not

Linda Mullen, RDR, CRR
(304) 234-2967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          107

1  wanting to be present in the room.  Asking the same questions

2  over and over again.  Asking when we could leave.

3      Some days he was a bit more talkative or a bit more

4  cooperative.  Specifically if I were asking Evan about things

5  that Evan was interested in, if I asked him about a Halloween

6  movie, we could have a discussion about that.  If I asked about

7  his collection of masks, we could talk about that.  If it were

8  a subject that I knew interested him -- and that's part of my

9  job, is to engage people -- I would always make every attempt.

10 But as far as being able to discuss anything beyond that, it

11 rarely had much substance.

12     Q.  Now, there's been testimony about this behavioral

13 contract.

14     A.  Yes.

15     Q.  And tell the Court, if you would, first of all, you do

16 have a copy of that behavioral contract in your file, do you

17 not?

18     A.  Yes, somewhere I do.

19     Q.  Okay.

20     A.  Yes, I've seen it.

21     Q.  And you would agree with Dr. Harris's testimony, this was

22 actually prepared by somebody else to send him home back to New

23 Orleans, was it not?

24     A.  Yes.  It's not uncommon when children or adolescents leave

25 treatment facilities for behavioral contracts to be written.

Linda Mullen, RDR, CRR
(304) 234-2967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - DIRECT          108

1  There are a couple of problems.  I think that any time you're

2  writing a behavioral contract with someone who has intellectual

3  deficiencies, that's a huge problem.  My experience has been

4  that a lot of those contracts are far too complicated and they

5  are far too long.

6      My experience has also been that a lot of times the young

7  people would agree to anything written on a contract just to

8  see the person who was showing it to them get out of their

9  face, leave them alone, so they could go on to the next task or

10 go home.

11     So I don't do behavioral contracts with individuals with

12 cognitive limitations.  I don't think they are worth the paper

13 they are written on.

14     Q.  Did the Harrises have any success with the behavior

15 contracts that they had entered into with Evan?

16     A.  I don't think so.

17     Q.  When was the last time that you interacted with Evan prior

18 to him leaving to go to Q&A in Davis, West Virginia?

19     A.  I want to look it up just to be exact so I can have the

20 note here in front of me.  That would have been on August the

21 18th, 2015.

22     Q.  That would have been prior to the testing performed by

23 Dr. Fenstermacher?

24     A.  Yes.

25     Q.  And what was Evan's condition like on the day that you saw

Linda Mullen, RDR, CRR
(304) 234-2967     PO Box 453, Wheeling, WV  26003

1  him?

2  A.  Evan had, as you may recall, had run away from a previous

3  program or signed himself out, depending -- you know.  And he

4  had been back in New Orleans about a week prior to my visiting

5  with him.  He was back on his medication.  He was recounting

6  some of the things that he had learned at Aspiro.  He was happy

7  that he had been there.  He was pleasant.  He was pretty

8  talkative.  He was in a pretty good frame of mind and willing

9  to go back to a program, willing to go to a program.

10  Q.  What role, if any, did you have in suggesting to the

11  Harrises that they have their son interdicted, as it's been

12  described here today?

13  A.  The interdiction process in the state of Louisiana is

14  called continuing tutorship.  And it must be entered into

15  before an individual turns 18 years of age.  The Harrises and I

16  had discussed that.  And I think they had also chosen to seek

17  legal counsel to discuss it.

18      The difficulty was trying to ascertain to what degree or

19  not Evan would see progress.  And also in understanding that

20  once that process has been done, at least in the state of

21  Louisiana, it's extremely difficult to undo.  And at the time

22  Evan was reasonably cooperative with treatments and his parents

23  were on board and had very close supervision of him and were

24  doing, in my opinion, an extraordinary job of trying to get his

25  needs taken care of.  So I didn't really feel the interdiction

1  process was necessary.

2      I also thought that since he had borderline intellectual

3  functioning, I wasn't really sure that he would qualify,

4  necessarily, for continuing tutorship.  He might or might not.

5  Q.  Now, when Evan, as you said, ran away from the program,

6  what was your understanding about how he got back to New

7  Orleans?

8  A.  My understanding was through the good graces of someone he

9  met either at the bus station or on the bus.  They basically

10  helped him get back to New Orleans and were in contact with

11  Dr. and Mrs. Harris to let them know that they were on their

12  way back.

13      The Harrises had also contacted me because we weren't

14  really sure in what condition Evan would be when he arrived

15  back in New Orleans, so we were strategizing about whether he

16  would need psychiatric hospitalization or other interventions,

17  because it was uncertain at that point, or fairly clear that he

18  had not been taking his medication.

