# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA
# ELKINS

**FRIEDRICH HARRIS, Administrator**
**of the Estate of Evan M. Harris,**

    Plaintiff,

v.                                                    Civil Action No. 2:16-CV-46
                                                      (BAILEY)

**Q&A ASSOCIATES, INC., et al.,**

    Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before this Court is the Defendants' Motion for Summary Judgment [Doc. 67], filed March 7, 2018. The matter is now fully briefed and ripe for review.

## BACKGROUND

On January 24, 2016, Evan Harris ("Evan") committed suicide while participating in Q&A Associates, Inc.'s ("Q&A") "troubled teen" program, The Journey WV ("Journey") [Id., ¶¶ 15-94]. Prior to his untimely death, the evidence presented demonstrates that Evan was a deeply troubled young man who, as of August 18, 2015, had eight different diagnoses, including Bipolar I Disorder and Depression [Doc. 26-1, ¶ 11]. These diagnoses accumulated at an early age, and worsened as he grew older. Evan's parents ("the Harrises") placed him in a variety of programs and special learning schools throughout his life before his placement at Journey. Evan's records reflect consistent issues with planning, memory, emotional regulation, anger, and self-destructive episodes. As a result of his issues with anger and emotional regulation, Evan would be hospitalized

for mental health issues multiple times, including once after an instance of violence towards his father.

Evan was enrolled in and eventually graduated from a high school that specialized in special education, the Bachman Academy. Evan was suspended multiple times for fighting with other students and disrespecting adults [Doc. 26, p. 4]. His course work at the Academy was directed towards preparing him for independent living, including classes in math, woodworking, and mechanics. During the summer of 2009, Evan would be hospitalized after his parents discovered he was engaging self-harm behaviors. After his discharge, Evan was sent to another residential treatment program, the Meridell Achievement Center, where he was prescribed lithium to treat manic depression and bipolar syndrome. This appeared to bring an end to or at least curb his fits of rage.

Evan eventually graduated from the Bachman Academy and returned home to live with his parents for three years, but it became clear to his family over this time that he did not have the ability or skills to live independently and it was not feasible for him to continue to live at home [Doc. 26-4]. Evan undertook several part-time or volunteer jobs over this period, none of which were successful. For example, Evan briefly worked at Rouses, a local grocery store, but was fired after he "started testing the edges" of what he could and could not do at work, and a staffing change resulted in a new boss who was less forgiving of the work-related things that Evan did not do [Doc. 61, p. 25]. Evan's parents noted that many of their son's experiences at jobs and programs followed a general pattern—he "[d]id great initially, listened to everybody, was very respectful. Did everything they asked . . . [a]nd then he started to find out what he could get away with and what he didn't need to do." [Doc. 61, p. 30].

After Evan had lived at home for three years, his parents concluded that he needed full-time, specialized treatment, and consulted with a psychiatrist, Dr. Paul Pelts ("Dr. Pelts") and an educational consultant, Christie Woodfin ("Ms. Woodfin"). In February of 2015, the Harrises enrolled Evan in the Waterfall Canyon Academy [Doc. 26-3].

Evan did well in this program for several months, and began to develop independent living skills—he could cook for himself, do his own laundry, began attending a course at an applied technology school, and maintained a horticultural job at Weber State [Doc. 26, pp. 3–4]. His success at the program did not last long. Once Evan was able to access the money he earned from his job he used it to buy alcohol, and also began to clash with others at the program. In July of 2015, Evan began to cut himself when "he was upset that he was not able to identify or meet his birth parents" [Doc. 26, p. 5]. Eventually, in August of 2015, the head supervisor at Waterfall Canyon told Evan's parents that he could no longer control Evan, Evan did not listen anymore, Evan was becoming destructive, and he was irritating the other residents in the program [Doc. 61, p. 32].

In August of 2015, Evan's parents made arrangements for Evan to go to another program, Aspiro, and arranged for him to stay in a motel until then [Doc. 61, p. 32]. Evan, with help of some people he met online, sold his possessions and used the money to buy a bus ticket to Louisiana. Evan, with the help of a kind stranger, made it to Louisiana safely, and stayed at a motel near his home for one week until he was taken to Aspiro, an outdoor therapeutic program with heavy mentoring [Doc. 61, p. 34]. There, Evan lived outside with six peers and hiked, rock climbed, cooked, and worked to develop social skills.