19  Q.  And what medications had you prescribed for Evan during

20  this time period that he was at Aspiro, what medications was he

21  to be taking?

22  A.  I wish I had the whole list right here.  He was taking

23  lithium carbonate.  He was taking Focalin.  He was taking

24  Deplin.  He was taking Trileptal.  He had been on Amantadine,

25  we had done some weaning of that dose over time.  I think I hit

1  them all.

2  Q.  Dr. Pelts, do you have an opinion to a reasonable degree

3  of medical probability as to whether or not Evan Harris was

4  capable of understanding terms like "economical" and

5  "expeditious"?

6  A.  I do not feel that he could understand those terms.

7  Q.  You heard what Sandy Schmidkmecht said about her

8  explaining this arbitration to Evan.  Even if what she said is

9  true, would he have been able to understand what she was

10  talking about in the terms that she allegedly used?

11  A.  Although I certainly was not there, and just based on her

12  testimony in court today that I heard, I do not believe, given

13  her explanation of how she broke it down so to give Evan a

14  better understanding, that Evan would have been able to

15  understand and totally take it in and make a decision.

16  Q.  You knew Evan for ten years almost?

17  A.  Almost.

18  Q.  And during the nine-plus years that he knew Evan, would he

19  have ever consented to anyone searching his personal

20  belongings?

21  A.  Evan, the one thing Evan took great pride in was his

22  stuff.  He liked his stuff.  The stuff he had in his room, the

23  stuff he collected, the stuff he owned.  I think those

24  collections were a great source of pride and self esteem.  And

25  the Harrises and I had many discussions about that, about how

1  many horror films were too many or how many masks were too many

2  or how many of this.  We tried to figure that out together.

3      But you know, one of the things that I will have to say

4  throughout that time was although he and I had multiple

5  discussions and he took great pride in these things, I don't

6  think he would have ever let anyone go through them or take

7  them, if he understood that were the case.  His discussions of

8  these almost bordered on hoarding.  It was such an obsessional

9  thing with him.

10  Q.  How did Dr. Fenstermacher classify Evan's intellectual

11  disability?

12  A.  Mild.

13  Q.  And tell the Court, if you would, what you would expect

14  from a person who has been labeled as having a mild

15  intellectual disability.

16  A.  Well, I would like to just speak a little bit from the

17  DSM-5.  And it really kind of separates that discussion out

18  into three separate domains.

19      The first would be conceptual, and I'm going to kind of go

20  down.  In adults, abstract thinking, executive functioning

21  issues.  Problems planning, priority setting, strategizing,

22  cognitive flexibility issues.  And issues with short-term

23  memory as well as difficulties with use of functional academic

24  skills, and that would be things like reading, money

25  management, those things are impaired.  And that these

PAUL GERARD PELTS - DIRECT                113

1  individuals tend to be -- take a concrete approach to problems
2  and solutions.
3       The other aspect would be looking at it as described in
4  the DSM-5 in the social domain.  And a lot of times they tend
5  to be immature, they miss social cues, difficulties regulating
6  emotion and behavior in an age appropriate way.  Limited
7  understanding of risk in social situations, immature social
8  judgment.  Gullibility.
9       And in a practical domain, competitive employment is often
10 seen in jobs that do not emphasize conceptual skills.  They
11 generally need support to make healthcare decisions and legal
12 decisions, and to learn to perform skilled vocation
13 competently, and support is typically needed to raise a family.
14      So many of those things which are right out of the DSM-5,
15 I think very much describe Evan.
16 Q.  In addition to his intellectual disability, would his
17 bipolar disorder affect his ability to understand and
18 comprehend the terms and conditions of the arbitration
19 agreement?
20 A.  I believe so.  Because a lot of times with bipolar
21 disorder and the swings that you can see in mood, having
22 difficulty with the thought processes in general.
23      Also Evan was taking some pretty high-powered psychotropic
24 medication, several of those can also affect cognition as well.
25      So you have both the mood disorder affecting judgment and

Linda Mullen, RDR, CRR
(304) 234-3967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                 114

1  thinking.  But as much as I would like to say not, the
2  medications to treat them frequently being problematic as well.
3  Q.  That's actually demonstrated in the Rachman Academy, where
4  he had trouble sleeping in class and paying attention in class?
5  A.  It was very, very difficult regulating his medication.
6  And it was very hard to find a spot where he would be bright
7  enough and alert enough to be able to do more cognitive
8  thinking.  And that frequently came at the expense of the
9  Harrises in violence in their home, versus the medications to
10 try to control some of the anger, aggression and impulsivity,
11 which sadly, I think, at times did negatively impact Evan's
12 cognition.
13 Q.  Dr. Fenstermacher suggested in his report, did he not,
14 that the Harrises should consider having him declared
15 incompetent?
16 A.  Yes.
17      MR. SIMS:  Your Honor, that's all the questions I
18 have of this witness.
19      THE COURT:  Cross-examination.
20           CROSS-EXAMINATION
21 BY MR. JONES:
22 Q.  Dr. Pelts, you provided approximately 482 pages of records
23 in this case.  They were obtained from your office.  Are those
24 all of the records, along with some billing records, that
25 you're aware of relating to your treatment of Evan Harris?