Due to Evan's success in the Aspiro program, his parents, after consultation, decided to transfer him to a program that focused on developing skills to live

3

independently, under heavy mentorship and supervision—Journey. Evan's mother filled out portions of the intake paperwork, and noted that Evan had issues related to his adoptive parents, had previously engaged in cutting behaviors, became very homesick and wanted to return to Louisiana once he could live independently, and suffered from a host of psychological issues that required medication, including depression and bipolar I [Doc. 40-11].

Evan was required to provide a copy of his latest psychological evaluation to Journey prior to admission. The evaluation from Dr. Kevin Fenstermacher ("Dr. Fenstermacher"), a licensed psychologist, included a series of specific recommendations that emphasized the importance of familial support and connections with others to Evan's health. Dr. Fenstermacher noted that "his parents remain connected to Evan and are an important source of support for him," and that "interventions should be targeted at helping Mr. and Mrs. Harris' [sic] negotiate Evan's ambivalent push-pull developmental process as he works to gain confidence in his ability to function[] independently while simultaneously managing his fear of separating from his parents (and possibly losing them in the process)." [Doc. 40-6, p. 22]. In a similar vein, the report also recommends addressing the adoption-related issues from which Evan was clearly suffering [Doc. 40-6, p. 21].

At Journey, records reflect that Evan's progress and demeanor were inconsistent. He struggled to maintain relationships with his peers, continued to abuse alcohol, engaged in self-harming behaviors, and left the program site multiple times. Evan appears to have discussed most of these issues, at least superficially, with Jennifer Randall ("Randall") the local counselor that worked with Journey. Throughout his time in the program, Evan consistently expressed a desire to return to the Waterfall program [Doc. 70-3, pp. 19, 51,

4

68, 70]. On January 14, 2016, Angela Shockley ("Ms. Shockley") told Evan that Waterfall was not an option, and "if that was going to work, it already would have." [Doc. 70-3, p. 14]. Evan also indicated to multiple individuals that he was or had engaged in self-harming behaviors and expressed suicidal ideation [Doc. 70-3, pp. 24, 30, 32, 34, 60; Doc. 70-9]. Evan was also involved in a number of conflicts with the other program participants, and does not appear to have made significant connections [Doc. 70–3, pp. 21, 22, 23, 30, 31, 32, 37, 42, 56, 57]. During his time in the program, Evan became involved with another program participant, referred to as "DF," and wanted to be in a romantic relationship with her—the romantic relationship appeared to be a source of distress for Evan, and appears to have come to an end by at least January 18, 2016 [Doc. 70-3, pp. 12, 16, 30, 32].

On or about December 21, 2015, a program participant ("John Doe") was found hanging in the barn at Journey. The Harrises were told that "it was a single accident, no other students were involved" and "[f]rom a safety perspective, it was not a typical behavior the other clients would be engaged in." [Doc. 70-3, p. 39]. It does not appear that Evan had another session with Randall before his next weekly appointment on December 28, 2015. At that appointment, Evan informed Randall that he had self-harmed the previous week, but "denied suicidal ideation, plan, or intent." [Doc. 70-3, p. 30]. Evan told Randall that "he began to fantasize what his parents might do if he was suddenly gone and if they would understand his pain." [Id.].

On January 21, 2016, at Evan's last therapy appointment, Randall described Evan as "shut down both physically and emotionally today," and noted that he "was almost monosyllabic in most of his responses and had a hard time staying present in the conversation." [Doc. 70-3, p. 8]. On January 23rd and 24th, Evan refused to do any of his

5

chores, including feeding the horses and sweeping [Doc. 70-3, p. 2]. On January 24, 2016, Evan was seen coming out of the barn in the morning, and then entering the barn alone at 2:11 p.m. [Id.]. Evan returned to the house for five to ten minutes, and then returned to the barn alone again [Id.]. Evan did not return. Around 3:00 p.m., his body was discovered hanging in the barn [Doc. 70-3, p. 2]. Ms. Shockley called Randall at 3:20 p.m. and notified her that Evan had died, and it appeared to be self-inflicted [Doc. 70-3, p. 1]. Ms. Shockley sent a text message to Tammy Robbins at 3:27 p.m. stating that she needed to come to the farm, and that Evan had hung himself [Doc. 70-3, p. 3]. Rick Harris was notified at 5:32 p.m. [Doc. 70-3, p. 3].