Linda Mullen, RDR, CRR
(304) 234-3967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                 115

1  A.  Yes.
2  Q.  No other records in your possession, correct?
3  A.  No.  The only records I have are some notes that I took
4  that I brought with me in court today based on my review of the
5  chart and based on my review of testing and other things.
6  Q.  Do you mind if I take a look at those notes?
7  A.  No problem.
8      MR. JONES:  Your Honor, may I approach?
9      THE COURT:  You may.
10 A.  And the DSM-5 that I brought with me today.
11 Q.  Thank you.
12 A.  Certainly.
13 Q.  Dr. Pelts, you would agree that capacity generally means
14 that someone understands what they are reading, understands an
15 agreement, for instance, that they are reading; if someone has
16 capacity, they understand it, correct?
17 A.  Well, I think if you're talking about capacity, I'm going
18 to take that to mean competence.  And in looking at that, you
19 can look at that in very broad senses, and you can look at that
20 in very narrow senses.  If you said that Evan Harris had the
21 capacity to brush his teeth, I would say yes, he did.  If you
22 said, do I think he could understand that complex legal
23 document in the language even as explained by the lady earlier,
24 I do not.
25 Q.  Okay.  And in this particular situation, I want to focus

Linda Mullen, RDR, CRR
(304) 234-3967     PO Box 453, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                 116

1  in on capacity to understand legal documents.
2  A.  Okay.
3  Q.  You would agree that if someone does not have capacity to
4  understand legal documents, they can't sign any legal
5  documents, correct?
6  A.  Well, whether they're allowed to do it or not is a
7  completely different thing.  I think that people are allowed to
8  sign documents all the time where their competency is not
9  necessarily something that someone has assessed.  I see things
10 all the time.  I see people with schizophrenia being allowed to
11 sign into psychiatric hospitals.  I don't think anyone with
12 active hallucinations is competent to sign into a psychiatric
13 hospital, but hospitals allow them to do that all the time.
14 Q.  Okay.  And if one of your patients that you believe to be
15 incompetent signed a document, a legal document, and you didn't
16 believe that they had the capacity to sign that document, you
17 would agree, in your opinion, that document wouldn't be valid
18 at that point, correct?
19 A.  Correct.  Unless there were extenuating circumstances to
20 why it was allowed to be signed.
21 Q.  What sorts of extenuating circumstances?
22 A.  We allowed Evan to sign a document so that he could apply
23 for social security disability.  I dealt with social security
24 enough that a long letter from me explaining why Evan probably
25 was not competent to sign it to release the records from my

Linda Mullen, RDR, CRR
(304) 234-3967     PO Box 453, Wheeling, WV  26003

PAUL GERARD PELTS - CROSS                     117

1  office would have gone in the dead letter some in social
2  security. We did allow Evan to sign that document, but I had
3  to make a decision. And the decision was I felt it was for his
4  greater good. And that if Evan did not sign that document,
5  which his mother was there to witness, we could not have ever
6  applied for him to get disability benefits. That would be an
7  exception, in my opinion.
8  Q.  So your testimony today is that you would allow someone to
9  sign a legal document even if you believe they were
10 incompetent?
11 A.  Once again, it would depend on the circumstances. If they
12 were signing away legal rights, no, I would not. If it were a
13 consent to get previous medical records so I could review them
14 to take better psychiatric care of them, yes, I would. Depends
15 on the circumstance.
16 Q.  As far as Evan Harris goes, there's no record in your
17 entire file other than the Fenstermacher report which you have
18 indicated you believe says he was incompetent; there's no other
19 record mentioning Evan Harris lacking capacity, is there?
20 A.  Perhaps not.
21 Q.  Okay. And there's no other document mentioning the word
22 or the term interdictment, is that --
23 A.  Interdiction.
24 Q.  Interdiction -- in your entire file, correct?
25 A.  Correct.