On June 10, 2016, Rick Harris, as the administrator of Evan Harris's estate, filed suit against Q&A, Angela Shockley, Keith Bishop, Matthew Shockley, Sandy Schmiedeknecht, and Tammy Robbins [Doc. 1]. Therein, the plaintiff asserted eleven claims: (1) intentional infliction of emotional distress; (2) negligence in performing assessments on Evan M. Harris; (3) negligent supervision of program participants; (4) negligent hiring of staff; (5) negligent training of staff; (6) negligent staffing levels; (7) negligent program design; (8) negligent program assessments; (9) negligent misrepresentations of fact; (10) intentional misrepresentations of fact; and (11) violations of the West Virginia Consumer Credit and Protection Act [Id.]. The defendants filed a Motion for Summary Judgment [Doc. 67] on March 7, 2018, seeking dismissal of all counts on the grounds that the plaintiff's claims require expert testimony, and no such expert testimony has been properly disclosed. The plaintiff responded on March 29, 2018 [Doc. 70], and argued that an expert witness was not required for the various claims of negligence and statutory violations.

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718–19 (4th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)), *cert. denied*, 502 U.S. 1095 (1992).

However, as the United States Supreme Court noted in *Anderson*, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250; *see also Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950))).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## ANALYSIS

The defendants ask this Court to grant summary judgment on all counts "because the Plaintiff has failed to identify an expert witness to support any theory of liability in this matter" and thus cannot sustain his burden of proof [Doc. 67]. In support, the defendants state that "the allegations in this case involve questions as to the duties owed by a young adult residential program and these questions are outside of the realm of knowledge of a lay witness or juror," and thus expert testimony is required. Specifically, the defendants assert that the plaintiff is required to "present expert testimony on the duties required in administering a young adult transitional program, causation as to the death of Evan Harris,

and any damages arising from Harris' death." [Doc. 67-1, p. 10]. This Court will address each count in turn.[1]

### A. Count One—Intentional Infliction of Emotional Distress

The plaintiff has asserted a claim for intentional infliction of emotional distress based on the actions of the defendant company and the individual defendants. Specifically, the plaintiff has alleged that the defendants, collectively, marketed their residential program at parents of troubled individuals despite having a program that was not developed to effectively help and protect those individuals [Doc. 1]. The defendants have generally argued that the plaintiff's claims must all fail because they lack necessary expert witness support. The plaintiff, in response, argues that an expert is not necessary to show intentional infliction of emotional distress. This Court agrees.

West Virginia law recognizes the intentional infliction of emotional distress as a separate cause of action. *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 375, 504 S.E.2d 419, 425 (1998). To succeed on such a claim, the plaintiff must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to

---

[1] The defendants have provided a statement of the facts based upon the plaintiff's complaint and stated "[t]hese allegations and characterizations are denied by the Defendants, but for the purpose [sic] this motion, these factual allegations amount to a wrongful death claim and derivative claims, which require the Plaintiff to come forth with expert witness opinions in support of his theories." [Doc. 67-1]. While the defendants have decided to condense the eleven counts into these two categories for the purpose of their motion, the Court will address each count individually, as each presents a different claim and requires different proof and support.

9

endure it.

*Id.* at 374, 504 S.E.2d at 424. "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Id.* at 378, 504 S.E.2d at 428. "Whether a defendant has acted intentionally or recklessly in inflicting emotional distress is usually a question of fact for the jury." *Id.* at 379, 504 S.E.2d at 429. To show causation, the plaintiff need only show "a 'logical sequence of cause and effect' between the actions of the defendant and the plaintiff's injury." *Id.* (quoting *Long v. City of Weirton*, 158 W.Va. 741, 761, 214 S.E.2d 832, 848 (1975)). "Although expert testimony may be a helpful and effective method of proving emotional distress and its relationship to the act complained of, it is not always necessary." Syl. Pt. 4, *Tanner v. Rite Aid of West Virginia*, 194 W.Va. 643, 461 S.E.2d 149 (1995).

The defendants have not challenged the factual sufficiency of the claim, only the viability of the claim without expert support—under West Virginia law, such expert support is generally not required, and in this case, is not necessary. The plaintiff alleges that the defendants, who were in a position of authority and trust, cut Evan off from his familial support, allowed him to go to a barn where John Doe had recently committed suicide alone, lied to the parents of program participants about the cause of the John Doe's death, allowed Evan to drink and smoke, and failed to supervise Evan, despite his erratic behavior and the wishes of his parents, all the while continuing to charge his parents $9,500.00 a month for their services.

Such conduct could reasonably be considered outrageous, and expert testimony is

not needed to show how the alleged acts caused severe emotional distress. Accordingly, the defendants' motion for summary judgment is denied as to this count.