              Linda Mullen, RDR, CRR
       (304) 234-3907      PO Box 433, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS                     118

1  Q.  So prior to the affidavit, which you signed and gave to
2  Mr. Sims in this case, you had never signed a document
3  indicating that Evan Harris was incompetent; is that correct?
4  A.  I had never been asked to, that's correct.
5  Q.  And you had never come to that conclusion; is that
6  correct?
7  A.  Well, one only need to spend some time with Evan, which I
8  was able to do on numerous occasions, to understand that he was
9  not able to have cognition concerning the medications he was
10 taking or other things. It's a very slippery slope.
11     And by the time he was old enough that that was really
12 being considered, he was really too old for interdiction unless
13 it became a very complicated legal procedure.
14     And Evan was showing progress in some domains. And I
15 wasn't sure that stripping him of those rights was necessary --
16 the timing was necessarily correct for that. If it were a
17 process in the future, that would be extremely difficult to
18 undo.
19 Q.  So in other words, since you started treating Evan Harris,
20 you have never been of the opinion that he had capacity to sign
21 any legal document?
22 A.  Correct.
23 Q.  And you mentioned interdictment or interdiction?
24 A.  Interdiction, yes.
25 Q.  Did you ever discuss legal guardianship or a

              Linda Mullen, RDR, CRR
       (304) 234-3907      PO Box 433, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS                     119

1  representative for Evan Harris with his parents?
2  A.  I had discussed the subject with his parents, but my
3  personal opinion was that the Harrises were doing an excellent
4  job of providing for Evan's needs, so it really didn't come up
5  as an issue. And the facilities to which Evan went, he went
6  voluntarily.
7  Q.  And yet you never took any record or notes in your entire
8  chart that you had, one, reached the conclusion that Evan
9  Harris did not have capacity, and, two, that his parents should
10 consider legal guardianship or interdiction, correct?
11 A.  Correct.
12 Q.  Is that typical in your practice to not document those
13 things in a patient's chart?
14 A.  It just depends on the person's level of severity. It
15 depends on whether they are making progress or not. It
16 depends.
17     He was also seeing other mental health professionals in
18 tandem. And before Dr. Fenstermacher, I don't recall another
19 professional calling me or saying that was something that they
20 felt we should pursue.
21 Q.  The affidavit you signed in this case, you didn't draft
22 it, did you?
23 A.  No.
24 Q.  Did Mr. Sims draft that affidavit for you?
25 A.  He did.

              Linda Mullen, RDR, CRR
       (304) 234-3907      PO Box 433, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS                     120

1  Q.  And then did he send it to you for review?
2  A.  Yes, he did.
3  Q.  Did you make any changes to the affidavit whenever you got
4  it?
5  A.  I did not.
6  Q.  You signed it, I think you added maybe two numbers?
7  A.  I think there was a little bit of information I had to
8  add, but it was some relatively minor things.
9  Q.  Perhaps 2006, to indicate when you first started treating
10 him, and 25 years to indicate how long you had been in
11 practice; does that sound correct?
12 A.  There was some factual information, yes, that sounds
13 correct.
14 Q.  That's the first document that you ever signed indicating
15 that Evan Harris lacked mental capacity to sign legal
16 documents, correct?
17 A.  Correct.
18 Q.  Approximately ten months after his death, correct?
19 A.  Correct.
20 Q.  Did you know the Harrises before you began treating Evan?
21 A.  No, I did not.
22 Q.  In 2006, whenever you began treating him, that was your
23 first experience with Dr. Harris or Mrs. Harris?
24 A.  That's correct.
25 Q.  Moving on to Dr. Fenstermacher's report, you weren't

              Linda Mullen, RDR, CRR
       (304) 234-3907      PO Box 433, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS    121

1  present for any of the testing that Dr. Fenstermacher
2  performed, correct?
3  A.   Correct.
4  Q.   You've never spoken to Dr. Fenstermacher about his testing
5  of Evan Harris, correct?
6  A.   I have not.
7  Q.   Your understanding of the testing and his conclusions is
8  limited solely to his report, correct?
9  A.   Yes.
10 Q.   In your affidavit, you actually indicated that it was a
11 requirement of Q&A for Evan Harris to go through this testing.
12 Are you indicating that you don't know whether that's true or
13 not today?
14 A.   Well, what I knew was that he was being considered for
15 alternative placements.  I knew that they were looking at some
16 different facilities.  I did not know whether the requirement
17 or the requesting for testing was specifically made by Q&A
18 specifically, or whether that was done in a blanket way.
19      I'll give you an example.  Sometimes a consultant who's
20 going to do a placement will call me.  And they will say before
21 we proceed with looking at facilities, we need some new testing
22 or we need the testing updated.  And I'm never sure when that's
23 being requested, whether it's to one facility, ones that they
24 all wanted, they believe that up-to-date information will help
25 a facility determine whether they are the right placement for