### B. Negligence Counts

The plaintiff has asserted a variety of claims sounding in negligence. The defendants have generally asserted that the plaintiff's claims all require expert testimony to establish the standard of care applicable in a youth residential program and for causation. The Court will first discuss general principles, and then address each count in light of the general principles.

Whether expert testimony is necessary in a particular case depends upon "a variety of factors readily apparent only to the trial judge." *Krizak v. W.C. Brooks & Sons, Inc.*, 320 F.2d 37, 42 (4th Cir. 1963). The West Virginia Supreme Court has emphasized that even in medical malpractice cases, "the circuit court has the discretion to determine whether the plaintiff is required to obtain an expert witness." *Short v. Appalachian OH-9, Inc.*, 203 W.Va. 246, 253, 507 S.E.2d 124, 131 (1998). Expert testimony is not required "in cases involving negligence claims within the jury's common knowledge as nonmedical laypersons." *Id.* Specifically,

> The standard of nonmedical, administrative, ministerial or routine care in a hospital need not be established by expert testimony, because the jury is competent from its own experience to determine and apply a reasonable care standard.

Syl. Pt. 9, *McGraw v. St. Joseph's Hosp.*, 2001 W.Va. 114, 488 S.E.2d 389 (1997).

While "[i]t is the general rule that want of professional skill can be proved only by expert witnesses . . . cases may arise where there is such want of skill as to dispense with expert testimony." Syl. Pt. 3, *Totten v. Adongay*, 175 W.Va. 634, 337 S.E.2d 2 (1985)

11

(internal quotations omitted). The West Virginia Supreme Court has previously noted a distinction between cases that are, very simply put, medical negligence and medical-adjacent negligence—"[a] private hospital may be held liable for injuries sustained by a patient as a result of the mere negligence of a physician employed by the hospital, as distinguished from the physician's unskillful treatment of the patient." *Duling v. Bluefield Sanitarium, Inc.*, 149 W.Va. 567, 582, 142 S.E.2d 754, 764 (1965). In such a circumstance, the merely negligent professional is not measured by the same standard as the unskillful professional. Rather, the merely negligent professional is measured by the ordinary reasonable person standard, which a jury is certainly competent to consider. Finally, under West Virginia law, "expert testimony is not always necessary to prove causation." *Spencer v. McClure*, 217 W.Va. 442, 447, 618 S.E.2d 451, 456 (2005).

1. Count Two—Negligence in Performing Assessments

The plaintiff has asserted a negligence claim based on the defendants' alleged failure to conduct a proper assessment of Evan to determine whether he was a proper candidate for their program before accepting him, and failed to conduct any formal assessments during his time in the program to determine the same. The defendants, again, have broadly argued that expert testimony is required for all counts, presumably as to this count "[b]ecause of the complex nature of the duties and obligations of a young adult transitional program in which the goal is to cultivate independence." [Doc. 67-1].

In this case, expert testimony is unnecessary—this is not a complicated question outside of the province of the jury. While the defendants appear to construe the plaintiff's claim as being rooted in professional negligence, the plaintiff does not allege that the

defendants' conduct fell below the standard of care exercised by other reasonable unlicensed residential care professionals in the area. Rather, the plaintiff alleges that the defendants' acts and omissions constituted simple negligence: specifically, the plaintiff has argued that the defendants advertised the residential program as one for troubled individuals and should have competently screened Evan Harris before and after his admission to the program but failed to do so, and as a result the defendants' staff was not adequately aware of his psychological problems, directly and proximately causing his death. The plaintiff further identifies that the psychological report, which was requested by the defendants and detailed Evan Harris' needs, was allegedly circulated by email, but no such email was ever produced in discovery, and the recommendations were not implemented. The plaintiff has not presented a complicated question as to the adequacy or accuracy of a psychological evaluation, but simply alleges that an evaluation should have been done before his admission given the nature of the program and it was not done. This is not a question that falls outside the purview of the jury. As such, the Court declines to grant summary judgment as to this count.

2. Count Three—Negligent Supervision of Program Participants

The plaintiff argues that the defendants had a duty to supervise Evan based upon the representations made to his parents and the Parent Handbook, and breached this duty by failing to supervise. In support, the plaintiff identifies various pieces of evidence showing that Evan was largely unsupervised, and evidence showing that he entered the program with the understanding that such supervision would be provided. The plaintiff has further argued that the harm was foreseeable, because the defendants were aware that Evan was deteriorating mentally and that another program participant had committed

13

suicide in the same place and manner one month prior.