Linda Mullen, RDR, CRR
(304) 336-3067    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS    122

1  that individual or not.  So the circumstances under which it
2  was -- I knew it had been requested, but I didn't know
3  specifically whether it was Q&A or not.
4  Q.   In paragraph number 15 in your affidavit, when you --
5  what you signed stating, I'm aware that Dr. Fenstermacher
6  completed his evaluation and report for Evan H. Harris as a
7  requirement for his admission into the program as Q&A
8  Associates, Inc., you don't know whether that's true or not?
9  A.   All I know is that the program, it was requested that
10 testing be done.  I didn't know it was Q&A, so that part I can
11 tell you, yes, I wasn't sure.
12 Q.   So it's incorrect, you're not aware of that, correct?
13 A.   Correct.
14 Q.   Okay.  In fact, doesn't his report actually say who
15 requested the testing?
16 A.   Yes.
17 Q.   Okay.  It actually says Evan, his parents and his
18 treatment team, correct?
19 A.   Yes.
20 Q.   You don't know who his treatment team is, correct, that
21 requested this?
22 A.   No.  I think, you know, as far as the treatment team, no,
23 I did not.
24 Q.   Dr. Fenstermacher's report actually says that it's for a
25 specific point in time, correct?

Linda Mullen, RDR, CRR
(304) 336-3067    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS    123

1  A.   Yes.
2  Q.   And that specific point in time would be the day of
3  testing, correct?
4  A.   Correct.
5  Q.   October 13th, 2015, correct?
6  A.   Correct.
7  Q.   It wouldn't be for November 30th, 2015, would it?
8  A.   Not necessarily.
9  Q.   And Dr. Fenstermacher's not here to say whether it would
10 or not, correct?
11 A.   Correct.
12 Q.   And you weren't there for the testing?
13 A.   I was not.
14 Q.   Haven't talked to him about it, correct?
15 A.   I have not.
16      MR. JONES:  May I approach, Your Honor?
17      THE COURT:  You may.
18 Q.   Dr. Pelts, I have handed you what's been marked
19 Plaintiff's Exhibit 6.  I would like you to turn to page 36.
20 At the bottom, it's Pelts 000371.  Do you recognize this
21 document?
22 A.   Yes.  The psychological report, yes.
23 Q.   That's in your chart, correct?
24 A.   That's correct.
25 Q.   Okay.  Yeah.  Page 36 at the top, or if you look at the

Linda Mullen, RDR, CRR
(304) 336-3067    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS    124

1  bottom, it's Pelts 000371.
2      MR. SIMS:  Those may not be Bates stamped like yours.
3  A.   I'm not following.
4  Q.   It's the last page, I believe.
5  A.   Okay, I'm on the last page.
6  Q.   Okay.  Perfect.  Okay.
7      Previously you testified that Dr. Fenstermacher actually
8  made a determination that Evan Harris was incompetent, correct?
9  A.   Based on what he was saying in this report, I felt it was
10 congruent with his being incompetent, yes.
11 Q.   Well, are you saying he made the determination that he was
12 incompetent?
13 A.   To make decisions as it resulted to the specifics that I
14 had been asked about the document.
15 Q.   So are you saying that he didn't make a determination of
16 incompetency and that you made that determination?
17 A.   No.  No.  No.  I think if you let me review it, I think he
18 did make some mention of that.  I would have to review.
19      Yes, it says in number 17, that the evaluation could be
20 helpful -- can be helpful if they want to consider
21 guardianship, power of attorney and/or conservatorship.  It's
22 likely that he will need extra years before he's competent to
23 independently manage his own affairs.
24 Q.   Okay.  It says this can be helpful if they want to proceed
25 with a guardianship, power of attorney and/or conservatorship?

Linda Mullen, RDR, CRR
(304) 336-3067    PO Box 452, Wheeling, WV 26003

PAUL GERARD PELTS - CROSS                                        125

1  A.   In the future.

2  Q.   That decision had already been made in the past that it

3  wasn't the right move at this point?

4  A.   Well, it's my understanding, and I'm not an expert on

5  this, I think one still can pursue that when someone is over

6  18, it's just a much more arduous process when someone is

7  already an adult.

8  Q.   But you would agree he didn't state definitively that Evan

9  Harris needs to have a guardian, conservator or a power of

10 attorney?

11 A.   Correct.

12 Q.   Right?  It says this could be helpful if you choose to

13 pursue that, correct?