Again, this is not a complicated question of professional or medical standards. The plaintiff has alleged and adduced facts—the sufficiency of which was not challenged—for the jury to consider and ultimately determine whether the defendants were negligent in their supervision of Evan. As such, this Court declines to grant summary judgment as to this count.

### 3. Count Four—Negligent Hiring of Staff

The plaintiff has asserted a claim for negligent hiring of staff and argued that the defendants had a duty to hire staff members who were capable of assisting program participants and did not do so [Doc. 1]. The plaintiff further argues, in response, that expert testimony is not required because the defendants' employees were supposed to be watching Evan Harris, as set out in the Parent Handbook, and did not do so. Again, it is unclear precisely what the defendants argue requires expert testimony.

The West Virginia Supreme Court has provided that the relevant inquiry in a negligent hiring or retention case is,

> when the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*McCormick v. West Virginia Dept. of Public Safety*, 202 W.Va. 189, 193, 503 S.E.2d 502, 506 (1998) (quoting *State ex rel. West Virginia State Police v. Taylor*, 201 W.Va. 554, 560 n. 7, 499 S.E.2d 283, 289 n. 7 (1997)). "[A] primary question in determining whether an employer may be held liable, based on a theory of negligent hiring or retention,

14

is the nature of the employee's job assignment, duties and responsibilities—with the employer's duty with respect to hiring or retaining an employee increasing, as the risks to third persons associated with a particular job increase." *Id.* at 194, 503 S.E.2d at 507 (citing *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 913 (Minn. 1983)).

The plaintiff's argument can be summarized quite simply—the defendants provided certain guarantees about the program and failed to hire individuals who complied with those guarantees. The question is not whether a reasonable unlicensed residential youth living facility would have hired more psychologists, but whether such a program that advertised itself as providing 24/7 mentoring and a safe environment for troubled individuals should have employed a staff that could carry out the program goals and comply with those guarantees. Because there is no reason to believe that expert testimony would be necessary for a jury, this Court declines to grant summary judgment as to this count.

### 4. Count Five—Negligent Training of Staff

The plaintiff argues that the defendant company was negligent in training its employees as to the needs of Evan Harris. Specifically, the plaintiff has stated that the psychological evaluation that the defendants required contained a number of recommendations to protect and adequately care for Evan, and these recommendations were not implemented. The defendants, again, have broadly asserted all eleven claims are either wrongful death or derivative claims, and require expert testimony as to the professional standard of care applicable to a residential youth home.

The crux of the issue, however, appears to be one that does not require expert testimony—again, the question is not about the adequacy of program measures, but the

absence thereof. It is unclear from the record what training, if any, the staff of the facility had, and the plaintiff identifies, without any specific, evidence based dispute from the defendants, various circumstances in which the defendants' staff was not equipped to deal with Evan despite having received a psychological report detailing his needs. The defendants' bare assertion that expert testimony is required is insufficient to justify granting summary judgment.

### 5. Count Six—Negligent Staffing Levels

Neither the defendants in their motion or the plaintiff in his response specifically address this count. The plaintiff essentially alleges that the defendants had a duty to adequately staff their program, and did not do so because of the cost, and as a result the program was not prepared to help participants like Evan Harris or prevent his foreseeable death [Doc. 1]. Without addressing the merits of the claim—as the defendants have only challenged the lack of and necessity for expert testimony—the Court concludes that while expert testimony might be helpful to a jury, it is not necessary. It is within the province of the jury to consider whether a program that advertised itself to troubled youths and adults and took on participants with mental illness and histories of self-harming behaviors had a duty to hire medical professionals rather than working with a local counselor, or to simply to hire more staff, and whether they failed to do so. As such, summary judgment is denied as to this count as well.

### 6. Count Seven—Negligent Program Design

The plaintiff has alleged a claim of negligence based upon the defendants' program design. Specifically, the plaintiff argues that the defendants required a copy of any recent psychological evaluation so as to tailor the program to the needs of participants, and failed

16

to do so. As a result of this failure, the plaintiff argues, Evan died, and his suicide was foreseeable in light of the prior suicide at the facility and his deteriorating behaviors.

While the defendants broadly assert that expert testimony is required for all claims, it is similarly unclear as to this count what expert testimony would be necessary for the jury. While this Court agrees that suicide, at its core, is not a simple matter, the defendants have failed to carry their burden as the moving party on summary judgment and have not convinced this Court that an expert witness would be necessary or even helpful to the jury. As such, this Court again declines to grant summary judgment on this count.