14 A.   Correct.

15 Q.   And this document also doesn't say that he lacks capacity

16 to sign a contract, does it?

17 A.   It doesn't speak to capacity or noncapacity.

18 Q.   Right.  It doesn't say that he's incompetent to sign a

19 contract, does it?

20 A.   It does not.

21 Q.   It says he might be -- he might not be competent to manage

22 his -- independantly manage his own affairs?

23 A.   It doesn't.  But I've never read a psychological

24 evaluation that spoke to that issue specifically before.

25 Q.   So it says, "it is likely that he will need extra years

                    Linda Mullen, RDR, CRR
          (304) 234-3967    PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                        126

1  before he will be competent to independently manage his own

2  affairs."  What is Dr. Fenstermacher talking about, his own

3  affairs?

4  A.   I'm assuming he's talking about living, money, day-to-day

5  things.

6  Q.   Let's not assume.  What does he mean by "affairs"?

7  A.   Well, we would have to ask him.

8  Q.   You don't know?

9  A.   I don't know.  I'm presuming, though, he's talking about

10 day-to-day living skills as I read it.

11 Q.   So this document, which you relied upon to say that Evan

12 Harris is incompetent, doesn't say that he's incompetent, nor

13 does it say that he needs a conservatorship, guardianship or

14 power of attorney?

15 A.   No.  What I'm saying is, I think based on this document,

16 it is my personal opinion, coupled with the mental illness from

17 which he suffers, coupled with my having had numerous visits

18 and treating him over numerous years, I do not believe he had

19 the intellectual capacity and understanding of the contract

20 that was placed in front of him specifically when it came to

21 signing away rights.

22 Q.   That's the same opinion you had for nine years, correct?

23 A.   I haven't been asked that opinion before.

24 Q.   So in 2011, do you think Evan Harris had capacity to sign

25 a release?

                    Linda Mullen, RDR, CRR
          (304) 234-3967    PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                        127

1  A.   No, I do not.

2  Q.   Okay.  In 2014, do you think he had capacity to sign a

3  release?

4  A.   Not as far as to understand something like this legal

5  document as it was explained in court today.

6  Q.   Okay.

7  A.   I don't think it could have been explained in a way that

8  Evan could really grasped what he was signing.

9  Q.   That's why you set up a guardianship or power of attorney

10 or a conservatorship, because someone doesn't understand what

11 they're signing, correct?

12 A.   Correct.

13 Q.   As a doctor, that's your duty to ensure and protect your

14 patients, correct?

15 A.   If I have concerns that the care that they are not

16 currently receiving is meeting their needs.

17 Q.   And you thought all of the care that Evan Harris was

18 receiving was meeting his needs over the course of treatment,

19 correct?

20 A.   Up until his untimely death, yes, I do.

21 Q.   Relating to this arbitration agreement, you weren't

22 present whenever it was signed, were you?

23 A.   No, I was not.

24 Q.   You don't know if it was signed in the morning, in the

25 evening, in the afternoon, correct?

                    Linda Mullen, RDR, CRR
          (304) 234-3967    PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                        128

1  A.   It wasn't dated and timed.  And it was not documented when

2  it was signed, so it's hard for me to know.  I was a bit

3  surprised that that was the case, to be honest with you, that

4  it was not documented when it was signed -- you know, when it

5  was signed or what was going on with that.  That's kind of

6  standard procedures.

7  Q.   As far as your opinion, you reached a conclusion that he

8  didn't have capacity to sign this document regardless of how it

9  was explained to him?

10 A.   Well, number one, no, I don't think he would.  But number

11 two, I got to hear the lady explain what she said to him.  And

12 I can assure you, I don't think, given what she said in court

13 today, that he would understand that.

14 Q.   Right.  And your --

15 A.   That anyone should perform.  If she said in court today

16 what she actually did, truly, in person, with Evan.

17 Q.   Okay.  Your opinion hasn't changed then, it was the same

18 back in November whenever you signed your affidavit as it is

19 today?

20 A.   Correct.

21 Q.   So it wouldn't have mattered how she explained it,

22 according to you, he wouldn't have understood the document,

23 correct?

24 A.   Correct.  If anything, her testimony today only further

25 made me believe and question whether he was understanding what

                    Linda Mullen, RDR, CRR
          (304) 234-3967    PO Box 452, Wheeling, WV  26003

PAUL GERARD PELTS - CROSS                                    129

1   he was signing.  It only reinforced that.

2   Q.   And you wouldn't want him to sign something he doesn't

3   understand, correct?

4   A.   Correct.

5   Q.   You mentioned some terms that Evan wouldn't understand, in

6   your opinion, such as the word "arbitration."

7        Did you ever discuss the word "arbitration" with Evan?

8   A.   No.

9   Q.   So far all you know, Evan could have learned about

10  arbitration in high school?

11  A.   I don't know.  But I would seriously doubt it given his

12  curriculum in school.

13  Q.   But you don't know definitively, correct?

14  A.   I don't.

15  Q.   The same with "economic," you wouldn't know whether he

16  learned that in high school or not, correct?

17  A.   Correct.

18  Q.   You wouldn't know whether he learned that in signing

19  another arbitration agreement at another facility, correct?

20  A.   I would not.

21  Q.   Same thing goes for --

22  A.   I can only speak to the simplicity of Evan's vocabulary

23  and his interactions with me and his very limited range of

24  understanding anything but the simplest of words and simplest

25  of terms.

                    Linda Mullen, RDR, CRR
            (304) 234-3947     PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                    130

1   Q.   You keep use the word simple.  What's a simple word?

2   A.   Smoking is a simple word.

3   Q.   Is there a list of simple words?

4   A.   TV.  No, I'm talking about -- I'm a child psychiatrist.  I

5   have to use language that people understand.  And a lot of

6   times my part is trying to figure out how can we explain things

7   in a way that someone can understand using simplistic language,

8   or no matter how simplistic the language that we use would they

9   not understand.

10       And I don't think arbitration, no matter who were

11  explaining it, would have been something that Evan would have

12  understood.

13  Q.   So there's no list of simple words that you can use with

14  someone like Evan Harris, correct?

15  A.   It depends on what you're trying to explain.  Like I said,

16  I think when you're getting into complex terms, it's a whole

17  different ballgame.

18       I also will tell you I don't think if Evan Harris, given

19  the number of times he said he wanted to sue somebody, had

20  understood that he was totally completely giving up his right

21  to do that, that he would have said hand it over, here, let's

22  sign it and be done.  He was threatening to sue all the time.

23       MR. JONES:  Approach, Your Honor?

24       THE COURT:  You may.

25       MR. JONES:  Have this marked as the next defense

                    Linda Mullen, RDR, CRR
            (304) 234-3947     PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                    131

1   exhibit.

2        Do you mind helping me with the Elmo?

3   Q.   Dr. Pelts, I've handed you what's been marked, I believe,

4   Defendants' Exhibit C.  My apologies.  This is an

5   authorization.  I believe this is one of the authorizations you

6   had actually mentioned earlier, correct?

7   A.   Correct.

8   Q.   And it's signed by Evan Harris?

9   A.   Correct.

10  Q.   Do you know whether Evan Harris could understand all of

11  the terms in this authorization?

12  A.   I wasn't there, because this was signed at the social

13  security office.  So I wouldn't know.  But my first guess

14  looking at it is I would say maybe yes, probably not.

15  Q.   Maybe yes, probably not?

16  A.   I wasn't there when it was explained to him.  But what I

17  understand about this form -- and I might mention, his mother

18  was the witness.  So someone was there who is responsible for

19  his well being.  And I take that to be a great important thing

20  to be mentioning here, is Evan was signing a form to let me

21  send social security his records.

22       His mother was there, she signed off on it.  I think

23  that's a pretty innocuous thing.  And I know social security

24  would not have allowed that to proceed without Evan's

25  signature.

                    Linda Mullen, RDR, CRR
            (304) 234-3947     PO Box 452, Wheeling, WV  26003

---

PAUL GERARD PELTS - CROSS                                    132

1   Q.   So -- okay.  Do you know whether it's a HIPAA violation to

2   release records with a release that's signed by an

3   incapacitated person?

4        THE COURT:  Let's keep on point.  You're getting too

5   far astray here.

6        MR. JONES:  Okay.  Yes, Your Honor.

7   Q.   So you were not present with this -- this document,

8   correct?

9   A.   I was not.

10  Q.   But it means something to you that his mother,

11  Mrs. Harris, was actually present whenever this was signed,

12  correct?

13  A.   Yes.

14  Q.   Would it be important to you if she was present or had

15  reviewed other documents that Evan Harris had signed?

16  A.   You have to understand.  If someone signs a release of

17  records at the social security office, for example, I'm not

18  releasing the records just because I received this in the mail.

19  I have that individual come into my office and sign a release

20  on my end, which is in the chart, and was witnessed by his

21  mother to release the records as well.

22  Q.   So it would be important that his mother signed this

23  document -- or was present whenever he signed this document,

24  correct?

25  A.   Correct.

                    Linda Mullen, RDR, CRR
            (304) 234-3947     PO Box 452, Wheeling, WV  26003

PAUL GERARD PELTS - CROSS                          133

1   Q.  And had reviewed this document; that would be important to
2   you, correct?
3   A.  Correct.
4   Q.  Because she wouldn't let him sign something that she
5   didn't think was okay, correct?
6            MR. SIMS:  Objection.
7   A.  I can't speculate.
8            THE COURT:  Sustained.
9            MR. JONES:  Approach, Your Honor?  Have this marked
10  as the next defense exhibit.
11  Q.  Dr. Pelts, this is another release signed by Evan Harris,
12  correct?
13  A.  Correct.
14  Q.  And this one is signed in 2014, correct?
15  A.  Correct.
16  Q.  And you, again, would have provided records based upon
17  Evan Harris's signature on this document, correct?
18  A.  Correct.
19  Q.  And you agree it's a legal document, correct?
20  A.  Correct.
21           MR. JONES:  No further questions at this time, Your
22  Honor.
23           THE COURT:  Redirect?
24           MR. SIMS:  No, Your Honor.
25           THE COURT:  May the witness be excused?

---

PAUL GERARD PELTS - CROSS                          134

1            MR. SIMS:  Yes.
2            THE COURT:  Thank you.  Plaintiff may call his next
3   witness.
4            MR. SIMS:  Your Honor, may I have a two-minute
5   recess?
6            THE COURT:  You may.
7            (Recess taken 3:23 p.m. to 3:37 p.m.)
8            THE COURT:  Mr. Sims.
9            MR. SIMS:  Your Honor, I would move for the admission
10  of Plaintiff's Exhibit 6 and I don't have any other witnesses,
11  Your Honor.
12           THE COURT:  Any objection to 6?
13           MS. SAAD:  No, Your Honor.
14           MR. JONES:  And, Your Honor, we would move for the
15  admission of Defendants' Exhibits C and D.
16           THE COURT:  All right.  Plaintiff's 6, Defendants' C
17  and D will be admitted into evidence.
18           MR. SIMS:  No objection, Your Honor.
19           [Plaintiff's Exhibit 6 and Defendants' Exhibits C and
20  D were admitted.]
21           THE COURT:  I assume there's no objection to them
22  calling no further witnesses.
23           Welcome back, Mrs. Harris.  And defense may call its
24  first witness.
25           MS. SAAD:  Your Honor, on that point, we may call

---

AUDREY PEAVEY - DIRECT                             135

1   Kathy Harris still in the future and would like for her to
2   continue being sequestered.  We have one witness we are going
3   to call and we would like her to be sequestered through that
4   witness, and then we will make the determination of whether to
5   her call her.
6            THE COURT:  Who is your witness?
7            MS. SAAD:  Your Honor, next we will call Audrey
8   Peavey.
9            THE COURT:  All right.
10           THE CLERK:  If you'll come over here first and state
11  and spell your name for the court reporter.
12           THE WITNESS:  Audrey Peavey.  A-u-d-r-e-y,
13  P-e-a-v-e-y.
14           AUDREY PEAVEY, DEFENSE WITNESS, SWORN
15               DIRECT EXAMINATION
16  BY MS. SAAD:
17  Q.  Good afternoon.  Would you please state your full name for
18  the record, please.
19  A.  Audrey Ann Peavey.
20  Q.  Where do you work?
21  A.  Q&A Associates.
22  Q.  What is your role and position there?
23  A.  I'm the admissions and marketing director, as well as
24  parent coach.
25  Q.  And in November of 2015, what was your role at Q&A?

---

AUDREY PEAVEY - DIRECT                             136

1   A.  I was the admissions and marketing director.
2   Q.  And prior to -- well, how long have you been with Q&A?
3   A.  Since fall of 2013.
4   Q.  Have you been in the role of admissions that entire --
5   your entire work period at Q&A?
6   A.  Yes.
7   Q.  And prior to coming to work at Q&A, have you worked in
8   admissions for other similar programs?
9   A.  Yes.
10  Q.  And give us roughly how many years have you worked in
11  admissions for this type of industry?
12  A.  About 16, 17 years.
13  Q.  Okay.  And in your role of admissions at Q&A, do you have
14  interactions with the parents of clients?
15  A.  Yes.
16  Q.  And what type of interactions do you have?
17  A.  Phone conversations, emails, sometimes face-to-face
18  meetings if they come to tour.
19  Q.  Is it your role that you try to help acquire the
20  information that Q&A needs to evaluate a client, also provide
21  information to the client and the client's family?
22  A.  Yes.
23  Q.  Do you recall being involved in the admission process for
24  Evan Harris?
25  A.  Yes.