### 7. Count Eight—Negligent Program Assessments

The plaintiff asserts a claim of negligence based upon the failure to perform any assessments of the Journey program. Specifically, the plaintiff argues that the defendants did not perform a program assessment to determine whether it would be effective for individuals like Evan Harris, but still marketed the program to his parents as a safe option for him. The plaintiff states that "[r]easonably prudent program designers for participants like Evan M. Harris would perform proper assessments of those programs to ensure that the programs were tailored to assist those participants, especially in light of the psychological evaluation that Defendants required for him." [Doc. 1].

While this claim initially appears to sound in professional negligence, on further examination, it is far more akin to the aforementioned professional-adjacent negligence that a layperson on the jury could understand—for example, the question of whether a hospital that advertised itself as a reliable and safe option for heart surgery owed a duty to assess whether their heart surgery program was actually safe is an entirely different and far more simple question than whether that same hospital's evaluation of its heart surgery

17

program, which revealed it to be safe and reliable, was accurate or properly performed. Here, the issues are not whether the program assessments were adequate or accurate, but whether the defendants had an obligation to perform a program assessment before marketing it to the parents of troubled youths and adults, whether the defendants failed to comply with that obligation, and whether that failure was the proximate and direct cause of Evan Harris's death. The defendant has not specifically identified what in this count requires expert testimony for the jury to understand, and it is not clear to this Court.

Accordingly, the Court concludes that expert testimony is not necessary, and declines to grant summary judgment as to this count.

### C. Counts Nine & Ten—Negligent and Intentional Misrepresentations of Fact

The plaintiff has alleged claims of negligent and intentional misrepresentations of fact based upon several guarantees made by the defendants, including that they had sufficient staff to ensure Evan's safety and progress, that Evan would be supervised, and that assessments would be done of Evan's progress and shared with his parents [Doc. 1].

The plaintiff further argues that these were intentional misrepresentations, and that the defendants intentionally misrepresented facts when they told the Harrises that John Doe had died in an accident, that there was no concern for other participants, that Evan was doing well, and that the Harrises needed to cut off their son so that he could become independent. As to negligent misrepresentations, the plaintiff alleges that the defendants knew that their program was ineffective, that deaths had resulted in previous locations the individual defendants had worked at, and that the Harrises had a right to know about the risks of this type of program before sending their son there. Again, the defendants have only argued broadly that the entirety of the claims require expert testimony. The Court

18

cannot identify a reason why this would be the case.

Under West Virginia law, a claim for negligent misrepresentation of fact exists where a person "under a duty to give information to another . . . makes an erroneous statement when he has no knowledge on the subject, and thereby misleads another to his injury." *Folio v. Clarksburg*, 221 W.Va. 397, 405, 655 S.E.2d 143, 151 (2007) (quoting Syl. Pt. 1, *James v. Piggott*, 70 W.Va. 435, 64 S.E. 667 (1910)). "Fraud includes intentional misrepresentation and the elements required to prove each tort overlap." *Fifth Third Bank v. McClure Properties, Inc.*, 724 F.Supp.2d 598, 610 (S.D. W.Va. 2010) (Chambers, J.) (citing Syl. Pt. 6, *Folio v. City of Clarksburg*, 221 W.Va. 397, 655 S.E.2d 143 (2007)). A successful fraud claim requires a showing:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

Syl. Pt. 2, *Jennings v. Farmers Mut. Ins. Co.*, 224 W.Va. 636, 687 S.E.2d 574 (2009).

As the defendants have not shown that there is no genuine issue of fact and argue only as to the necessity of expert testimony, the Court will not address the merits of the claims. The questions of whether the defendants negligently or intentionally misrepresented facts is not a matter that a jury would need expert testimony for, it is merely the kind of factual question that juries, with proper instructions of law, are regularly tasked with addressing. Accordingly, the Court denies summary judgment as to both counts.

### D. Count Eleven—West Virginia Consumer Credit and Protection Act

The plaintiff has alleged that the defendants committed several violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA") and that expert testimony

19

is not required to prove violation of the act. The defendants did not respond to this argument. On consideration of the record and relevant law, this Court concludes again that expert testimony is not required. Juries regularly deliberate on violations of this section without the need for expert testimony, and there is no such unique, complex circumstance in this case that would justify deviating from the usual approach.

## **CONCLUSION**

Because the defendants have failed to show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law, this Court concludes that the Defendants' Motion for Summary Judgment should be, and is, hereby **DENIED [Doc. 67]**.

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order to all counsel of record.

**DATED:** May 16, 2018.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE